No. 23-2531

_____

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

_____

KEVIN JOHNSON,

*Appellant*,

v.

SUPERINTENDENT MAHANOY, ET AL.,

*Appellees*.

_____

On Appeal from the July 24, 2023, Order of the United States
District Court for the Eastern District of Pennsylvania (Robreno, J.),
No. 13-cv-03197, Denying Petition for Writ of Habeas Corpus

_____

## INITIAL BRIEF FOR APPELLANT & JOINT APPENDIX, VOLUME I

_____

CLAUDIA B. FLORES
Supervising Attorney,
Non-Capital Habeas Unit
LISA EVANS LEWIS
Chief Federal Defender

Federal Community Defender Office for the
Eastern District of Pennsylvania
601 Walnut Street, Ste. 540 West
Philadelphia, PA 19106
215-928-1100

NILAM A. SANGHVI
Pennsylvania Innocence Project
1515 Market Street, Ste. 300
Philadelphia, PA 19102
215-204-4255

DAVID RUDOVSKY
Kairys, Rudovsky, Messing,
Feinberg, & Lin LLP
718 Arch Street, Ste. 501 South
Philadelphia, PA 19106
215-925-4400

# TABLE OF CONTENTS

**PAGE**

Table of Authorities ........................................................................ iv

Jurisdictional Statement ................................................................... 1

Statement of Related Cases and Proceedings ........................................... 2

Statement of the Issues ..................................................................... 2

Statement of the Case ...................................................................... 4

    I.     Facts Relevant to the Issues on Appeal ............................................. 4

           A.    Lyndon "Cowboy" Morris's Murder ...................................... 4

           B.    The Identifications ..................................................... 5

           C.    The Alibi .............................................................. 8

           D.    The Alleged Motive .................................................... 9

           E.    Johnson's Conviction and Sentence ................................... 10

           F.    The Recantations ..................................................... 11

                  1.  James Smith ..................................................... 11

                 2.  Angelo Smith .................................................... 11

                  3.  Opal Nickson .................................................... 12

                  4.  Elisha Bennett ................................................... 13

            G.    The Suppressed Arrest Photographs ................................. 13

II.     Procedural History ............................................................. 14

III.    Ruling Under Review ...................................................... 17

Summary of the Argument ...................................................... 17

Standard of Review ................................................................... 19

Argument ................................................................................... 21

I.      The District Court Erred by Failing to Excuse Procedural Default
        with Respect to Two of the Three *Brady* Claims ............................ 21

        A.    The District Court Was Bound by the Commonwealth's
              Waiver of Procedural Defenses ................................. 21

        B.    The District Court Abused its Discretion in Rejecting the
              Waiver ............................................................. 24

        C.    Cause and Prejudice Excuse Procedural Default ................... 25

        D.    Alternatively, PCRA Counsel's Ineffectiveness Excuses Any
              Procedural Default ................................................ 30

II.     Johnson Is Entitled to Habeas Relief ................................. 33

        A.    The Commonwealth Suppressed Material Exculpatory and
              Impeaching Evidence in Violation of *Brady v. Maryland* ...... 33

              1.  The Suppression of Johnson's Arrest Photographs ........... 34

              2.  The Suppression of Angelo Smith's Failure to Identify
                  Johnson at Trial ................................................ 38

3. The Suppression of Opal Nickson's Statements to Investigators About the Perpetrator's Complexion ........... 39

4. The Cumulative Prejudicial Impact of the Commonwealth's Suppression of Exculpatory Evidence ............................... 41

B. Johnson's Trial Counsel Rendered Ineffective Assistance ...... 44

C. Johnson Is Entitled to Habeas Relief Due to the Cumulative Prejudice Caused by the Constitutional Violations ................. 46

Conclusion ........................................................................................... 50

Certificate of Bar Membership

Certificate of Compliance

Certificate of Service

# TABLE OF AUTHORITIES

**SUPREME COURT OPINIONS**                                    **PAGE(S)**

*Banks v. Dretke,*
    540 U.S. 668 (2004) ........................................................ 25-26, 27, 34

*Berger v. United States,*
    295 U.S. 78 (1935) ........................................................ 25

*Brady v. Maryland,*
    373 U.S. 83 (1963) ........................................................ 21

*Brumfield v. Cain,*
    576 U.S. 305 (2015) ........................................................ 20

*Christian Legal Soc'y Chapter of the Univ. of Cal. Hastings, Coll. of the Law v.
Martinez,*
    561 U.S. 661 (2010) ........................................................ 4, 5, 6

*Cone v. Bell,*
    556 U.S. 449 (2009) ........................................................ 21

*Day v. McDonough,*
    547 U.S. 198 (2006) ........................................................ 22, 23

*Granberry v. Greer,*
    481 U.S. 129 (1987) ........................................................ 24

*Kyles v. Whitley,*
    514 U.S. 419 (1995) ........................................................ *passim*

*Martinez v. Ryan,*
    566 U.S. 1 (2012) ........................................................ 30

*McQuiggin v. Perkins,*
    569 U.S. 383 (2013) ........................................................ 32

*Schlup v. Delo,*
    513 U.S. 298 (1995) ........................................................ 33

*Smith v. Cain,*
    565 U.S. 73 (2012) ........................................................ 44

*Strickland v. Washington*
    466 U.S. 668 (1984) ............................................ 31, 45, 46

*Wearry v. Cain*,
    577 U.S. 385 (2016) (*per curiam*) ................................. 44

*Williams v. Taylor*,
    529 U.S. 362 (2000) ............................................... 20

*Wood v. Milyard*,
    566 U.S. 463 (2012) ........................................ 22, 23, 24

**FEDERAL COURT OPINIONS**

*Abdul-Salaam v. Sec'y, Pa. Dep't of Corrs.*,
    895 F.3d 254 (3d Cir. 2018) ...................................... 46

*Albrecht v. Horn*,
    485 F.3d 103 (3d Cir. 2007) ...................................... 47

*Bennett v. Superintendent Graterford SCI*,
    886 F.3d 268 (3d Cir. 2018) ...................................... 21

*Blystone v. Horn*,
    664 F.3d 397 (3d Cir. 2011) ...................................... 19

*Bracey v. Superintendent Rockview SCI*,
    986 F.3d 274 (3d Cir. 2021) .................................. 27, 28

*Breakiron v. Horn*,
    642 F.3d 126 (3d Cir. 2011) ...................................... 21

*Christy v. Horn*,
    115 F.3d 201 (3d Cir. 1997) ...................................... 22

*Cox v. Horn*,
    757 F.3d 113 (3d Cir. 2014) ...................................... 20

*Dennis v. Sec'y, Pa. Dep't of Corrs.*,
    834 F.3d 263 (3d Cir. 2016) (*en banc*) ..................... *passim*

*Haskins v. Superintendent Greene SCI*,
   755 F. App'x. 184 (3d Cir. 2018) (*per curiam*) .......................................... 44-45

*Howell v. Superintendent Albion SCI*,
   978 F.3d 54 (3d Cir. 2020) .............................................................. 49

*Hull v. Freeman*,
   932 F.2d 159 (3d Cir. 1991) ............................................................ 22

*Jacobs v. Horn*,
   395 F.3d 92 (3d Cir. 2005) ............................................................. 21

*Kennedy v. Superintendent Dallas SCI*,
   50 F.4th 377 (3d Cir. 2022) ............................................................ 23

*Lambert v. Blackwell*,
   387 F.3d 210 (3d Cir. 2004) ............................................................ 34

*Long v. Wilson*,
   393 F.3d 390 (3d Cir. 2004) ............................................................ 23

*Marshall v. Hendricks*,
   307 F.3d 36 (3d Cir. 2007) ............................................................. 47

*McMullen v. Tennis*,
   562 F.3d 231 (3d Cir. 2009) ............................................................ 20

*Morris v. Horn*,
   187 F.3d 333 (3d Cir. 1999) ............................................................ 20

*Orie v. Sec'y Pennsylvania Dep't of Corr.*,
   940 F.3d 845 (3d Cir. 2019) ............................................................ 23

*Sharrieff v. Cathel*,
   574 F.3d 225 (3d Cir. 2009) ........................................................ 23-24

*Smith v. Horn*,
   120 F.3d 400 (3d Cir. 1997) ........................................................ 24-25

*Szuchon v. Lehman*,
  273 F.3d 299 (3d Cir. 2001) ........................................................ 24, 33

*Tapia-Felix v. Sessions*,
  755 F. App'x. 602 (9th Cir. 2018) ........................................................ 4

*Waldorf v. Shuta*,
  142 F.3d 601 (3d Cir. 1998) ........................................................ 4

*White v. Vaughn*,
  2022 WL 4080760 (E.D. Pa. Sept. 6, 2022) ................................................ 28-29

*Williams v. United States*,
  879 F.3d 244 (7th Cir. 2018) ........................................................ 24

*Workman v. Superintendent Albion SCI*,
  915 F.3d 928 (3d Cir. 2019) ........................................................ 32, 31

**FEDERAL STATUTES**

28 U.S.C. § 2241 ........................................................ 1

28 U.S.C. § 2254 ........................................................ 1, 20, 22

**STATE CASES**

*Commonwealth v. Johnson*,
  51 A.3d 237 (Pa. Super. Ct. 2012) (*en banc*) ........................................ 15, 16, 47

*Commonwealth v. Johnson*,
  2018 WL 2295655 (Pa. Super. Ct. May 21, 2018) ...................................... 16, 29

*Commonwealth v. Towles*,
  300 A.3d 400 (Pa. 2023) ........................................................ 29

**STATE STATUTES**

42 Pa. C.S. § 9545 ........................................................ 29

**STATE RULES** PAGE(S)

Pa. R. Evid. 803.1 ............................................................................ 42

**OTHER AUTHORITIES**

*Report of the United States Court of Appeals for the Third Circuit Task Force on Eyewitness Identifications*,
    92 Temple L. Rev. 1 (2019) (2019 Third Circuit Report) ................. 7, 9, 12, 14

James C. Bartlett & Amina Menon, *The Handbook of Eyewitness Psychology Vol. II: Memory for Events*, Chapter 13 (2007) .........................................................49

Jonathan P. Vallano, et al., *Familiar Eyewitness Identifications: The Current State of Affairs*, 25 Psychol. Pub. Pol'y & Law 128 (2019)........................................49

**JURISDICTIONAL STATEMENT**

This is a habeas corpus action brought by a prisoner in state custody pursuant to 28 U.S.C. § 2254. Appellant Kevin Johnson filed a petition for a writ of habeas corpus on June 7, 2013. JA90.[1] On July 24, 2023, the District Court denied the petition. JA4. On August 22, 2023, Johnson filed a timely notice of appeal. JA1. The District Court granted a certificate of appealability (COA) on August 29, 2023. JA76. The District Court had jurisdiction pursuant to 28 U.S.C. §§ 2241 and 2254. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253.

---

[1] The joint appendix is cited as "JA" followed by the page number.

# STATEMENT OF RELATED CASES AND PROCEEDINGS

Counsel are unaware of any related cases.

# STATEMENT OF THE ISSUES

I.    Whether the District Court erred in rejecting the Commonwealth's carefully considered waiver of procedural defenses and whether it erred in finding procedural default.

The Commonwealth waived all non-jurisdictional bars to relief in the October 2021 Proposed Settlement Agreement (Agreement), and Johnson argued that the District Court should accept the waiver in his October 2022 and March 2023 briefs. JA320, 338-39, 428-31. The District Court ruled on this issue in its July 24, 2023 memorandum opinion. JA18-37.

II.    Whether the District Court erred in denying relief on Johnson's *Brady* claims, considered individually or cumulatively, for lack of materiality.

Johnson raised *Brady* claims in the September 2014 and May 2020 amendments to his petition; the claims were addressed in the Agreement and Johnson's October 2022 and March 2023 briefs. JA176-80, 310-11, 321, 339-43, 431-37. The District Court ruled on this issue in its July 24, 2023 memorandum opinion. JA21-31, 38-43.

III. Whether the District Court erred in determining that, in a case resting solely on eyewitness identifications, Johnson was not prejudiced when trial counsel failed to secure arrest photographs that directly contradicted eyewitness descriptions and failed to interview a key eyewitness.

Johnson presented these claims in the 2014 and 2023 amendments to his petition. JA180-82, 408-09. The District Court ruled on them in its July 24, 2023 memorandum opinion. JA54-62.

IV. Whether the District Court erred in determining that the cumulative effect of the suppression of evidence, trial counsel's ineffective assistance, and the prosecutor's misconduct did not warrant relief.

Johnson raised this claim in the 2013 amendment to his petition and his October 2022 and March 2023 briefs. JA156, 342-45, 437-39. The District Court ruled on it in its July 24, 2023 memorandum opinion. JA63-69.

# STATEMENT OF THE CASE

## I.  Facts Relevant to the Issues on Appeal[2]

### A.  Lyndon "Cowboy" Morris's Murder

In 1988, a jury convicted Kevin Johnson of first-degree murder, conspiracy, and possessing an instrument of crime for the 1986 murder of Lyndon "Cowboy" Morris. After the trial court ruled that it would be unlawful for the jury to consider the death penalty, Johnson was sentenced to life imprisonment without the possibility of parole. JA319 (Agreement ¶ 16). Johnson, who has always maintained his innocence of this crime, has now been incarcerated, with "an excellent institutional record," for over 37 years. JA317 (Agreement ¶ 5).

On October 8, 1986, two men shot Morris at Opal Nickson's home in Southwest Philadelphia, where Morris sold drugs from a bedroom. JA318 (Agreement ¶ 6). James Smith, who worked for Morris, opened the door on the night

---

[2] The parties agreed to the facts in the District Court. Although stipulations of law are not binding on the courts, "[i]t is a well-recognized rule of law that valid stipulations entered into freely and fairly, and approved by the court, should not be lightly set aside." *Waldorf v. Shuta*, 142 F.3d 601, 616 (3d Cir. 1998) (alteration in original; internal quotation marks omitted); *see also, e.g.*, *Tapia-Felix v. Sessions*, 755 F. App'x. 602, 604 (9th Cir. 2018) ("Factual stipulations, unlike legal stipulations, are ordinarily binding on the courts and 'are formal concessions . . . that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact.'") (quoting *Christian Legal Soc'y Chapter of the Univ. of Cal. Hastings, Coll. of the Law v. Martinez*, 561 U.S. 661, 676-78 (2010); alteration in original).

of the shooting; one man with a shotgun and one man with a pistol forced their way into the home and demanded to be taken to Morris's room. JA318 (Agreement ¶¶ 7-8). Once upstairs, the man with the shotgun followed Smith to the bedroom and fired at Morris as he opened the door. *Id.* (Agreement ¶ 8).

The man with the pistol went to the back bedroom, where Nickson, Angelo Smith, and Elisha Bennett were getting high on cocaine and marijuana. *Id.* (Agreement ¶ 9). At the doorway of that bedroom, he aimed his pistol at the occupants and ordered them to the floor; almost immediately, the light in the room went out and, hearing shotgun fire, the man with the pistol ran from the back bedroom and began firing in Morris's direction, evidently hitting him once. *Id.* (Agreement ¶ 10).

### B.  The Identifications

Within two days, Johnson was arrested as the man with the pistol. JA319-20 (Agreement ¶¶ 14-15, 22). No one else was ever arrested. "No physical evidence linking Johnson to the offense was found at the crime scene, nor were any weapons or drugs recovered when police arrested Johnson and searched his family home." JA319 (Agreement ¶ 13).

The police obtained identifications from Opal Nickson, James Smith, and Elisha Bennett *after* a tentative identification by Angelo Smith. *Id.* (Agreement ¶ 14). Angelo Smith reviewed a book of photos at 4:30 a.m. and told police that

although Johnson "looks like him, *I am not positive*." *Id.* (emphasis added); *see also* JA196 (A. Smith Statement). Angelo also stated that "if it comes down to where I see him again, I will identify him, he threatened my life to[o]." JA197 (A. Smith Statement). At 5:50 a.m., James Smith identified Johnson as one of the two perpetrators during his second interview with police. JA319 (Agreement ¶ 15); *see also* JA199 (Second J. Smith Statement). At 9:45 a.m., Elisha Bennett identified Johnson. JA319 (Agreement ¶ 15); *see also* JA206 (Bennett Statement). At noon, Opal Nickson identified Johnson. JA319 (Agreement ¶ 15); *see also* JA210 (Nickson Statement). Angelo Smith and James Smith both stated that the perpetrator had no facial hair. James Smith said, "*he was clean shaven*," JA192 (First J. Smith Statement) (emphasis added), and Angelo Smith said that he had "close cut hair, *no mustache or facial hair*." JA194-95 (A. Smith Statement) (emphasis added).

Angelo Smith did not know Johnson. *Id.* The other witnesses had little or no previous contact with him. Elisha Bennett testified that he had previously seen Johnson "[t]owards Woodland Avenue." JA1118-19 (Bennett Trial Testimony). Opal Nickson did "not really know" Johnson but knew "his face from around the neighborhood." JA629 (Nickson Prelim. Hr'g Testimony). James Smith had seen the man with the pistol "once, saw him a couple of times." JA744 (J. Smith Testimony).

The occupants of the back bedroom—Opal Nickson, Elisha Bennett, and Angelo Smith—described extremely poor conditions for an identification, including poor lighting, stress, focus on the pistol, a limited opportunity to view the man with the pistol, and heavy personal drug use. *See* JA194 (Angelo Smith's description of conditions to police); JA837-39, 848, 851, 886-88, 895, 900-01, 905, 909-10 (Nickson's testimony about conditions); JA1113, 1116, 1122, 1137-43 (Bennett's testimony about conditions).[3] Nickson and Angelo Smith specifically emphasized their focus on the gun. JA839 (Nickson: "Pointed it straight to my face"); JA848 (Nickson: "Like this, straight to my face"); JA195 (Angelo Smith: "After I saw the gun that is what I was looking at.").

For his part, James Smith told police that he saw the man with the pistol when he opened the door, and the man pointed the gun in his face. JA200. He confirmed that the man with the pistol told the occupants of the back bedroom to cut the lights, *id.*, and while he claimed he had only drunk a cooler that night, Nickson testified that James had been smoking crack before the shooting. *See* JA764 (J. Smith Testimony); JA887 (Nickson Testimony). Significantly, although James initially

---

[3] These factors render eyewitness identifications less reliable. *See generally 2019 Report of the United States Court of Appeals for the Third Circuit Task Force on Eyewitness Identifications*, 92 Temple L. Rev. 1, 19-21 (2019) (2019 Third Circuit Report).

told police that he "jumped the bannister" and fled the house after the man with the shotgun shot Morris, JA200-01, his account evolved by the time of trial. At trial he testified that he had additional opportunities to see part of the man with the pistol's face by glancing "sideways" at it as they walked up the stairs and, in contrast to his police statement, testified that he did not immediately flee after Morris was shot. JA705, 711-12. Instead, he stayed and saw the man with the pistol as he left the back bedroom and came "straight past" him. JA711-12, 738.

These identifications were the centerpiece of the Commonwealth's case against Johnson, and *no other evidence* linked him to Morris's murder. The prosecutor emphasized all four eyewitnesses' police statements to the jury in his opening statement, including the tentative identification of Johnson by Angelo Smith. *See* JA672-73. Angelo Smith ultimately did not testify. The prosecutor again emphasized the supposed strength of the identifications, all of which have now been recanted, as discussed below, in his closing argument. JA1488.

## C.    The Alibi

Upon his arrest, Johnson immediately told police that he had been with Ronald Crawford selling clothing in West Philadelphia on the night of Morris's death. JA318 (Agreement ¶ 12). At trial, Johnson testified that he had met with Crawford that evening, and he and Crawford went from one location to another throughout the evening, between 9:00 p.m. and midnight, to sell clothing to people Johnson knew

at various businesses in the area. JA1334-43. During his testimony, Johnson named at least 12 people and 10 different locations he visited, offering approximate times for each. *Id.* He testified that he and Crawford decided to "call it a day" after he met his cousin at a bar and she asked for a ride home. JA1341-43.

Johnson's attorney, who did not subpoena alibi witnesses until after the trial began, failed to properly investigate and call the witnesses who could place Johnson elsewhere at the precise time of the crime, including the main alibi witness, Crawford. JA1314; JA1326. In his cross-examination of Johnson, the prosecutor highlighted the alibi witnesses who had not been called and argued in closing that Johnson lied about his alibi. JA1355; JA1357; JA1360; JA1365; JA1493-94.

### D.    The Alleged Motive

At trial, the prosecutor repeatedly asserted—in the absence of any evidence—that Johnson was a hitman and that was the motive for murdering Morris. In his opening statement, the prosecutor described Johnson as a "muscle m[a]n" sent to "snuff out the little nothings" operating in their drug territory. JA665-66; *see also* JA327 (Agreement ¶ 52). On cross-examination, the prosecutor, without any evidentiary support, accused Johnson of being one of the "strongmen" for Ricky Nelson, "Big Roach, one of the bigger suppliers of drugs." JA1376-77. This line of questioning prompted the court to state that it was inclined to grant a motion for mistrial. JA1378.

Although it ultimately denied a mistrial, the trial court repeatedly admonished the prosecutor for this misconduct. The court stated that the prosecutor had brought out Johnson's alleged motive "in a way that violates every standard of professional conduct known to this court. You told me at sidebar that you were going to ask him if he knew Ricky Nelson. You went right back to the jury and screamed at the top of your lungs a question, aren't you a gunman for Roachie, the biggest drug supplier in Philadelphia. That's how you introduced this. You've got no right to do it that way. You've got no right to deceive me and counsel and you've got no right to introduce it in that manner." JA1417-18; *see also* JA1418 ("It couldn't be clearer that you intentionally deceived me").[4]

### E.     Johnson's Conviction and Sentence

During its deliberations, the jury asked to see Johnson's, Nickson's, and James Smith's statements, and for photographs and diagrams of the second floor of the house. The court provided the second-floor materials but not the statements. JA1582-83. After Johnson's conviction, the Commonwealth continued to press for the death penalty, but the court held that it had not established an aggravating factor. JA1589-93.

---

[4] The prosecutor, Robert Campolongo, had a history of similar misconduct in other cases. *See* JA328 (Agreement n.15) (detailing this history).

### F. The Recantations

In the decades since Johnson's conviction, the three witnesses who identified him have recanted—all pointing to police threats and a consistent tactic of pointing out Johnson's photograph and saying that others had already identified him. Moreover, Angelo Smith attested that he could not identify Johnson when he observed him in the courtroom.

#### 1. James Smith

In 2001, James Smith signed an affidavit stating that police "told me that everyone else had pick[ed] one of the photographs as one of the robbers who killed [C]owboy. I went along with picking out that photograph too because the detective told me if I didn't pick out one of those picture[s] I would be going to jail for murder. That's why I did it." JA214; *see also* JA324-25 (Agreement ¶ 46). In 2014, James signed a more detailed affidavit pointing to the same police tactics. JA219-20.

#### 2. Angelo Smith

In 2014, Angelo Smith provided two affidavits stating that he was subpoenaed to testify at trial but was told that his testimony was not needed when he could not identify Johnson as the man with the pistol. *See* JA215-16; JA221. In 2016, when interviewed by detectives during post-conviction proceedings, Angelo claimed to have signed the affidavit without reading it but "affirmed the most significant fact: that he did not testify at trial because he 'told the cops [he] didn't

recognize the guy in the courtroom.'" JA326 (Agreement n.12); *see also* JA356-58 (2016 A. Smith Statement). Lending support to Mr. Smith's statement that he came to court, the Commonwealth's files show approval of a $10.00 witness fee payment to Mr. Smith on February 23, 1988, for two days of attendance as a witness in this case. JA360.

### 3. Opal Nickson

In 2014, Opal Nickson signed an affidavit stating that she knew when she identified Johnson and testified against him that he was not the man with the pistol. JA 217 (2014 Nickson Aff.). She stated that, although Johnson "looked a little like the guy with the pistol," the perpetrator had darker skin. *Id.* She also said police threatened her with losing her children and home if she did not pick Johnson. *Id.*; *see also* JA325 (Agreement ¶ 47). Like James Smith, Nickson stated, "I only picked Kevin's picture after the police pointed to Kevin's picture and said Elijah Bennett, James Smith, and Angelo Smith had all picked Kevin as the guy with the pistol." JA217.

In 2016, when interviewed by detectives, Nickson stated she was certain that Johnson was the man with the pistol. JA326 (Agreement n.12); *see also* JA304-05 (2016 Nickson Statement). However, in 2019, when deposed for purposes of preserving her testimony in Johnson's federal habeas proceedings, Nickson stated that she suffered memory issues, but she was adamant on both direct and cross-

examination that Johnson was not the man with the pistol because he had lighter skin than that person. JA326 (Agreement n.12); *see also* JA250-51, 264-65, 271, 276-77 (2019 Nickson Testimony).

### 4. Elisha Bennett

In 2014, Bennett signed an affidavit stating, like James Smith and Nickson, that police told him others had already identified Johnson. JA326 (Agreement ¶ 48). He stated: "The police showed me some pictures, I don't really remember how many. They kept pointing to one picture and saying that my friends Angelo Smith, James Smith and Opal Nickson had all picked that picture as the guy who pointed a pistol at us the night before in Opal's house. They told me that if I didn't pick a picture I could get charges for drugs and murder." JA222-23 (2014 Bennett Aff.).

In Johnson's state post-conviction proceedings, his prior post-conviction attorneys attested that they had no strategic reason for not interviewing Opal Nickson, Angelo Smith, and Elisha Bennett after James Smith provided his 2001 affidavit. *See* JA567; *see also* JA319-20 (Agreement ¶ 18) ("Johnson's other PCRA counsel have both conceded they had no strategic reason for not investigating the eyewitnesses.").

### G. The Suppressed Arrest Photographs

On May 7, 2019, the Commonwealth produced previously withheld arrest photographs taken of Johnson approximately 36 hours after Morris's murder. *See* JA

313-15; *see also* JA461-66. These photographs show Johnson with a defined mustache, a height of 5'6", and weighing 114 pounds. JA313-15; *see also* JA325 (Agreement n.9). This is in stark contrast to the descriptions of the perpetrator as "*clean shaven*" and as having "*no mustache or facial hair*," JA192 (First J. Smith Statement) (emphasis added); JA195 (A. Smith Statement) (emphasis added), and to James's description of the man as being 6'1" tall. JA192.

## II.    Procedural History

Johnson's trial counsel continued to represent him for his direct appeal but failed to file a brief. JA319 (Agreement ¶ 17). The Disciplinary Board later found that trial counsel had failed in his duty to diligently represent Johnson. *Id.* Ultimately, Johnson's direct appeal was denied, and he filed a *pro se* Post Conviction Relief Act (PCRA) petition on December 3, 1996. His court-appointed attorney filed no further pleadings for nearly five years and was dismissed from the case in 2002 for "failure to pursue the matter." JA319 (Agreement ¶ 18). Johnson then retained counsel who amended the petition, but it was dismissed without a hearing on January 15, 2003.

On appeal, the Superior Court remanded for an evidentiary hearing on Johnson's claim that trial counsel was ineffective for failing to consult with him before trial, and any other issues, including Johnson's claim that his attorney was ineffective for failing to call alibi witnesses. Judge James Fitzgerald III presided over

14

an evidentiary hearing limited to the consultation claim in 2006. After Judge Fitzgerald left the bench, the case was reassigned to Judge Peter Rogers, who acknowledged trial counsel's "*professional and ethical*" failings and "admittedly meager consultation with the defendant" but dismissed the petition. JA474; JA482 (emphasis in original).

A Superior Court panel reversed and granted Johnson a new trial, finding that "Attorney Gallagher was ineffective in his representation of Johnson for failing to adequately consult with him before trial." JA516. However, the Superior Court sitting *en banc* affirmed the dismissal of the petition. *Commonwealth v. Johnson*, 51 A.3d 237 (Pa. Super. Ct. 2012) (*en banc*). In doing so, the majority "acknowledge[d] that more contact may have been advisable." *Id.* at 244.[5]

In a concurring opinion, then-Judge, now-Pennsylvania Supreme Court Justice Wecht stated that, "[a] fair review of the record in this case reveals that the attorney-client interactions were anything but substantive. Indeed, they were cursory and shallow. . . ." *Id.* at 247. As Justice Wecht stressed, in a capital trial where, "'the stakes can be no higher[;] [t]he punishment can be no more severe. . . . [Johnson's] lawyer visited [him] in jail exactly once.'" JA322 (Agreement ¶ 34) (quoting

---

[5] The majority opinion quotes the PCRA court's summary of the facts including, incorrectly, that both James Smith and Angelo Smith identified Johnson at trial. *See Johnson*, 51 A.3d at 239.

*Johnson*, 51 A.3d at 247) (Wecht, J., concurring). "That sole visit was no more than 15 to 20 minutes, on the eve of jury selection. Prior to trial, apart from no meaningful meeting, there also were no telephone calls between Johnson and counsel, and no letters from counsel responding to Johnson's writings." *Id.* (citing *Johnson*, 51 A.3d at 252). In citing the Commonwealth's "overwhelming" evidence as a basis for denying relief, the Superior Court did not have the benefit of the recantation evidence. *See Johnson*, 51 A.3d at 254.

On June 7, 2013, Johnson filed a *pro se* federal habeas petition. JA90. Appointed counsel amended the petition in November 2013, and supplemented it over the following years. *See generally* JA77-89 (docket entries). The District Court stayed the habeas proceedings to allow Johnson to litigate his recantation claims in state court, but the PCRA court dismissed the claims without a hearing in 2017, and the Superior Court affirmed in 2018. *See Commonwealth v. Johnson*, No. 1368 EDA 2017, 2018 WL 2295655 (Pa. Super. Ct. May 21, 2018).

Johnson's federal habeas proceedings remained stayed as the parties engaged in informal discovery and as Johnson filed another, counseled PCRA petition in state court in May 2020, related to the suppression of his arrest photographs. Johnson withdrew that petition in September 2021, and the parties filed an agreement recommending habeas relief in federal court in October 2021. JA316-33 (Agreement). In that agreement, the Commonwealth "waiv[ed] all non-jurisdictional

bars to relief, including exhaustion. . . ." JA320. The District Court held a hearing on Johnson's claims, appointed the Pennsylvania Attorney General to submit an *amicus* brief, and denied the petition. JA87-89 (docket entries).

## III. Ruling Under Review

The District Court accepted the Commonwealth's waiver as to Johnson's unexhausted claims, but it rejected the Commonwealth's waiver as to claims that were dismissed on procedural grounds. JA19. The court also held that Johnson could not overcome procedural default as to the claims not presented to the state courts and denied relief on the merits of all other claims. JA20-75. The court issued a certificate of appealability, stating that: "The court has determined that the Petitioner has made a substantial showing of the denial of a constitutional right, including regarding his arguments that his PCRA and trial counsel provided ineffective assistance." JA76.

**SUMMARY OF THE ARGUMENT**

The District Court committed multiple legal errors in denying Johnson's petition.

*First*, the District Court acted contrary to Supreme Court precedent in rejecting the Commonwealth's carefully considered waiver of its procedural defenses, a waiver that simply allowed Johnson to present the merits of all constitutional claims in one forum after his decade-long federal habeas proceedings.

In the alternative, even if the District Court were not required to accept the waiver, it erred in rejecting Johnson's arguments to overcome procedural default, including by erroneously injecting a requirement of diligence by the defense into its analysis of Johnson's defaulted *Brady* claims.

*Second*, the District Court erred in rejecting Johnson's *Brady* claims. The Commonwealth suppressed critical evidence, including Johnson's arrest photos showing he had a mustache just 36 hours after Morris's shooting, Angelo Smith's statement to investigators that he could not identify Johnson when he saw him in the courtroom, and Opal Nickson's statements to investigators that Johnson's skin was lighter than that of the man with the pistol. The District Court erroneously found this evidence was not material. However, in a case resting solely on eyewitness identifications, access to any one of these pieces of evidence would have given Johnson c material to impeach the identification witnesses and the quality of the investigation that led to his arrest. Significantly, the District Court addressed only the arrest photo claim on the merits and discussed the other two in the context of procedural default. Therefore, its erroneous procedural default ruling caused it to forego the required cumulative analysis of the materiality of these three pieces of evidence—an analysis that makes clear that Johnson's due process rights were violated.

*Third*, the District Court erred in rejecting the argument that trial counsel was ineffective for failing to obtain the exculpatory arrest photos, as they would have effectively impeached the eyewitness identifications, and for failing to interview Angelo Smith, who could have been called as defense witness. As with the *Brady* analysis, failure to present this evidence was clearly prejudicial in an identification case.

*Fourth*, again due to its flawed procedural default ruling, the District Court conducted only a truncated analysis of Johnson's claim that the cumulative prejudice of the multiple constitutional violations at his trial violated his rights. The state courts and the District Court identified serious problems with respect to suppression of exculpatory evidence, counsel's deficient performance, and the prosecutor's conduct. With the additional backdrop of the post-trial recantations, the cumulative prejudice of counsel's failings, the suppression of exculpatory evidence, and prosecutorial misconduct require habeas relief.

## STANDARD OF REVIEW

This Court's review of the District Court's resolution of the habeas claims is plenary, as the District Court did not hold an evidentiary hearing. *Blystone v. Horn*, 664 F.3d 397, 416-17 (3d Cir. 2011). A district court "abuses its discretion when it bases its decision upon a clearly erroneous finding of fact, an erroneous conclusion

of law, or an improper application of law to fact." *Cox v. Horn*, 757 F.3d 113, 118 (3d Cir. 2014) (citing *Morris v. Horn*, 187 F.3d 333, 341 (3d Cir. 1999)).

This Court's review is conducted under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). 28 U.S.C. § 2254. Where a state court adjudicated the merits of a claim, a federal court can grant relief only if the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," *id.* at § 2254(d)(1), or involved "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* at § 2254(d)(2); *see also Brumfield v. Cain*, 576 U.S. 305, 311 (2015).

A state court's decision is "contrary to" clearly established federal law if the state court (1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or (2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent" and reaches an opposite result. *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *McMullen v. Tennis*, 562 F.3d 231, 236 (3d Cir. 2009).

A state court's decision is an "unreasonable application" of federal law if the state court "unreasonably applies the correct legal rule to the particular facts, unreasonably extends a legal principle to a new context, or unreasonably refuses to

extend the principle to a new context where it should apply." *Breakiron v. Horn*, 642 F.3d 126, 131 (3d Cir. 2011) (internal quotation marks omitted).

AEDPA's deferential standards of review do not apply to federal claims that were not adjudicated on the merits by the state court. *Cone v. Bell*, 556 U.S. 449, 472 (2009); *Jacobs v. Horn*, 395 F.3d 92, 110-11 (3d Cir. 2005). For those claims, habeas review is de novo. *Cone*, 556 U.S. at 472; *Bennett v. Superintendent Graterford SCI*, 886 F.3d 268, 283 (3d Cir. 2018).

## ARGUMENT

## I. The District Court Erred by Failing to Excuse Procedural Default with Respect to Two of the Three *Brady* Claims

The District Court declined to consider two of Johnson's three due process claims made pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), finding that they were procedurally defaulted. The District Court erred in doing so because the Commonwealth waived its procedural defenses and, in the alternative, because Johnson's meritorious *Brady* claims and his actual innocence overcome procedural default. Significantly, because of its erroneous ruling, although the District Court ruled that the *Brady* evidence was suppressed and exculpatory, it did not engage in the mandated cumulative analysis of materiality. *See Kyles v. Whitley*, 514 U.S. 419, 421 (1995); JA43.

## A. The District Court Was Bound by the Commonwealth's Waiver of Procedural Defenses

The Commonwealth waived all procedural defenses for claims that were untimely, unexhausted, or procedurally defaulted. JA320 (Agreement ¶ 23). The District Court accepted the Commonwealth's waiver of timeliness and exhaustion and reviewed some claims *de novo*. JA19. However, the court refused to accept the Commonwealth's waiver for claims that were rejected by the state courts "on procedural grounds." *Id*.

The District Court acknowledged that respondents in habeas cases may "elect to waive procedural defaults" because "exhaustion is not a jurisdictional limitation." JA17; *see* 28 U.S.C. § 2254(b)(3). The court nevertheless rejected the waiver based on this Court's rulings in *Hull v. Freeman*, 932 F.2d 159, 164 (3d Cir. 1991), and *Christy v. Horn*, 115 F.3d 201, 207 n.3 (3d Cir. 1997). *See* JA17-18. This was error because the Supreme Court's subsequent decision in *Wood v. Milyard*, 566 U.S. 463 (2012), undermined both rulings.

In *Wood*, the Supreme Court held that the Court of Appeals abused its discretion by considering a statute of limitations defense waived by the state. 566 U.S. at 466. The Court concluded that "[a] court is *not* at liberty . . . to bypass, override, or excuse a State's deliberate waiver" of affirmative defenses. *Id.* (emphasis added) (citing *Day v. McDonough*, 547 U.S. 198, 202 (2006)). The Court further stated that even an *inadvertently forfeited* non-exhaustion argument should

only be considered "when extraordinary circumstances so warrant." *Id.* at 471 (citing *Day*, 547 U.S. at 201).

The District Court sought to distinguish *Wood* and related cases on the ground that they did not involve "the specific issue of a petitioner's failure to comply with a state court's statute of limitations." JA19-20. But the Supreme Court understood that it made "scant sense to treat AEDPA's statute of limitations differently from other threshold constraints on a federal habeas petitioner," as both "implicate values beyond the concerns of the parties." *Wood*, 566 U.S. at 472 (internal citations omitted); *see also Long v. Wilson*, 393 F.3d 390, 404 (3d Cir. 2004) ("AEDPA's statute of limitations advances the same concerns as those advanced by the doctrines of exhaustion and procedural default, and must be treated the same").

Moreover, to the extent the District Court cited federalism concerns in rejecting the waiver as to defaulted claims, JA19-20, this Court and other appellate courts have emphasized that accepting the Commonwealth's carefully considered waivers of procedural defenses respects the Commonwealth's "primary authority for defining and enforcing the criminal law." *Kennedy v. Superintendent Dallas SCI*, 50 F.4th 377, 382 (3d Cir. 2022) (internal citation omitted); *see also, e.g.*, *Orie v. Sec'y Pennsylvania Dep't of Corr.*, 940 F.3d 845, 854 (3d Cir. 2019) (accepting the Commonwealth's explicit exhaustion waiver); *Sharrieff v. Cathel*, 574 F.3d 225, 229 (3d Cir. 2009) (enforcing the Commonwealth's exhaustion concession even where

it was based on a flawed legal conclusion); *Williams v. United States*, 879 F.3d 244, 248 (7th Cir. 2018) (court was bound to accept the government's waiver of procedural default, citing *Wood* for the premise that "courts must respect the government's formal waivers of procedural defects in collateral cases").

### B.     The District Court Abused its Discretion in Rejecting the Waiver

Even if the District Court was not required to accept the Commonwealth's waiver of affirmative defenses, it abused its discretion in rejecting it. As noted above, even an inadvertent forfeiture of procedural defenses by a state should be rejected only in "exceptional cases." *Granberry v. Greer*, 481 U.S. 129, 134 (1987); *see also Wood*, 566 U.S. at 471. A court must consider several factors that limit its discretion to reject a waiver, including whether a miscarriage of justice would result. *See Szuchon v. Lehman*, 273 F.3d 299, 321 n.13 (3d Cir. 2001) (considering the "ends of justice," and explaining that a miscarriage of justice includes "cases where the record is well developed, and the merits strongly support the petitioner's claim.") (internal citations omitted); *Smith v. Horn*, 120 F.3d 400, 408 (3d Cir. 1997) (a "'miscarriage of justice' in [the procedural default] context should be defined somewhat more loosely than in the non-exhaustion context because '[u]nlike in exhaustion cases, if we decline to reach the merits in a procedural default case, the

defendant has no further recourse to either state or federal relief'") (internal citation omitted).

Here, the facts supporting the *Brady* claims were fully developed through declarations and depositions, there were no fundamental questions of state law at stake, and the Commonwealth sought to advance the interests of justice, based on "serious concerns about the fairness of Johnson's capital trial and the integrity of his conviction." JA328. The waiver was made "after a thorough review of the record and careful consideration . . . to allow this matter – which has been in near continuous litigation for over three decades – to reach a resolution, or if needed, be adjudicated on the merits in a forum where *all* of Petitioner's claims could be fully and fairly considered, and without further delay." JA521-22 (emphasis in original). As this Court has observed, the Commonwealth's interest "'in a criminal prosecution is not that [it] shall win a case, but that justice shall be done.'" *Dennis v. Sec'y, Pa. Dep't of Corrs.*, 834 F.3d 263, 290 (3d Cir. 2016) (*en banc*) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)).

## C. Cause and Prejudice Excuse Procedural Default

The District Court recognized that Johnson could overcome procedural default and establish cause and prejudice by presenting a meritorious *Brady* claim. JA21; *see Banks v. Dretke*, 540 U.S. 668, 691 (2004) ("[A] petitioner shows 'cause' when the reason for his failure to develop facts in state-court proceedings was the

State's suppression of the relevant evidence . . . prejudice within the compass of the 'cause and prejudice' requirement exists when the suppressed evidence is 'material' for *Brady* purposes") (internal citation omitted). Johnson's procedurally defaulted *Brady* claims regarding the suppression of Angelo Smith's and Opal Nickson's statements to investigators are meritorious, as the suppressed evidence was exculpatory. JA27, 29; *see also* Section II.A., *infra* (discussing *Brady* claims). In particular, with respect to Angelo Smith's avowal that he could not identify Johnson in court, the District Court found that it "would have been useful to the defense, especially given the misidentification and alibi theories that had been presented at trial," and that it "may have undercut the credibility of the three other witnesses." JA28.

The District Court erred by resolving the materiality issue on an irrelevant factor: that "trial counsel was on notice that Angelo Smith could have been an exculpatory witness, in light of his statement to the police, and failed to compel his attendance." JA27-28. Diligence is irrelevant to the *Brady* materiality analysis, and the court erred in "distinguishing" *Dennis*, where this Court stated that, "the United States Supreme Court has *never* recognized an affirmative due diligence duty of defense counsel as part of *Brady*, let alone an exception to the mandate of *Brady*." 834 F.3d at 290 (emphasis added). The "duty to disclose under *Brady* is absolute" and "does not depend on defense counsel's actions," as "defense counsel is entitled

to presume that prosecutors have 'discharged their official duties,'" and need not "'scavenge for hints of undisclosed *Brady* material.'" *Id.* (quoting *Banks*, 540 U.S. at 695-96).

The District Court ruled that "[a]t the time of Petitioner's trial, there could be no *Brady* violation where defense counsel, with reasonable diligence, could have obtained the information." JA28 (citing *Bracey v. Superintendent Rockview SCI*, 986 F.3d 274 (3d Cir. 2021)). However, *Bracey* stands for a very limited principle, that in the context of a Rule 60(b) motion to reopen a prior judgment, the court should look to whether "*Dennis* changed the relevant decisional law on which the dismissal of Bracey's underlying habeas petition rested." 986 F.3d at 294.

*Bracey*'s analysis of Rule 60(b)'s requirements does not apply to the failure of the Commonwealth to provide *Brady* material on the grounds that defense counsel might have other means of securing that evidence. *Dennis* controls the fundamental question of whether there was a due diligence exception to *Brady* at the time of Johnson's trial and made clear that this has "never" been the case. *Dennis*, 834 F.3d at 290. This is particularly true as *Dennis* "had the effect of bringing [this Circuit's] case law back in line with clearly established Supreme Court precedent." *Bracey*, 986 F.3d at 290. *Dennis* simply restated what has always been the law.

In any event, there was no lack of due diligence by counsel. The fact that counsel was on notice that Angelo Smith had told police investigators that he was

"not positive" about his photo identification of Johnson is not the key to counsel's actions. Rather, Smith's failure to identify Johnson in the courtroom is the relevant fact. Counsel had every reason to expect that *if* Smith came to court by reason of a subpoena from the Commonwealth and identified Johnson that he would be called to testify by the prosecution and, if he could not identify Johnson, that counsel would have been provided with that exculpatory *Brady* information.

The notion that defense counsel should have anticipated that Smith would not be able to identify his client in the courtroom and that the Commonwealth would then inform Smith that *he was excused from appearing or testifying* (all in direct conflict with an established *Brady* duty) is irreconcilable with due process. As this Court reasoned in *Bracey*, "absent evidence to the contrary, a petitioner would reasonably expect—and, indeed, 'is entitled to presume' . . . that there is no *Brady* violation to be discovered." 986 F.3d at 291 (quoting *Dennis*, 834 F.3d at 290).

*Dennis* also provides sufficient cause for overcoming any procedural default with respect to both *Brady* claims. *See White v. Vaughn*, No. 94-6598, 2022 WL 4080760, at *6 (E.D. Pa. Sept. 6, 2022) (Padova, J.) ("*Dennis*'s conclusions that the prosecutor's obligation to disclose *Brady* material is absolute and that a defendant has no independent obligation to ferret out *Brady* material plainly conflict with the state court's conclusion that Petitioner waived his *Brady* claim for failing to raise it

on direct appeal. *Dennis* thus provides new support for a finding of cause for Petitioner's procedural default.").

In defiance of *Dennis* and *Brady*, the state courts have imported a due diligence requirement into the "governmental inference" exception to the PCRA's time bar. *Johnson*, 2018 WL 2295655, at *5; 42 Pa. C.S. § 9545(b)(1)(i).[6] Imposing this requirement is contrary to clear Supreme Court precedent as established in *Brady*, and this Court's recognition of that precedent in *Dennis* serves as a basis for overcoming procedural default. *Dennis*, 834 F.3d at 293 ("The Pennsylvania Supreme Court's conclusion . . . was an unreasonable application of law and fact . . . . [U]nder United States Supreme Court precedent, it is clear that there is no

---

[6] Justices on the Pennsylvania Supreme Court have directly challenged the diligence requirement as lacking in statutory support and in conflict with *Brady*. *See Commonwealth v. Towles*, 300 A.3d 400, 421 (Pa. 2023) (Donohue, J., concurring) ("[T]he General Assembly did not impose an affirmative duty on criminal defendants to actively seek evidence of unlawful governmental interference with the presentation of a claim. Indeed, it is antithetical to the integrity of our criminal justice system to allow a conviction to stand because a defendant did not affirmatively ferret out evidence to establish that the government procured his or her conviction by hiding evidence."); *id.* at 422 (Wecht, J., concurring) ("By its express terms, the PCRA requires a petitioner to establish due diligence only with respect to the exception for newly discovered facts. The PCRA imposes no such requirement for the exception premised upon governmental interference.").

additional prong to *Brady* and no 'hide and seek' exception depending on defense counsel's knowledge or diligence.").

### D. Alternatively, PCRA Counsel's Ineffectiveness Excuses Any Procedural Default

If this Court rejects the arguments above regarding procedural default, under *Martinez v. Ryan*, 566 U.S. 1 (2012), state post-conviction counsel should be held ineffective for failing to challenge trial counsel's ineffectiveness in not compelling Angelo Smith's testimony at trial. The District Court acknowledged that "postconviction counsel's failure to investigate the other eyewitnesses and fully assess Petitioner's case after receiving notice of James Smith's recantation may have prejudiced Petitioner," JA7, but the court erred in rejecting the *Martinez* argument on the basis that PCRA counsel may have had a strategic reason not to raise this claim. JA35.

The District Court speculated that PCRA counsel "*could* have made a number of strategic choices," including a determination that his case "would be best supported by additional alibi and character witnesses, rather than an investigation of the witnesses who previously testified at trial," that "James Smith's statement was not sufficiently 'trustworthy' to warrant investigating the other eyewitnesses," JA36-37 (emphasis added), and that PCRA counsel "*could* have made the strategic choice not to investigate the other eyewitnesses because the allegations of police and

prosecutorial misconduct laid out in James Smith and John Spencer's affidavits were sufficient to cast doubt on the fairness of Petitioner's trial." JA37 (emphasis added).

This speculation is not a proper basis for crediting a supposed strategic choice. *Strickland v. Washington* makes clear that counsel should investigate "each line [of defense] substantially before making a strategic choice about which lines to rely on a trial." 466 U.S. 668, 681 (1984). Thus, a court must look to whether "counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Workman v. Superintendent Albion SCI*, 915 F.3d 928, 942 (3d Cir. 2019). Arguing that additional alibi and character witnesses should have been called after the jury rejected those presented at trial was clearly weaker than a *Brady* claim calling into question nearly all of eyewitness identifications—the only evidence against Johnson—at trial. PCRA counsel's failure to interview the trial witnesses, and his resulting failure to uncover the suppressed *Brady* evidence, bars any "strategic" basis for not presenting this claim and provides sufficient cause and prejudice to excuse procedural default. *Id.* at 941 (if underlying claim "has some merit" and "state post-conviction counsel's performance fell below an objective standard of reasonableness," a petitioner "has shown sufficient prejudice from

counsel's ineffective assistance that his procedural default must be excused under *Martinez*").[7]

The District Court also rejected the argument that the procedural default of the claims should be excused under the miscarriage of justice or actual innocence doctrines. JA28. The miscarriage of justice exception applies to "cases in which new evidence shows 'it is more likely than not that 'no reasonable juror' would have convicted [the petitioner].'" *McQuiggin v. Perkins*, 569 U.S. 383, 394–95 (2013) (internal citation omitted). Here, the District Court failed to consider all the new evidence, having ruled that two of the three *Brady* violations were procedurally defaulted. That ruling prevented the court from engaging in the appropriate cumulative prejudice analysis. A cumulative prejudice analysis of all three *Brady* claims would make clear that "the government's evidentiary suppression 'undermine[d] confidence in the outcome of the trial'" such that there is a "'reasonable probability' of a different result." *Kyles*, 514 U.S. at 434; *see* Section

---

[7] The District Court erred in asserting that Johnson "has not provided any affidavit from any counsel stating that it was or was not a strategic choice for PCRA counsel not to investigate the eyewitnesses further when originally presenting the amended PCRA petition." JA35. In a response to a specific request from the District Court, Johnson provided a copy of his 2016 amended PCRA petition, JA542-88, which cited an affidavit from PCRA counsel, Andrew Gay, confirming that he had never interviewed those witnesses and that he "had no strategic or tactical reason" for failing to do so. JA567. Johnson's subsequent PCRA counsel, Ronald Greenblatt, submitted a separate affidavit making the same point. *Id.*

II.A.4., *infra* (laying out cumulative analysis of *Brady* claims). The *Brady* violations with respect to Angelo Smith, Opal Nickson, and the arrest photos were cumulatively strong evidence of actual innocence given the weak eyewitness identifications, the witness recantations, the lack of physical evidence connecting Johnson to the crime, and the alibi evidence. In these circumstances it is "more likely than not that no reasonable juror would have convicted." *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *see also Szuchon*, 273 F.3d at 321 n.13 (a miscarriage of justice includes "cases where the record is well developed and the merits strongly support the petitioner's claim").

Johnson has overcome procedural default in multiple ways, and this Court should review the claims *de novo* in conjunction with the third *Brady* claim relating to the arrest photo.

## II. Johnson Is Entitled to Habeas Relief

### A. The Commonwealth Suppressed Material Exculpatory and Impeaching Evidence in Violation of *Brady v. Maryland*

The Commonwealth violated Johnson's constitutional rights under *Brady* and its progeny by suppressing: (1) his October 10, 1986, arrest photographs, which show Johnson did not match the descriptions of the shooter provided by two key witnesses; (2) evidence that Angelo Smith failed to identify Johnson in the courtroom and was instructed by an investigator to leave as his testimony was not

needed; and (3) evidence that Opal Nickson told investigators that the perpetrator had darker skin than Johnson.

The elements of a *Brady* claim are well established: "a defendant must show that (1) the government withheld evidence, either willfully or inadvertently; (2) the evidence was favorable; and (3) the withheld evidence was material." *Lambert v. Blackwell*, 387 F.3d 210, 252 (3d Cir. 2004) (citing *Banks*, 540 U.S. at 691). The District Court agreed that the Commonwealth withheld and suppressed exculpatory and impeaching evidence but denied relief for lack of materiality, a conclusion that it reached without considering the cumulative impact of these errors. Given the weakness of the evidence against Johnson, had he been able to present any of this evidence, there would have been a reasonable probability of a different result.

### 1.    The Suppression of Johnson's Arrest Photographs

Johnson's arrest photographs were suppressed at trial and not produced until May 7, 2019, as part of discovery in the District Court. *See* JA40. In 2020, counsel confirmed that there was no documentation in the Commonwealth's files that these photographs were produced to the defense. *See* JA362-63 (pre-trial discovery letters not listing arrest photographs).

The photographs constitute exculpatory and impeachment evidence. Within hours of the shooting, both James Smith and Angelo Smith described the man with

the pistol, who the Commonwealth later contended was Johnson, as having *no facial hair or mustache*:

- **James Smith**: "B/M 6'1", brown skin, thin build about 20-21, both men were about the same age, *he was clean shaven*, he was wearing all black leather to [sic]." JA192 (emphasis added).

- **Angelo Smith**: "I don't know if I saw him before, he was a black male, dark complexion, close cut hair, *no mustache or facial hair*, but he had a black gun, a revolver, it was as big as a .38 caliber snub nose. After I saw the gun, that is what I was looking at." JA194-95 (emphasis added).

Johnson's arrest photographs, taken just two days after the murder, showed him to be 5'6" (not 6'1") and with a full mustache and could have been used to impeach witnesses who testified that the perpetrator had no mustache or facial hair. The "touchstone of materiality is a reasonable probability of a different result." *Dennis*, 834 F.3d at 285 (internal quotation marks omitted). The relevant question is whether, in the absence of the suppressed evidence, the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434. There can be no confidence in the outcome of a trial where Johnson was deprived of evidence that he could have used to establish that he did not fit the eyewitnesses' description of the man with the pistol. This is particularly true given

that there was no other evidence of guilt and in light of the prosecutor's heavy reliance in his opening and closing statements on the *quality* of the identifications of Johnson. *See, e.g.*, JA672-73 (Opening: "That is what is remarkable about this case. As you will see, these witnesses were all independently–by that I mean not having spoken to any of the witnesses, not having any of the other witnesses being present, independently picked out the photograph of the defendant."); JA1498 (Closing: "[Y]ou believe it's just a coincidence that they could all pick the same man? Can't be.").

The District Court denied relief, finding the photos were only "somewhat . . . favorable." JA40. The court asserted that it was possible that the witnesses failed to detect Johnson's mustache because the room was enveloped in darkness within seconds of the perpetrator's appearance. JA41. But if lighting is the basis for judging the reliability of the witness identifications, it cuts entirely the other way: if the witnesses were unable to observe the Johnson's distinct mustache because of the darkness in this chaotic scene, how could they have made a reliable identification? Indeed, the prosecutor argued the very opposite, asserting that all witnesses had a

very good opportunity to identify the assailant, and due to his suppression of the photographs, he could do so without fear of contradiction.[8]

The Attorney General's argument as *amicus* in the District Court that the photographs were "not exculpatory" because the arrest photos of Johnson taken from March 1981 to October 1986 show him with "exactly the same thin pencil mustache" and "otherwise completely clean-shaven" is plainly mistaken. *See* JA388, 397. A mustache is a mustache, regardless of its style. Someone who has a mustache is not "clean shaven" regardless of whether they have any other facial hair. *See, e.g.*, Cambridge Academic Content Dictionary (defining "clean-shaven" as "having no beard or mustache on his face"), *available at* https://dictionary.cambridge.org/us/dictionary/english/clean-shaven (last accessed Apr. 6, 2024).

Finally, the photographs could also have been used to question the integrity of the police investigation. *See Dennis*, 834 F.3d at 302. This is particularly true because the tentative identification by Angelo Smith set investigators on the path to Johnson. Detectives Nachurski and Bittenbender, who testified at trial as to the

---

[8]The same is true for the District Court's observation that the witnesses identified Johnson from earlier arrest photographs with a similar mustache and, therefore, an observable mustache at the time of the crime was not critical. JA42. That is hardly conclusive, as they may have believed that the perpetrator had shaved his mustache before this incident.

investigation and identifications, could have been questioned about why they arrested someone who did not match the witnesses' descriptions. JA1065-81 (Nachurski Testimony), 1248-51 (Bittenbender Testimony).

2. **The Suppression of Angelo Smith's Failure to Identify Johnson at Trial**

Police interviewed Angelo Smith shortly after the shooting, and he made a qualified and tentative identification of Johnson from a book of photographs, telling police the photo "looks like" the man with the pistol but "I am not positive." JA196. He added, "[T]hat photo that I picked out looked like the guy and if it comes down to where I might see him again, I will identify him, he threatened my life to[o]." JA197.

In 2014, Angelo Smith signed two affidavits stating that when he was subpoenaed to trial, someone in the courtroom associated with law enforcement asked him if he saw the man with the pistol there. JA326 (Agreement ¶ 49); *see also* JA215-26, 221 (2014 A. Smith Affs.). He said he did not. At that point, the official told him that he need not stay or testify as he could not identify Johnson. JA326 (Agreement ¶ 49). Angelo Smith reiterated this key fact—that he "told the cops [he] didn't recognize the guy in the courtroom"—to detectives during post-conviction proceedings in 2016. JA326 (Agreement n.12).

The District Court found that, if Angelo Smith's "2014 affidavits are to be believed," "then the prosecution certainly suppressed his availability and inability to

identify Petitioner in court, as the prosecutor affirmatively represented that Angelo Smith was simply unavailable to testify." JA26. The court also found that Angelo Smith's "statement that he could not identify Petitioner in the courtroom was favorable." JA27. "This information would have been useful to the defense, especially given the misidentification and alibi theories that had been presented at trial." *Id.*

The District Court failed to articulate a rationale for finding lack of prejudice other than defense counsel's supposed duty to seek out exculpatory evidence in light of [Smith's initial] statement to the police." JA27-28. As discussed, *Brady* and its progeny make clear that defense counsel has *no duty* to seek out exculpatory or impeaching evidence. *See* Section I.C., *supra*. On the correct metric for determining materiality, the District Court recognized that the evidence "may have undercut the credibility of the other three witnesses." JA27. If anything, that finding is understated, as the evidence would have undermined the Commonwealth's *entire* case that was based solely on witness identifications.

### 3. The Suppression of Opal Nickson's Statements to Investigators About the Perpetrator's Complexion

In 2014, Opal Nickson signed an affidavit stating that she had told both police and the prosecutor before trial that the man with the pistol had darker skin than Johnson, a fact not previously disclosed. JA217-18. Interviewed by detectives in 2016, she stated that Johnson was the man with the pistol, JA326 (Agreement n.12),

but when she was deposed in 2019, she was again quite clear that she could not identify Johnson as the perpetrator and that she had informed investigators and the prosecutor that the perpetrator had darker skin than Johnson. *Id.* For example, she testified:

- "Kevin Johnson is light brown skin, and the man that pointed the gun at us was dark, but they favor each other," JA250-51;

- "Q. Did you tell the police that Kevin Johnson has lighter skin than the man who pointed the gun at you? A. Yes, I did. I told the attorney that too, the man who took us down there. The man who pointed the gun at us was dark. . . ." JA251;

- "I just know the man who pointed the gun at me was dark, and Kevin Johnson is brown skin. He is light brown skin," JA263-64;

- "[L]ike I said, the other guy was dark skin, real dark. . . [w]hen I saw Kevin Johnson in the courtroom, what, a little bit lighter than me or darker than me. That man was nowhere near his color," JA271;

- "Q. At what point do you change your mind to decide actually that isn't the guy? A. Because of the color of his skin." JA277.

The District Court recognized that this evidence was suppressed but, despite Nickson's consistency in her deposition, characterized it as only "weakly favorable" because the room was dark and therefore it would have been difficult for her to

accurately judge the color of the assailant's skin. JA29. That logic, however, ignores the more powerful countervailing inference: if it was so dark that she could not discern skin color, how could she identify him at all?

Even more flawed is the assertion that this information was not material because "it would have opened the door for the introduction of her initial introduction of Petitioner. The jury then would have been left to decide which of her identifications they believed." *Id.* This is precisely why this evidence is material— its suppression deprived Johnson of the ability to present the jury with that choice. Moreover, the court's speculation that counsel would not have used it to impeach as it would have opened the door to admission of Nickson's out-of-court photographic identification is wrong as a legal matter. In Pennsylvania, the out-of-court identification of a testifying witness is admissible as an exception to the hearsay bar. *See* Pa. R. Evid. 803.1(2). And, because the prosecutor discussed Nickson's out-of-court identification in detail in his opening statement, "the door" had already been opened. JA673.

### 4. The Cumulative Prejudicial Impact of the Commonwealth's Suppression of Exculpatory Evidence

Each of the *Brady* violations was material, and the cumulative prejudice caused by the *Brady* violations was overwhelming. The District Court did not engage in the cumulative prejudice analysis required by *Kyles*, 514 U.S. at 421, due to its ruling on procedural default. In assessing the prejudice of the only *Brady* claim it

reviewed on the merits (the suppression of the arrest photo), the District Court found that it was not material "standing alone," suggesting that it may have reached a different conclusion had it reviewed the three claims cumulatively. JA42.

The court failed to consider evidence that impeached all three eyewitnesses in a case where the identifications were already suspect due to poor conditions for observation. All witnesses were intoxicated on drugs and/or alcohol, and their ability to see the perpetrator was severely compromised by the chaos and darkness in a room where the only lamp was out within a very short time of his entry and where the perpetrator pointed a gun directly at them. This Court's Task Force on Eyewitness Identification has documented the following factors, all present here, as highly relevant on the question of the accuracy of identification testimony:

- *Weapon focus*: "The visible presence of a weapon during a witnessed event can influence eyewitness accuracy by directing attention towards the weapon and away from the perpetrator, an effect termed weapon focus." 2019 Third Circuit Report at 19 (internal quotation marks omitted).[9]

---

[9] With respect to weapons focus, during closing arguments the prosecutor repeatedly implied that the presence of a gun *increased* the credibility of the identifications of Johnson. *See, e.g.*, JA1485-87. To the contrary, the presence of a gun is a factor that can *decrease* the reliability of an eyewitness identification. *See* 2019 Third Circuit Report at 19.

- *Stress*: "Like the presence of a weapon, increased levels of stress can affect memory." *Id.*

- *Exposure duration*: "Not surprisingly, the length of time that a witness has to view an event, known as the exposure duration, can impact the accuracy of the memory. Exposure of limited duration may also result in poorer quality person descriptions." *Id.* at 20 (internal quotation marks omitted).

- *Lighting*: "Lighting is another viewing factor that influences the quality of memory. Specifically, low illumination may result in poorer quality person descriptions and reduced identification accuracy." *Id.* at 21 (internal quotation marks omitted).

Against this backdrop, the suppression of the arrest photographs, Angelo Smith's failure to identify Johnson in court, and Nickson's statements about Johnson's complexion deprived Johnson of significant impeachment as to the accuracy of the identifications and the quality of the police investigation and blocked what would have been a clear path to calling Angelo Smith as a defense witness.

Moreover, if Johnson had more effectively undercut the identifications, the jury may have viewed his alibi in a more favorable light. *See Wearry v. Cain*, 577 U.S. 385, 392-93 (2016) (*per curiam*) (granting habeas relief where the jury credited the key prosecution witness over the petitioner's alibi, where the state had

suppressed evidence that would have impeached the witness's credibility). The prejudice caused by the suppression is manifest, as there is a reasonable probability the outcome of his trial would have been different. *See Wearry*, 577 U.S. at 392 ("[petitioner] need not show that he 'more likely than not' would have been acquitted had the new evidence been admitted. He must show only that the new evidence is sufficient to 'undermine confidence' in the verdict." (quoting *Smith v. Cain*, 565 U.S. 73, 75 (2012)); *Haskins v. Superintendent Greene SCI*, 755 F. App'x. 184, 189 (3d Cir. 2018) (*per curiam*) ("A different outcome" for purposes of *Brady* materiality "includes not only an acquittal, but also a hung jury or a verdict on a lesser included offense.").

### B. Johnson's Trial Counsel Rendered Ineffective Assistance

As set forth in the parties' Agreement, trial counsel failed to meaningfully communicate or consult with Mr. Johnson before trial. *See* JA320 (Agreement ¶¶ 33-34 & n.2). On that claim, the Court must give AEDPA deference to the Superior Court's determination that the trial counsel's failure to consult with Johnson before trial did not unduly prejudice him under *Strickland v. Washington*, 466 U.S. 668 (1984). Nevertheless, in the overall analysis of cumulative prejudice, the strikingly poor consultation, preparation, and presentation of evidence are relevant factors that support habeas relief. As the District Court stated, "counsel could have done more

to exculpate petitioner." JA51; *see* Section II.C., *infra* (discussing cumulative prejudice).

No deference is required on Johnson's claims that trial counsel was constitutionally ineffective for failing to secure his arrest photographs and to interview Angelo Smith. To be sure, the Commonwealth's failure to produce the photographs violates the suppression prong of *Brady*, but as the District Court concluded, trial counsel also should have secured them. *See* JA55-56 ("[T]rial counsel should have known that the police would have taken an arrest photo of Petitioner on or about October 10, 1986, and he should have requested the photograph in order to test the witnesses' identifications and challenge their credibility. This is especially true where a primary theory of the defense's case at trial was misidentification."); *see also* JA61 ("Counsel thus acted unreasonably in failing to interview Angelo Smith."); JA67 (summarizing trial counsel's errors).

Once again, the court erred in ruling that counsel's failure to do so was not prejudicial since counsel's failure may have been "sound strategy," as the witness identifications were better challenged by showing that they were not able to accurately "perceive or recall" the events. JA56-59. By this reasoning, the court not only undermined its own rationale in discounting the power of impeachment by skin color and mustache descriptions but ignored the well-settled rule that a "strategic" decision can be credited only if counsel has in fact investigated, secured, and

considered the evidence that is later not used. *See, e.g.*, *Abdul-Salaam v. Sec'y, Pa. Dep't of Corrs.*, 895 F.3d 254, 268-69 (3d Cir. 2018). Equally important, there is no inconsistency in attacking identification testimony by challenging lack of perception and recall *and* raising specific inconsistencies in descriptions provided. Counsel's failure to secure the arrest photographs and interview Angelo Smith prejudiced Johnson for the same reasons that the photographs and information provided by Angelo Smith are material for the purposes of the *Brady* analysis. *See Strickland*, 466 U.S. at 694.

### C. Johnson Is Entitled to Habeas Relief Due to the Cumulative Prejudice Caused by the Constitutional Violations

This Court has "recognize[d] that errors that individually do not warrant habeas relief may do so when combined." *Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007) (citing *Marshall v. Hendricks*, 307 F.3d 36, 94 (3d Cir. 2007)). Here, the cumulative prejudice analysis should have encompassed all the claims properly before the court, including:

- The Commonwealth's suppression of Johnson's arrest photographs;

- The Commonwealth's suppression of Angelo Smith's failure to identify Johnson in the courtroom;

- The Commonwealth's suppression of Opal Nickson's statements to investigators about Johnson's complexion;

- Trial counsel's failure to obtain the arrest photographs;

- Trial counsel's failure to interview Angelo Smith;

- Trial counsel's failure to properly investigate and present Johnson's alibi;

- Trial counsel's failure to adequately consult with Johnson before trial; and

- Prosecutorial misconduct that pervaded Johnson's trial.[10]

The District Court's conclusion that none of the violations were prejudicial or material was driven in large part by the court's view that these issues did not prejudice Johnson "in light of the unequivocal identification testimony by three eyewitnesses who knew him from around the neighborhood." JA67. However, this reasoning ignores the prejudicial impact of the *Brady* violations, the mutually corroborative recantations by these witnesses, the ineffectiveness of trial counsel,

---

[10] As to the last three claims, the Pennsylvania Superior Court never expressly ruled on Johnson's alibi claim although it did discuss the alibi evidence in ruling on the consultation claim. *Johnson*, 51 A.3d at 244. To the extent the state courts' rulings on these three issues are subject to AEDPA deference, this Court may consider trial counsel's deficient performance and the prosecutor's misconduct as part of the cumulative prejudice analysis coupled with all of the other claims for which there is *de novo* review. As discussed above, the state courts were troubled by trial counsel's deficient performance. And, as the District Court found, "[t]he record thus indicates that whether or not Petitioner's trial counsel was a constitutionally effective advocate was not a clear call." JA68 (also concluding that "[t]he state courts in this matter have acknowledged that trial counsel was deficient (though not constitutionally ineffective) for failing to consult with Petitioner more extensively before trial").

including counsel's poor preparation for trial, and the prosecutor's misconduct in bringing out a motive without any evidentiary support, and the science of memory.

The witnesses' post-trial statements, provided under penalty of perjury, corroborate each other on the central point of police pressure tactics in securing the identifications. JA324-26 (Agreement ¶¶ 45-50); *see also* Section I.F. (Statement of the Case), *supra* (discussing recantations). This Court has instructed that, "[a]lthough recantations are generally looked upon with suspicion, they are not subject to a categorical rejection . . ." *Howell v. Superintendent Albion SCI*, 978 F.3d 54, 55 (3d Cir. 2020). In *Howell*, the Court emphasized that "recantations should be analyzed on an individual and fact-specific basis" and that "multiple recantations may themselves be mutually corroborating evidence, with each one having the potential to bolster the reliability of the others." *Id.* at 60-61.

Moreover, the District Court's emphasis on the eyewitnesses' knowing Johnson from the neighborhood is significantly overstated. Opal Nickson testified at the preliminary hearing that she did not really know Johnson; James Smith testified at trial that he had seen the man with the pistol only "*once, saw him a couple of times*;" and it is undisputed Bennett did not personally know Johnson. Section I.B. (Statement of the Case), *supra* (discussing identifications); *see also* JA379 (Attorney General's concession that "Bennett did not personally know petitioner"). Further, studies have shown that identifications by a witness with some familiarity with a

suspect are not infallible. There is "mounting evidence that similar to stranger identifications, familiar identifications invoke overlapping cognitive processes and therefore can be correspondingly hindered by certain estimator and system variables." Jonathan P. Vallano, et al., *Familiar Eyewitness Identifications: The Current State of Affairs*, 25 Psychol. Pub. Pol'y & Law 128, 132 (2019); *see also* James C. Bartlett & Amina Menon, *The Handbook of Eyewitness Psychology Vol. II: Memory for Events*, Chapter 13 (2007) ("Under some conditions, prior exposure to a face can *increase* the chances it will be chosen in a line up despite the fact that it is not the face of the perpetrator. One example is the 'innocent bystander' or 'unconscious transference' effect, whereby a case seen near the time of the crime, or even during the crime itself, is falsely identified as the perpetrator when in fact it is not.").

Against the backdrop of already unreliable identifications, Johnson was deprived of evidence that impeached each of the witnesses, affirmatively excluded him as the perpetrator, and further impeached the reliability of the identifications. The courts who have thus far had the opportunity to review Johnson's claims in isolation have been troubled by the deficient performance of his trial counsel, the prosecutor's misconduct, and the Commonwealth's suppression of evidence. This Court has the opportunity to view all the claims together for the first time; the cumulative effect of the constitutional violations requires habeas relief.

# CONCLUSION

Johnson's trial was rife with constitutional violations, the cumulative effect of which caused him significant prejudice. Under *Brady* and *Strickland*, there is far more than a "reasonable probability" of a different result at trial. This Court should reverse the District Court's denial of his petition, grant the writ, and order his immediate release.

Respectfully submitted,

/s/ *Claudia Flores*
CLAUDIA B. FLORES
Supervising Attorney,
Non-Capital Habeas Unit
LISA EVANS LEWIS
Chief Federal Defender
Federal Community Defender Office
for the Eastern District of Pennsylvania
Suite 540 West – The Curtis Center
601 Walnut Street
Philadelphia, PA 19106
215-928-1100

/s/ *Nilam A. Sanghvi*
The Pennsylvania Innocence Project
1515 Market Street, Suite 300
Philadelphia, PA 19102
215-204-4255

/s/ *David Rudovksy*
Kairys, Rudovsky, Messing,
Feinberg, & Lin LLP
718 Arch Street, Suite 501S
Philadelphia, PA 19106
215-925-4400

*Counsel for Appellant Kevin Johnson*

## CERTIFICATE OF BAR MEMBERSHIP

I, Claudia Flores, hereby certify that I am a member in good standing of the Bar of this Court.

## CERTIFICATE OF COMPLIANCE

I, Claudia Flores, hereby certify that this Initial Brief for Appellant complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,167 words, as calculated by the word count software in Microsoft Word 2016 for Windows 10, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 for Windows 10 in 14-point Times New Roman font.

I further certify that the text of the electronic copy of the brief is identical to the text of the paper copies of the brief filed with the Court and that the electronic copy of this brief was scanned using Symantec Endpoint Protection, version 14.0, and found to contain no known viruses.

*/s/ Claudia Flores*
CLAUDIA FLORES

Dated: April 10, 2024

## CERTIFICATE OF SERVICE

I, Claudia Flores, hereby certify that on this date, I caused the foregoing to be served on all counsel of record through this Court's CM/ECF system.


*/s/ Claudia Flores*
CLAUDIA FLORES

Dated: April 10, 2024