No. 23-2531

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

**KEVIN JOHNSON**

*Appellant,*

*v.*

**SUPERINTENDENT MAHONEY SCI,** *et al.,*

*Appellees.*

_____

Appeal from the Order of the United States
District Court for the Eastern District of Pennsylvania,
Honorable Eduardo C. Robreno, No. 13-cv-03197,
Denying Petition for Writ of Habeas Corpus.

_____

**APPELLEES' BRIEF**

_____

Sᴀʀᴀ Cᴏʜʙʀᴀ
*Assistant District Attorney*
Mɪᴄʜᴀᴇʟ Gᴀʀᴍɪsᴀ
*Supervisor, Conviction Integrity Unit*

*(counsel listing continued inside)*

LAWRENCE S. KRASNER
*District Attorney of Philadelphia*

Office of the District Attorney
Three South Penn Square
Philadelphia, Pennsylvania 19107
(215) 686-8000

# TABLE OF CONTENTS

JURISDICTION ............................................................................1

ISSUES .......................................................................................2

STATEMENT OF THE CASE.....................................................3

  I.   The crime.........................................................................3

  II.  The trial ..........................................................................4

  III. Post-conviction proceedings in state court....................6

  IV. Initial habeas corpus proceedings in the district court............. 12

  V.  Exhaustion proceedings in state court ........................ 12

  VI. Continued habeas corpus proceedings in the district court................................................................................ 16

  VII.The district court's opinion ......................................... 18

RELATED CASES OR PROCEEDINGS ................................ 20

SUMMARY OF ARGUMENT.................................................. 21

ARGUMENT............................................................................. 24

  I. The district court employed erroneous materiality standards in its review of Johnson's *Brady* claims...................... 24

     A.  The district court misread *Dennis* and *Bracey* to require Johnson to prove that he was diligent in order to establish that a key eyewitness's inability to identify Johnson was improperly suppressed by the prosecution. ......................................... 25

B. The district court relied on a legal position expressly foreclosed by *Dennis* when it required Johnson to show that he had been diligent...................... 26

C. The district court also erred in concluding that *Dennis* only applies to cases tried *after Dennis* was decided.......................................................................... 28

II. The district court misapplied the materiality prong of *Brady* when it found that no cause and prejudice existed to excuse the procedural default regarding Opal Nickson's statement that Johnson's skin was lighter than the perpetrator's.............................................................. 32

D. The district court's rejection of Johnson's claim regarding the suppression of arrest photographs also was based on a misunderstanding of the materiality prong of *Brady*. ...............................................35

E. The district court's flawed materiality analysis tainted all of its rulings that Johnson did not establish cause and prejudice to overcome procedural default, therefore precluding merits review of some of Johnson's individual *Brady* claims, and the overall cumulative *Brady* claim....................................................37

III. The district court erred by rejecting the Commonwealth's waiver of affirmative procedural-default defenses and thus failing to consider all of Johnson's claims on their merits. .............................................................................. 41

A. Federal district courts are bound by a state's waiver of exhaustion and other procedural defaults...... 42

IV. Alternatively, the district court abused its discretion by rejecting the Commonwealth's waivers without providing

the parties a fair opportunity to present their positions, and because there were no extraordinary circumstances requiring the court to resurect the procedural bars sua sponte. ............................................................................. 52

  V.  Remand for Further Proceedings is Appropriate. ...................... 60

    A.  This Court should remand to apply correct materiality and *Brady* analyses. ...................................... 60

    B.  Remand would permit the district court to correct its improper rejection of the Commonwealth's waiver of affirmative procedural default defenses and accept the waivers to consider the merits of all of Johnson's claims. ......................................................... 61

    C.  This Court should instruct the district court to engage in any fact-finding process the district court deems necessary to resolve factual issues. ..................... 62

CONCLUSION ............................................................................. 65

COMBINED CERTIFICATIONS ............................................................ 66

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Albrecht v. Horn,*
   485 F.3d 103 (3d Cir. 2007) ..................................................... 61

*Alvarez v. Lopez,*
   835 F.3d 1024 (9th Cir. 2016) ................................................. 50

*Banks v. Dretke,*
   540 U.S. 668 (2004) ........................................................... 25, 31

*Barna v. Bd. of Directors of Panther Valley Sch. Dist.,*
   877 F.3d 136 (3d Cir. 2017) ..................................................... 60

*Bracey v. Superintendent Rockview SCI,*
   986 F.3d 274 (3d Cir. 2021) ......................................... 18, 19, 21

*Chester v. Comm'r of Pa. Dept. of Corr.,*
   598 Fed. Appx 94 (3d Cir. 2015) ............................................. 48

*Christy v. Horn,*
   115 F.3d 201 (3d Cir. 1997) ..................................................... 46

*Coleman v. Thompson,*
   501 U.S. 722 (1991) ................................................................ 25

*Day v. McDonough,*
   547 U.S. 198 (2006) ........................................................ passim

*Dennis v. Secretary, Pennsylvania Department of Corrections,*
   834 F.3d 263 (3d Cir. 2016) ............................................. passim

*Douglas v. United States,*
858 F.3d 1069 (7th Cir. 2017) ........................................................ 48, 49

*Fisher v. Somerset,*
591 Fed. Appx. 118 (3d Cir. 2014) .................................................. 34, 37

*Freytag v. Comm'r of Internal Revenue,*
501 U.S. 868 (1991) .............................................................................. 44

*Greenlaw v. United States,*
554 U.S. 237 (2008) .............................................................................. 45

*Hamer v. Neighborhood Hous. Servs. of Chicago,*
583 U.S. 17 (2017) ................................................................................. 43

*Hapag-Lloyd Aktiengesellshaft v. U.S. Oil Trading LLC,*
814 F.3d 146 (2d Cir. 2016) .................................................................. 51

*Howell v. Superintendent Albion SCI,*
978 F.3d 54 (3d Cir. 2020) .................................................................... 38

*Hull v. Freeman,*
932 F.2d 159 (3d Cir. 1991) .................................................................. 46

*Jimmerson v. Payne,*
957 F.3d 916 (8th Cir. 2020) ................................................................ 49

*Johnson v. Folino,*
705 F.3d 117 (3d Cir. 2013) ........................................................ 22, 34, 37

*June Med. Servs. v. Russo,*
591 U.S. 299 (2020) (abrogated on other grounds by *Dobbs v. Jackson
Women's Health Org.,* 597 U.S 215 (2022)) .................................... 47, 48

*Kyles v. Whitley,*
514 U.S. 419 (1995) ........................................................... 22, 29, 30, 37

*Maslonka v. Hoffner,*
  900 F.3d 269 (6th Cir. 2018) ................................................ 50

*Murray v. Carrier,*
  477 U.S. 478, 495–96 (1986) ................................................ 59

*Rivera v. Pennsylvania,*
  187 Fed. Appx. 240 (3d Cir. 2006) ....................................... 36

*Ryan v. United States,*
  688 F.3d 845 (7th Cir. 2012) ........................................... 51, 53

*Strickler v. Greene,*
  527 U.S. 263 (1999) ............................................................. 45

*United States v. Agurs,*
  427 U.S. 97 (1976) ............................................................... 27

*United States v. Bagley,*
  473 U.S. 667 (1985) ............................................................. 22

*United States v. Dowdell,*
  70 F.4th 134 (3d Cir. 2023) ................................................. 44

*United States v. Tyler,*
  956 F.3d 116 (3d Cir. 2020) ................................................ 48

*Williams v. Taylor,*
  529 U.S. 420 (2000) ............................................................. 64

*Wood v. Milyard,*
  566 U.S. 463 (2012) ...................................................... passim

**State Cases**

*Commonwealth v. Clancy,*
  648 Pa. 179 (2018) .............................................................. 45

*Commonwealth v. Dennis,*
   715 A.2d 404 (Pa. 1998) .................................................................. 28, 39

*Commonwealth v. Johnson,*
   51 A.3d 237 (Pa. Super. 2012) (en banc) ................................... 10, 11, 12

*Commonwealth v. Johnson,*
   610 A.2d 65 (Pa. Super. 1992) ....................................................... 6

*Commonwealth v. Johnson,*
   2187 EDA 2009 (Pa. Super. 2011) ................................................. 11

*Commonwealth v. Johnson,*
   467 EDA 2003 (Pa. Super. Jan. 31, 2005) ..................................... 9

*Commonwealth v. Natividad,*
   200 A.3d 11 (Pa. 2019) ................................................................. 57

## Federal Statutes

28 U.S.C. § 1291 ......................................................................... 1
28 U.S.C. § 2241 ......................................................................... 1
28 U.S.C. § 2244(d)(1)(D) ........................................................... 31
28 U.S.C. § 2253 ......................................................................... 1
28 U.S.C. § 2254 ......................................................................... 28
28 U.S.C. § 2254(a) ..................................................................... 1
28 U.S.C. § 2254(d)(1) ................................................................. 29
28 U.S.C. § 2254(e)(2) ................................................................. 64

## Federal Rules

Fed. R. App. P. 32 (a)(7)(B) ........................................................ 1
Fed. R. App. P. 32(a)(5) .............................................................. 1
Fed. R. App. P. 32(a)(6) .............................................................. 1
Fed. R. App. P. 32(f) ................................................................... 1

Fed. R. Civ. P. 8(c)(1), 12(b) ...................................................... 43
Fed. R. Evid. 804(b)(1) .............................................................. 64
Habeas Corpus Rule 5(b) .................................................. 43, 46
Habeas Corpus Rule 12 ............................................................ 43

## State Rules

Pa. R. Professional Conduct 3.8 ............................................. 45
Pa. R. App. Proc. 1925 ............................................................ 11

## Other Authorities

*2019 Report of the United States Court of Appeals for the Third Circuit Task Force on Eyewitness Identifications*, 92 Temple L. Rev. 1 (2019) ................................................................................ 38, 39

Kenneth A. Deffenbacher et al., *Mugshot Exposure Effects: Retroactive Interference, Mugshot Commitment, Source Confusion, and Unconscious Transference*, 30 L. & Hum. Behav. 299 (2006) .................................... 39

K.J. Nelson et al., *Change Blindness Can Cause Mistaken Eyewitness Identification*, 16 Logical and Criminological Psychology (2011) ..... 39

# JURISDICTION

The district court had jurisdiction to consider Kevin Johnson's habeas corpus petition, filed on June 7, 2013, pursuant to 28 U.S.C. §§ 2241 and 2254(a). JA90. The district court denied Johnson's petition on July 24, 2023, JA4, and Johnson filed a notice of appeal on August 22, 2023, JA1. The district court granted Johnson's application for certificate of appealability on August 29, 2023. JA76. This Court now has jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253.

**ISSUES**

I.  Whether the district court erred in its consideration and analysis of Johnson's *Brady* claims by misinterpreting the materiality standard established by the United States Supreme Court and articulated by this Court.

II. Whether the district court erred and/or abused its discretion in rejecting the Commonwealth's intentional and carefully considered waiver of procedural defenses and thereby failing to consider all of Johnson's claims on their merits.

# STATEMENT OF THE CASE

## I.     The crime

On the evening of October 8, 1986, Lyndon "Cowboy" Morris was shot and killed by two assailants inside a Southwest Philadelphia home. Morris was selling drugs from one of the upstairs bedrooms in the home, which he rented from the primary tenant, Opal Nickson. Witnesses heard someone knock and announce his name as "Keith," which was also Nickson's brother's name. James Smith, who worked for Morris, opened the door and was confronted by two men, one armed with a shotgun and the other with a handgun. The men directed James Smith up the stairs at gunpoint. The man with the shotgun approached Morris's bedroom, while the man with the handgun went to the back bedroom and ordered Nickson and her friends Angelo Smith and Elisha Bennett—all of whom were using alcohol, cocaine, and marijuana—to the floor. Nickson complied with the man's order but inadvertently unplugged the lamp, darkening the room. James Smith, Nickson, Angelo Smith, and Bennett heard the shotgun fire, and the man with the handgun ran toward Morris's room and fired as well.

Morris died from the gunfire.

All four witnesses picked out Johnson's photo—which had been taken at least a year earlier—from a mugshot book. Angelo Smith, the first to pick out the photo, commented that the photo "looks like him, I am not positive." JA196 (A. Smith statement). The photo depicted Johnson with a mustache, in contrast to the descriptions Angelo and James Smith provided that the perpetrator with the handgun was clean shaven. JA192, JA194–95 (A. Smith and J. Smith statements). Johnson was a stranger or nearly a stranger to all the witnesses—Angelo Smith had never seen him before and the other three witnesses had seen him "once, saw him a couple of times" or "around the neighborhood." JA744, JA629 (Nickson testimony); JA1118 (Bennett testimony).

Although there were two perpetrators, Johnson was the only person arrested for the crimes.

## II.    The trial

Johnson was charged with capital murder. At his trial in 1988, James Smith, Opal Nickson, and Elisha Bennett identified Johnson as

the perpetrator with the handgun. Angelo Smith did not testify. The eyewitness testimony of the three witnesses was the only evidence linking Johnson to the crime.

Despite the seriousness of the charges, Johnson's trial lawyer failed to take his telephone calls or respond to his letters, and visited him in jail only once, and only for a few minutes, the night before jury selection was to begin. Johnson's lawyer presented an alibi defense but did not present testimony from the most important alibi witness— Ronald Crawford, the person with whom Johnson claimed to have spent most of the night in question. Johnson's lawyer unsuccessfully moved to suppress the eyewitness identifications.[1]

During trial, the prosecutor was repeatedly admonished by the trial judge for engaging in egregious misconduct, including deceiving the judge during sidebar proffers and introducing facts not in evidence

---

[1] The notes of testimony of the hearing on the motion to suppress are not available, and the evidence and argument presented therein are unknown.

by accusing Johnson of being a strongman for a powerful drug supplier in the area. JA665–66, 1376–77, 1417–18 (trial transcript). Although the trial court suggested that these tactics might call for a mistrial, JA1377, the court eventually denied such a motion, JA1378.

On February 4, 1988, Johnson was convicted of first-degree murder, conspiracy, and possession of an instrument of crime and sentenced to the mandatory term of life imprisonment without the possibility of parole. JA7 (district court opinion).

## III. Post-conviction proceedings in state court

Johnson's convictions were affirmed on direct appeal on March 4, 1992, but only after his appeal was dismissed because his trial lawyer failed to file an appellate brief, his appeal rights were reinstated, and new counsel was appointed. JA319; *Commonwealth v. Johnson*, 610 A.2d 65 (Pa. Super. 1992) (*Johnson I*).

Thereafter, Johnson filed several pro se petitions in state court under the Post-Conviction Relief Act (PCRA). In his first petition,

which he timely filed on December 23, 1996, Johnson alleged (1) ineffective assistance of trial counsel for failing to consult with him, investigate and present alibi evidence, and investigate alternate suspects, (2) violations of *Brady v. Maryland*, including the suppression of statements provided by an alternate suspect, (3) prosecutorial misconduct for presenting inadmissible hearsay evidence, and (4) actual innocence. SA1–29 (PCRA Pet., 12/23/1996). Counsel was appointed to represent Johnson, SA30 (Order Appointing Counsel, 6/26/1997), but that attorney did not file additional pleadings and was relieved from representation in 2002 (Order, March 25, 2002) after Johnson sent numerous letters (approximately one per month beginning in 1998) to the PCRA court advising that counsel had not communicated with him about the status of the proceedings, *see, e.g.*, SA31—39 (Johnson Ltrs. dated 5/29/1998, 11/9/1998, 12/8/1999, 5/18/2000, 7/21/2000, 8/1/2000, 10/16/2000, 10/24/2000, 11/27/2000, 2/13/2001, 3/21/2001, 3/26/2002, 4/9/2002).

Johnson then retained counsel who filed an amended PCRA petition. The petition incorporated all of the claims in Johnson's pro se petition and added a claim of ineffective assistance of trial counsel for failing to present character evidence and the alibi testimony of Ronald Crawford, among other omissions, and a claim that investigating officers coerced James Smith into giving a false statement. SA41–68 (Am. PCRA Pet. & App., June 12, 2002); District Ct. ECF No. 19–2 at A–143–46.

The Commonwealth filed a motion to dismiss the counseled PCRA, arguing that Johnson's claims had no merit and that they could be denied without an evidentiary hearing. In support of the latter contention, the Commonwealth argued that the affidavits supporting Johnson's alibi were "obviously fabricated" and that James Smith's recantation of his identification of Johnson was "inherent[ly] unreliab[le]." SA69–89 (Commonwealth's Mot. to Dismiss, filed 11/26/2002 (State Court Record), at 15 ("Defendant is not entitled to an evidentiary hearing on these obviously fabricated [alibi] affidavits"); *id*. at 18

("Given the inherent unreliability of the [recantation] allegation upon which defendant premises his bid for PCRA relief, this Court should summarily deny relief without a hearing"). Relying at least in part on the Commonwealth's representations, the PCRA court dismissed Johnson's petition without a hearing, finding that "[r]ecantation evidence is the least reliable form of proof, particularly where the witness admits to perjury." District Ct. ECF No. 19–2 at A–97 (Ct. of Common Pleas Op., 4/10/2003).

On appeal, the Superior Court reversed and remanded, ordering the Court of Common Pleas to hold an evidentiary hearing on the claim of ineffective assistance of counsel for failure to consult with Johnson. The Superior Court also encouraged the court to "take evidence and rule on any other outstanding issues in this case, in addition to the consultation issue," *Commonwealth v. Johnson*, 467 EDA 2003 (Pa. Super. Jan. 31, 2005) (unpublished mem.), District Ct. ECF No. 19–1 at A–51 (*Johnson II*).

On remand, the court limited the evidentiary hearing to the consultation issue. The hearing was continued multiple times and was eventually completed on February 26, 2007, when the Commonwealth was unable to produce a witness. JA1651; SA90–103 (State Court Proceeding Notes dated 5/2/2005, 6/3/2005, 9/19/2005, 12/5/2005, 1/23/2006, 3/3/2006, 4/10/2006, 6/5/2006, 8/21/2006, 11/27/2006, 12/4/2006, 12/11/2006, 12/16/2006, 2/26/2007). Following briefing, the court denied relief on July 15, 2009. JA1652. The court nevertheless found that "from a *professional* or *ethical* standpoint, defendant's trial counsel was wanting in his representation of the defendant," and that counsel's consultation with Johnson was "admittedly meager." JA474 (emphasis in original), JA482.

The delay in holding a hearing on the ineffectiveness claim, due at least in part to the Commonwealth's arguments, resulted in trial counsel's dying before the court could convene the hearing, thus limiting Johnson's ability to prove his claim. *Commonwealth v. Johnson*, 51 A.3d 237, 240 n.2 (Pa. Super. 2012) (en banc) (*Johnson IV*) (noting that

while trial counsel's death "ma[de] Appellant's burden of proving ineffective assistance more difficult, that burden [was] not reduced."); *see also Commonwealth v. Johnson*, 1925 Op., Nos. 800, 801, 803, July 7, 2010, District Ct. ECF No. 19–1 at A–85 (observing that because trial counsel "was deceased at the time of the evidentiary hearings, [he] was thus unable to provide any details about the substance or duration of the two meetings" with Johnson).

On appeal, the Superior Court again vacated the denial of Johnson's PCRA petition. This time, instead of remanding for a hearing, the Superior Court held that trial counsel had rendered ineffective assistance, vacated the conviction, and remanded for a new trial. JA516 (*Commonwealth v. Johnson*, 2187 EDA 2009 (Pa. Super. 2011) (*Johnson III*)). The Commonwealth filed a petition for rehearing en banc, which the Superior Court granted, and the en banc court withdrew the panel decision and affirmed the PCRA court's denial of relief on the ineffectiveness claim for failure to consult. The en banc court did not reach the merits of any of Johnson's other claims, finding it was "powerless"

to consider them because Johnson had failed to explicitly describe them in his Pennsylvania Rule of Appellate Procedure 1925 Statement of Matters Complained of on Appeal. *Johnson IV*, 51 A.3d at 247.

## IV.   Initial habeas corpus proceedings in the district court

In 2013, Johnson filed a pro se petition for writ of habeas corpus in the United States District Court for the Eastern District of Pennsylvania. Johnson was appointed counsel who amended the petition, asserting claims of prosecutorial misconduct, suppression of materially exculpatory evidence, and ineffective assistance of counsel. JA128. Johnson amended his petition several times between 2013 and 2019, following continued investigation and receipt of additional, previously withheld items from the prosecution and police files. JA159, JA306, JA320.

## V.   Exhaustion proceedings in state court

During the years that Johnson's federal petition was pending, the district court stayed the proceedings to permit Johnson to return to state court to litigate claims arising from the disclosure of information not previously provided to Johnson by the Commonwealth. The new

evidence, which Johnson proffered to the state court in a pro se PCRA

petition filed on July 2, 2014 (amended counseled petition filed on January 1, 2016), and a counseled petition filed on May 4, 2020, included:

(1) recantations of their identifications of Johnson by Angelo Smith (affidavits dated June 10, 2014 and August 14, 2014, PCRA Petition filed July 2, 2014), Opal Nickson (affidavit dated July 23, 2014), Elisha Bennett (affidavit dated September 10, 2014), and an additional affidavit from James Smith confirming his recantation (affidavit dated August 6, 2014);

(2) information that Angelo Smith was available to testify at the trial, contrary to the prosecutor's representation, and that he had informed law-enforcement personnel and/or the prosecution at the time of trial that he was unable to identify Johnson and was then told he could leave without testifying (affidavits dated June 10, 2014 and August 14, 2014);

(3)    information that Opal Nickson had told investigating officers that Johnson had lighter skin than the perpetrator (affidavit dated July 23, 2014); and

(4)    an arrest photograph of Johnson taken within two days of the homicide that showed him with a mustache, in contrast to the descriptions Angelo Smith and James Smith provided of the perpetrator as clean-shaven.

PCRA Pet. dated May 4, 2020, Ex. 3.

The Commonwealth opposed the state court's consideration of Johnson's claims, arguing that (1) the courts should not even reach the merits because the claims were untimely, (2) the recantations and other information undercutting the reliability of the eyewitness identifications could have been obtained earlier, (3) the recantations were "belated and highly suspect," (4) Johnson's claims relied upon contentions that the prosecutor was untruthful, (5) Johnson's alibi claim and claims of actual innocence were not credible, (6) there was "overwhelming evidence" of Johnson's guilt, and (7) the delay in filing the second

PCRA petition caused prejudice to the Commonwealth.[2] The PCRA court granted the Commonwealth's motion to dismiss without holding a hearing, stating that the petition was untimely.[3] JA1666–67, 1679.

In 2021, after discovering the previously suppressed arrest photograph in the District Attorney's Office (DAO) file and conducting a thorough review of Johnson's pleadings, the trial record, the Philadelphia Police File, and the Commonwealth's prosecution file, the Conviction Integrity Unit (CIU)[4] concluded that Johnson presented

---

[2] In 2020, Johnson filed a PCRA petition alleging a *Brady* violation based on the Commonwealth's failure to disclose the arrest photograph. Johnson withdrew that PCRA petition with prejudice in September 2021. JA316–33.

[3] The order denying relief stated that the petition was "untimely filed and … the issues raised therein are without merit." The PCRA court made clear in its written opinion, however, that it "did not conduct a merits analysis; instead, it found the PCRA petition was time-barred. To the extent the order said both, counsel was present in the room and well aware of the Court's findings." JA1684.

[4] The CIU is an investigative unit of the DAO that reviews claims of innocence, wrongful conviction, and sentencing inequity. Based on national best practices, the CIU investigates cases independently of other units in the DAO. The CIU exercises its discretion to litigate cases

plausible claims of constitutional violations at his trial. Although the CIU was unable to determine whether Johnson was actually innocent, it concluded that, if Johnson's allegations were true, these facts would establish the basis for habeas relief.

## VI.    Continued habeas corpus proceedings in the district court

In filings in the district court, the Commonwealth expressly waived exhaustion and procedural defaults because it determined that these barriers to merits review of Johnson's claims did not serve the interests of judicial economy or prosecutorial fairness. The Commonwealth concluded that Johnson should have an opportunity to prove the merits of all his claims and to have the district court assess them both individually and cumulatively.

---------------------------

when it determines that the facts and the law support post-conviction relief and/or when a compromise and settlement agreement would further the ends of justice.

The Commonwealth also proposed a Compromise and Settlement Agreement with Johnson. JA316–32. After Johnson indicated a willingness to accept the terms, the Commonwealth recommended to the district court, consistent with the proposal, that it grant a conditional writ on Johnson's first-degree murder conviction with the understanding that he thereafter would plead guilty in state court to a lesser degree of murder and related offenses. JA331. The Commonwealth acknowledged that the district court was not required to order the proposed settlement and that it retained its independent judgment to examine the facts to determine whether a sufficient basis existed for granting a conditional writ. *See, e.g.*, JA350, JA352.[5]

———————————

[5] When the district court indicated that it was not inclined to adopt the settlement, the Commonwealth urged it to hold a hearing for fact-finding on the merits of Johnson's claims. JA352–53 (Commonwealth supplemental brief stating, "Respondents believe that the proposed agreement and a conditional writ of habeas corpus would be an appropriate resolution to this case…. In the event this Court does not grant a conditional writ, Respondents believe an evidentiary hearing would be appropriate[] [g]iven this Court's questions regarding the possible need to resolve credibility issues."); JA528–29 ("Should this

## VII.  The district court's opinion

The district court did not approve the proposed settlement agreement, finding that it did not "possess unfettered discretion to order a state prisoner released without assuring itself that the petitioner's claims have merit," and that "it must review the merits of Petitioner's claims, not merely rubber stamp them, before determining whether the proposed stipulation and settlement agreement may be approved." JA10–11.

The district court accepted only some of the Commonwealth's express, knowing, and considered waivers of procedural default defenses and rejected others. The district court denied Johnson's habeas corpus petition without a hearing.

The district court's opinion relied heavily on its interpretation of

_____

Court not accept Respondents' waiver, Respondents submit that an evidentiary hearing is warranted to determine whether Petitioner has demonstrated his actual innocence under *Schlup*.").

The district court did not hold a hearing or otherwise examine all the facts.

this Court's decisions in *Dennis v. Secretary, Pennsylvania Department of Correction*s, 834 F.3d 263 (3d Cir. 2016) (en banc), and *Bracey v. Superintendent Rockview SCI*, 986 F.3d 274 (3d Cir. 2021). The district court reasoned that *Bracey* limited *Dennis*'s applicability to cases tried after *Dennis* was decided by this Court:

> At the time of Petitioner's trial, there could be no *Brady* violation where defense counsel, with reasonable diligence, could have obtained the information. *Bracey v. Superintendent Rockview SCI*, 986 F.3d 274, 289–90 & 290 n.14 (3d Cir. 2021) (noting that the "due diligence exception to *Brady*" remained valid Third Circuit precedent up until the en banc opinion in *Dennis v. Secretary, Pennsylvania Department of Corrections*, 834 F.3d 263 (3d Cir. 2016)).

JA28. Because Johnson's case was tried before *Dennis* was decided, the district court required him to establish that his counsel had been diligent in order to prevail on his *Brady* claim.

The district court determined that the withheld evidence was not material because, if presented, it would have required the jury to (1) select among Nickson's inconsistent out-of-court statements, and (2) assess the reliability of James and Angelo Smith's identifications of the

19

Johnson when arrest photographs showed that Johnson's appearance shortly after the crime was different from the descriptions of the perpetrator the Smiths had provided.

## RELATED CASES OR PROCEEDINGS

This is Johnson's first federal petition for writ of habeas corpus. Counsel for the Commonwealth is not aware of any related case that is pending before this Court or any other court.

## SUMMARY OF ARGUMENT

The district court's ruling rested on an erroneous interpretation of the core holding of this Court's landmark decision in *Dennis*, 834 F.3d 263. *Dennis* held that counsel's diligence has never been an element of *Brady*, but the district court denied relief on one of Johnson's *Brady* claims precisely because he had not proved that his counsel was diligent. The district court reasoned that *Dennis's* holding did not apply to cases, like Johnson's, where the trial occurred before *Dennis* was decided. This is a serious misreading of *Dennis*; after all, *Dennis's* own trial was in 1992. The district court's reasoning rested on a misinterpretation of *Bracey*, 986 F.3d at 289–90 & 290 n.14. Nothing in *Bracey* purported to nullify *Dennis's* central holding for cases tried before 2016. Reversal is warranted on this basis alone.

Further, the district court erred in holding that the withheld evidence was not material where, if presented, it would have required the jury to (1) select among a witness's inconsistent out-of-court state-

ments, or (2) assess the reliability of witness identifications of a defendant when his appearance shortly after the crime was different than the descriptions of the perpetrator the same witnesses had provided. These determinations conflict with the materiality standard as articulated in Supreme Court and this Court's jurisprudence. *See United States v. Bagley*, 473 U.S. 667, 682 (1985); *Johnson v. Folino*, 705 F.3d 117, 129 (3d Cir. 2013).

The court's misapplication of *Brady* affected its three central conclusions: (1) Johnson did not establish cause and prejudice to overcome procedural default, thereby precluding merits review of some of his *Brady* claims; (2) Johnson did not establish the *Brady* claim that the court considered on its merits; and (3) the *Brady* violations, when considered cumulatively, did not require relief. *See Kyles v. Whitley*, 514 U.S. 419, 436 n.10 (1995) (before evaluating the cumulative effect for purposes of materiality, courts must first correctly evaluate the undisclosed information item by item).

Finally, the district court erred and abused its discretion when it

accepted only some of the Commonwealth's express, knowing, and considered waivers of procedural-default defenses and rejected others, in violation of *Wood v. Milyard*, 566 U.S. 463 (2012). As a result, it did not consider all Johnson's claims on their merits.

This Court should vacate the district court judgment denying relief and remand to the district court with instructions to apply well-established *Brady* law to resolve Johnson's claims and honor the Commonwealth's waivers of procedural default to permit all his claims to be resolved on their merits.

# ARGUMENT

## I.    The district court employed erroneous materiality standards in its review of Johnson's *Brady* claims.

The district court misapplied well-established *Brady* law in its consideration of the claims for relief, and its findings and conclusions relying on this misapplication cannot stand.

Johnson presented three distinct but related *Brady* claims to the district court: (1) the Commonwealth suppressed an arrest photograph of Johnson taken within two days of the homicide that showed that he had physical attributes inconsistent with the eyewitnesses' descriptions of the perpetrator; (2) the Commonwealth suppressed information that eyewitness Angelo Smith told law enforcement or prosecutorial personnel while in the courtroom that he was not able to identify Johnson as the perpetrator; and (3) the Commonwealth suppressed Opal Nickson's statement to law enforcement and/or prosecutors that the perpetrator's skin was darker than Johnson's.

The district court found that only the first of these *Brady* claims was reviewable on the merits and determined that the second and

third were procedurally defaulted. Nevertheless, the district court engaged in a *Brady* analysis for all three of Johnson's *Brady* claims, the first to determine its merit and the second and third to assess whether cause and prejudice excused the procedural default. JA21 (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991), and *Banks v. Dretke*, 540 U.S. 668, 698–99 (2004)).

The district court's analysis of these *Brady* claims was significantly flawed. Although the district court correctly set forth the elements of a *Brady* claim—(1) suppression, (2) favorability, and (3) materiality—*see* JA22–24, the court's analysis of the materiality prong was improper with regard to each of Johnson's three claims.

## A. The district court misread *Dennis* and *Bracey* to require Johnson to prove that he was diligent in order to establish that a key eyewitness's inability to identify Johnson was improperly suppressed by the prosecution.

The district court determined that, assuming Angelo Smith's 2014 affidavits were truthful, the prosecutor had suppressed information that Smith was available to testify and could not identify Johnson as the perpetrator, and that this suppressed information was

favorable to Johnson, JA26–27, establishing the first two *Brady* prongs.

The district court also found that "Angelo Smith's inability to identify

Petitioner may have undercut the credibility of the other three wit-

nesses," JA27, apparently establishing the third *Brady* prong—materi-

ality. But because the court determined that the materiality prong

could not be satisfied if, with diligence, Johnson could have discovered

this information independently, and that Johnson could have discov-

ered it because "trial counsel was on notice that Angelo Smith could

have been an exculpatory witness, in light of his statement to the po-

lice, and failed to compel his attendance," the court found no cause

and prejudice to excuse the default. JA27–28.

## B. The district court relied on a legal position expressly fore-closed by *Dennis* when it required Johnson to show that he had been diligent.

The district court's imposition of a diligence requirement was

squarely foreclosed by this Court's opinion in *Dennis*, 834 F.3d 263. In

*Dennis*, the Commonwealth failed to disclose a receipt showing that a

witness cashed her welfare check at a different time than what she testified to. The receipt was both favorable and material evidence because it would have corroborated Dennis's alibi and impeached the witness's testimony that she saw Dennis at a much later time than his alibi indicated. The receipt was suppressed for purposes of *Brady* because "the police had the receipt and therefore so did the prosecution," and whether defense counsel could have obtained the receipt from some other source was irrelevant. *Id.* at 288–91.

This Court explained that "the duty to disclose under *Brady* is absolute—it does not depend on defense counsel's actions." *Id*. at 290 (citing *United States v. Agurs*, 427 U.S. 97, 107 (1976)). It concluded that *Brady* must be construed in "a manner that encourages disclosure," and that "[r]equiring an undefined quantum of diligence on the part of defense counsel . . . would dilute *Brady's* equalizing impact on prosecutorial advantage by shifting the burden to satisfy the claim onto

defense counsel." *Id*.[6]

The district court misread *Dennis's* mandate by requiring John-son to show that he was diligent. JA28. This conclusion is directly at odds with the holding in *Dennis*.

### C. The district court also erred in concluding that *Dennis* only applies to cases tried *after Dennis* was decided.

In *Dennis*, this Court evaluated the *Brady* claim related to the wel-fare-check receipt under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254. *Dennis*, 834 F.3d at 286. Through that analysis, this Court determined that the Pennsylvania Supreme Court's decision rejecting Dennis's *Brady* claim on the

---

[6] Moreover, the diligence exception rejected by this Court in *Dennis* related not to the *materiality* prong of *Brady*, as the district court main-tained (set forth in more detail below), but to the *suppression* prong. "*Brady's* mandate and its progeny are entirely focused on *prosecutorial disclosure*, not defense counsel's diligence." *Dennis*, 834 F.3d at 290 (em-phasis added). That is, whether or not defense counsel exercised dili-gence to independently discover that Angelo Smith could not identify Johnson as the perpetrator has no bearing upon whether "the failure to disclose Angelo Smith's availability would have been material." JA27.

grounds that there was no evidence that the Commonwealth withheld the receipt from the defense, *see Commonwealth v. Dennis*, 715 A.2d 404, 408 (Pa. 1998), involved an unreasonable application of clearly established federal law under § 2254(d)(1) because it "ignored *Kyles* [*v. Whitley*, 514 U.S. 419, 437–38 (1995)]," a Supreme Court holding that favorable evidence in the police's possession is imputed to the prosecution. *Dennis*, 834 F.3d at 288. This Court observed that *Kyles* was decided "three years prior to the Pennsylvania Supreme Court's decision" and thus was "clearly established federal law, as determined by the Supreme Court of the United States" at the time of the state court's decision. *Id*. at 288–89.

This Court was unequivocal that *Brady* has never required diligence, and that the parties' arguments and prior court decisions holding or suggesting the contrary were wrong. *Id.* at 291–92 (acknowledging that while the circuit's case law "is inconsistent and could easily confuse . . . the focus of the Supreme Court has been, and

it must always be, on whether the government has unfairly 'suppressed' the evidence in question in derogation of its duty of disclosure."). This Court pointed out that "the United States Supreme Court has *never* recognized an affirmative due diligence duty of defense counsel as part of *Brady*, let alone an exception to the mandate of *Brady* as this would clearly be…. *Brady's* mandate and its progeny are *entirely* focused on prosecutorial disclosure, *not* defense counsel's diligence." 834 F.3d at 290 (emphasis added). *Dennis* merely announced what has always been the law pursuant to *Kyles*, 514 U.S. 419, and other United States Supreme Court precedent; there is "no additional prong to *Brady*." *Dennis*, 834 F.3d at 293.

Furthermore, by granting *Dennis* relief (a conditional writ of habeas corpus) for the *Brady* violations occurring before and during his trial in 1992, this Court made clear that its ruling was not simply prospective. 834 F.3d at 313.

Nor did this Court's decision in *Bracey* hold that a diligence exception to *Brady* "remained valid Third Circuit precedent up until the

en banc opinion in *Dennis*." JA28. Indeed, such a holding would have been entirely inconsistent with the reasoning of *Dennis* and the language cited above. Instead, *Bracey* held that a court ruling on a Rule 60(b) motion to reopen a prior judgment must look to the effect *Dennis* had on relevant decisional law in determining whether a petitioner had met the due diligence requirements of 28 U.S.C. § 2244(d)(1)(D). *Bracey*'s discussion of *Dennis*'s application is, therefore, inapposite to Johnson's case.[7]

For the reasons set forth above, if Johnson proved that what Angelo Smith put in his statement was true, all three *Brady* prongs would

---

[7] The district court determined that Johnson was not diligent because he was "on notice that Angelo Smith could have been an exculpatory witness, in light of his statement to the police, and failed to compel his attendance." JA27–28. But the court disregarded Johnson's allegations that the prosecutor not only withheld the information that in the courtroom Angelo Smith could not identify Johnson as the perpetrator, but also affirmatively lied to Johnson and the trial court that Angelo Smith was unavailable. Counsel was permitted to rely on the prosecutor's misrepresentation and was not required to double-check it. *See Banks*, 540 U.S. at 695–96 (rejecting the state's argument that "the prosecution can lie and conceal and the prisoner still has the burden to . . . discover the evidence" (internal quotations omitted)).

be met, cause and prejudice would excuse any procedural default, and *Brady* relief would be required.

## II. The district court misapplied the materiality prong of *Brady* when it found that no cause and prejudice existed to excuse the procedural default regarding Opal Nickson's statement that Johnson's skin was lighter than the perpetrator's.

The district court determined that, "if Opal Nickson's affidavits are to be believed," Johnson satisfied the suppression and favorability prongs of *Brady* with respect to the withholding of information that Nickson described the perpetrator as darker skinned than Johnson. JA29 (acknowledging that "[t]here were no notes in [Nickson's] initial statement to the police, nor at the preliminary hearing, that indicate that she identified the wrong person on the basis of his skin color" (suppression), and that "this evidence may have been weakly favorable to Petitioner . . . so the evidence is slightly exculpatory.)"

But the district court then ruled that Johnson had not proved that this information was material, "as it would have opened the door for the introduction of her initial identification of Petitioner" and "[t]he jury then would have been left to decide which of her identifications

they believed." JA29. This is plainly wrong. Witnesses regularly provide statements that are inconsistent with one another in certain respects. When a witness testifies consistent with one of her pretrial statements, but not another, it is the jury's job to weigh the witness's credibility and determine which, if any, of her statements and testimony to believe. When an exculpatory out-of-court statement is withheld, while incriminatory statements are disclosed, and the witness's testimony is consistent with the incriminatory statement, the jury is deprived of information critical to assessing the credibility of the testimony. In such a case, as here, the undisclosed inconsistent statement may well be material under *Brady* because it undermines the apparent certainty of the presented evidence.

Nickson's pretrial observation that Johnson and the perpetrator were differently complected impeached her identification of Johnson in the courtroom. Nickson's identification was the most damning of the three eyewitness identifications presented to the jury: Nickson repeatedly referred to the perpetrator as "Kevin" and confirmed that

"Kevin" was Johnson. *See, e.g.*, JA835, JA850. Nickson's previous statement to investigating officers and the prosecutor that the perpetrator's complexion was darker than Johnson's—"Kevin Johnson is light brown skin, and the man that pointed the gun at us was dark, but they favor each other" (JA250–51)—might have cast doubt on her testimony identifying Johnson by name as the perpetrator. Such is the defining characteristic of materiality. *See, e.g., Johnson v. Folino*, 705 F.3d 117, 129 (3d Cir. 2013) ("undisclosed evidence that would seriously undermine the testimony of a key witness may be considered material when it relates to an essential issue or the testimony lacks strong corroboration."); *see also Fisher v. Somerset*, 591 Fed. Appx. 118, 123 (3d Cir. 2014) (a proper materiality inquiry "requires consideration of the nature of the impeachment information, when it came into existence, and the strength of the other evidence").

Because the district court erred in determining that the evidence was not material, its conclusion that no cause and prejudice existed to excuse the delay in presenting it to the state court also was erroneous.

**D. The district court's rejection of Johnson's claim regarding the suppression of arrest photographs also was based on a misunderstanding of the materiality prong of *Brady*.**

The only *Brady* claim the district court considered on its merits was Johnson's claim regarding the arrest photograph. JA38. Although the court expressed skepticism about whether the arrest photographs had been disclosed prior to or during Johnson's trial, it ultimately concluded that "the trial record appears consistent with the claim that Petitioner's counsel did not have access to the October 10, 1986 arrest photos." JA40, thus determining that the suppression prong of *Brady* was satisfied. The court also concluded that the arrest photograph "was somewhat, but not strongly favorable," because it was taken shortly after the crime and depicted him with a thin mustache in contrast to the descriptions provided by eyewitnesses Angelo Smith and James Smith that the perpetrator was completely clean-shaven. JA40.

The district court then ruled that "standing alone, the arrest photograph is not material" because the photographs that were shown to the eyewitnesses, though taken at least a year earlier, depicted Johnson

with a similar mustache, and that mustache did not prevent the eye-witnesses from identifying him from those photos.[8] JA42.

But photographs showing Johnson with a mustache hours after the crime could have established that *at the time of the crime* Johnson did not match the descriptions of the perpetrator provided by Angelo Smith and James Smith. Although this Court has held that "[e]vidence of slight, trivial or hypothetical favorability obviously does not sway us as much in our materiality analysis as does evidence of a clearly impeaching or exculpatory nature," *Rivera v. Pennsylvania*, 187 Fed.

---

[8] The Attorney General argued in its amicus brief to the district court that the arrest photographs taken shortly after the crime demonstrate only "that petitioner's appearance was remarkably consistent over time" and that "[a]nyone who knew his face in 1981 or 1983 or 1985 would easily have recognized it in 1986." JA389. But what is relevant about the arrest photo is that someone who knew Johnson would recognize him with a thin mustache because that is what he always wore, *and would not have described him as clean shaven*, as at least two of the eyewitnesses described the perpetrator.

Appx. 240, 245 (3d Cir. 2006), the photographs were "clearly impeaching" because they could have impeached the reliability of the witnesses' identifications of him—and James Smith's trial testimony to that effect—after having described the perpetrator differently, and cast doubt on the only evidence tying Johnson to the crime. Again, such is the defining characteristic of materiality. *See Folino*, 705 F.3d at 129; *Fisher*, 591 Fed. Appx. at 123.

**E.** **The district court's flawed materiality analysis tainted all of its rulings that Johnson did not establish cause and prejudice to overcome procedural default, therefore precluding merits review of some of Johnson's individual *Brady* claims, and the overall cumulative *Brady* claim.**

The district court's flawed materiality analysis precluded it from considering the cumulative prejudice resulting from the suppressed evidence, all of which challenged the identifications that formed the sole basis of Johnson's convictions. *See Kyles*, 514 U.S. at 436 n.10 (holding that a court must not only "evaluate the tendency and force of the undisclosed evidence item by item," but also must "evaluate its cumulative effect for purposes of materiality separately").

Johnson's convictions relied entirely upon eyewitness identifications that have been recanted. This Court's recent decision in *Howell v. Superintendent Albion SCI*, 978 F.3d 54 (3d Cir. 2020), rejected the historically taken position that recantations are categorically unreliable. In *Howell*, this Court recognized that multiple recantation affidavits are potentially "mutually corroborating evidence, with each one having the potential to bolster the reliability of the others." *Id.* at 61.

Additionally, the eyewitness identifications here were made under conditions that research has shown cast additional doubt on their reliability. *See 2019 Report of the United States Court of Appeals for the Third Circuit Task Force on Eyewitness Identifications*, 92 Temple L. Rev. 1 (2019). These include the following conditions, which the eyewitnesses reported to law enforcement and to which they testified at trial: (1) minimal opportunity to see the perpetrator's face prior to the crime scene plunging into darkness when the light was disconnected; (2) use of intoxicating substances in the hours preceding the attack; (3) focus on the perpetrator's gun pointed at them; and (4) stress and fear. *Id.* at

19, 21, 92. They also include additional factors that Johnson alleged were present during the out-of-court identifications: (1) leading questions and post-identification feedback by detectives and the prosecutor at the preliminary hearing; (2) mugshot searching, which may cause the witness to conflate the perpetrator with someone seen elsewhere; and (3) unconscious transference, in which the accuracy of an eyewitness identification is undermined "when a person seen in one context is confused with a person seen in another." *Id*. at 9, 15, 16, 60, 61 n.316 (citation omitted); *see also Dennis*, 834 at 328 n. 112 (citing Kenneth A. Deffenbacher et al., *Mugshot Exposure Effects: Retroactive Interference, Mugshot Commitment, Source Confusion, and Unconscious Transference*, 30 L. & Hum. Behav. 287, 299 (2006) (explaining how unconscious transference can negatively affect the reliability of an identification when the witness sees the suspect's photo multiple times)); Nelson et al., *Change blindness can cause mistaken eyewitness identification,* 16 Logical and Criminological Psychology 62 (2011) (discussing faulty eyewitness identifications when an eyewitness mistakenly identifies a person

as having committed the crime, when in fact the eyewitness had actually encountered that person in a different context). Moreover, the eyewitnesses reported in their post-conviction affidavits that they were not merely asked leading or suggestive questions during the identification procedure but were coerced and threatened by detectives with repercussions if they did not identify Johnson as the perpetrator. JA325 ns.10, 11; JA326.

The district court was aware of these factors and their implications for the reliability of Johnson's convictions. *See, e.g.*, JA29, JA41 (commenting about the limited lighting at the crime scene); JA56–58 (noting that the eyewitnesses were smoking cocaine and marijuana); JA42 n.17 (referring to the eyewitnesses' statements "that they were coerced into pointing out Petitioner's photograph"). But the district court's repeated application of flawed materiality standards prevented it from considering how the suppressed evidence, when considered together with these factors, fundamentally undermined the eyewitness identifications that formed the basis of the Commonwealth's case

against Johnson.

III. **The district court erred by rejecting the Commonwealth's waiver of affirmative procedural-default defenses and thus failing to consider all of Johnson's claims on their merits.**

The Commonwealth explicitly waived all procedural-default defenses, which required the district court to consider each of Johnson's claims, individually and cumulatively. JA320 ("the Commonwealth is now waiving all jurisdictional bars to relief, including exhaustion, in this habeas proceeding. The Commonwealth concedes that Johnson's claims are properly before this Court.").

The district court acknowledged that habeas respondents can elect to waive procedural defaults but, relying on outdated authority, asserted that district courts are free to reject such a waiver. JA16–19 (Mem. Op. Denying Relief). The court based this decision on general principles of finality, comity, justice, and federalism. JA19. The court then refused to honor the Commonwealth's waivers "as to claims that were presented to, but rejected by, the state courts on procedural grounds." JA19 & n.7.

The district court erred in rejecting the Commonwealth's affirmative waivers or, alternatively, abused its discretion by failing to provide the parties an opportunity to set forth their positions before it sua sponte rejected the Commonwealth's waivers. The distinction the district court made between a party's waivers of different types of procedural defenses (exhaustion, statute of limitations, and state procedural bars) finds no support in the law of this Court or the Supreme Court. Indeed, legal authority requires federal courts to accept waivers of procedural defenses and address the merits of claims where the parties "deliberately steer[ ] the… Court away from the question [of procedural bars] and towards the merits." *Wood v. Milyard*, 566 U.S. 463, 474 (2012).

## A. Federal district courts are bound by a state's waiver of exhaustion and other procedural defaults.

The Rules Governing Section 2254 and 2255 Cases (hereinafter "Habeas Corpus Rules"), which implement AEDPA, require respondents to state in their answer "whether any claim in the petition is barred by a failure to exhaust state remedies, a procedural bar, non-

retroactivity, or a statute of limitations."). Habeas Corpus Rule 5(b).

Similarly, the Federal Rules of Civil Procedure provide that affirmative

defenses to a claim for relief must be asserted in the responsive plead-

ing. Fed. R. Civ. P. 8(c)(1), 12(b).[9]

Although a federal court may, but is not obliged to, sua sponte

consider a forfeited habeas defense, *Day v. McDonough*, 547 U.S. 198,

210 (2006), *Wood v. Milyard*, 566 U.S. 463, 473 (2012), a court is bound

to accept a state's explicit refusal to assert a statute of limitations de-

fense.[10] In *Wood*, the Supreme Court held that a court does not have

discretion to impose a timeliness bar where the State has chosen to

---

[9] The Federal Rules of Civil Procedure and Criminal Procedure are applicable to habeas corpus proceedings "to the extent that they are not inconsistent with any statutory *provisions* or [the Habeas Corpus] rules." Habeas Corpus Rule 12 (emphasis added).

[10] The Supreme Court has noted the "distinction between defenses that are 'waived' and those that are 'forfeited.' A waived defense is one that a party has knowingly and intelligently relinquished; a forfeited plea is one that a party has merely failed to preserve." *Wood*, 566 U.S. at 470 n.4; *see also Hamer v. Neighborhood Hous. Servs. of Chicago*, 583 U.S. 17, 20 n.1 (2017) (the "terms waiver and forfeiture—though often used interchangeably by jurists and litigants—are not synonymous").

waive it: "Does court discretion to take up timeliness hold when a State is aware of a limitations defense, and intelligently chooses not to rely on it in the court of first instance? The answer *Day* instructs is 'no[.]'" *Wood*, 566 U.S. at 466. Although *Wood* and *Day* have described a court's rejection of a state's waiver of an untimeliness defense as an "abuse of discretion," *Wood* made it clear that a court has no discretion in this situation; a court must, as a matter of law, accept the state's waiver. *Id.* at 466 ("A court is not at liberty … to bypass, override, or excuse a State's deliberate waiver of a limitations defense.").[11]

In *Wood*, the Supreme Court found that where the state explicitly declined to challenge the timeliness of a habeas corpus petition, the

_____

[11] Just as it is "understandable" that parties may confuse or conflate the terms "waiver" and "forfeiture" because "courts only recently have focused on the difference between the two," *United States v. Dowdell*, 70 F.4th 134, 140 (3d Cir. 2023), it also is understandable that courts would continue to use the term "abuse of discretion" in this context because that term has been used to describe the resurrection of a *forfeited* affirmative defense, *see Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 894 n.2 (1991) (Scalia, J., concurring) ("[We] have so often used them interchangeably that it may be too late to introduce precision.").

Tenth Circuit erred by nevertheless addressing the timeliness issue to preclude review of the claims on their merits. *Wood*, 566 U.S. at 466. As the Supreme Court has explained, federal courts must "follow the principle of party presentation" as "[o]ur adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief.'" *Greenlaw v. United States*, 554 U.S. 237, 243–44 (2008) (holding that absent a government appeal, the Eighth Circuit could not, on its own initiative, order an increase in a defendant's sentence). This rule applies equally when the advocate has the special responsibility of a prosecutor who "must ensure that the defendant is accorded procedural justice." *Commonwealth v. Clancy*, 648 Pa. 179, 194 (2018) (citing Pa.R.P.C. 3.8 cmt. 1); *see also Strickler v. Greene*, 527 U.S. 263, 281 (1999) (the prosecutor's interest in a criminal prosecution "is not that it shall win a case, but that justice shall be done.").

The district court relied upon this Court's opinions in *Hull v. Freeman*, 932 F.2d 159, 164 (3d Cir. 1991) (*Hull I*), and *Christy v. Horn*,

115 F.3d 201, 207 n.3 (3d Cir. 1997), both of which predated *Wood*, to conclude that it was permitted to reject the Commonwealth's waiver of procedural defaults and sua sponte apply the defaults to preclude merits review. The holdings in *Hull I* and in *Christy* are no longer good law after *Wood*.

Although *Wood* addressed only waivers of statute-of-limitations defenses, the same balancing of those concerns applies when the state waives another procedural-default defense as it does when the state waives a statute-of-limitations defense. The Supreme Court's analysis in *Wood* thus logically extends beyond timeliness to the other affirmative defenses, or potential barriers to merits review, set forth in Habeas Corpus Rule 5(b). *See Day*, 547 U.S. at 209 (concluding that "it would make 'scant sense' to distinguish in this regard AEDPA's time bar from other threshold constraints on federal habeas petitioners" because it is "on a par" with "failure to exhaust state remedies, procedural defaults, and non-retroactivity and "must be treated the same.") (citations omitted). This was decided in response to arguments that AEDPA's statute

of limitations, like the exhaustion doctrine, 'implicat[es] values beyond the concerns of the parties.'" *Id.* (quoting *Day*, 547 U.S. at 205). These concerns are "comity, finality, and the expeditious handling of habeas proceedings." *Day*, 547 U.S. at 208.

Neither the Supreme Court nor this Court has squarely addressed whether *Wood* applies to state waivers of other procedural defenses. But both have indicated that *Wood* applies to waivers in contexts other than statute of limitations. For example, the Supreme Court recently cited *Wood* to reject Louisiana's claim that plaintiffs lacked standing to vindicate their constitutional rights, because Louisiana intentionally chose not to raise that defense earlier in the litigation. *June Med. Servs. v. Russo*, 591 U.S. 299, 317 (2020) (abrogated on other grounds by *Dobbs v. Jackson Women's Health Org.*, 597 U.S 215 (2022)). The Court decided that the "State's unmistakable concession of standing as part of its effort to obtain a quick decision from the District Court on the merits of the plaintiffs' undue-burden claims bar our consideration of it here." *Id*. at 317 (citing *Wood*, 566 U.S. at 474.)

This Court, too, has acknowledged that it "may 'resurrect' a forfeited defense (but not a waived one)." *Chester v. Comm'r of Pa. Dept. of Corr.*, 598 Fed. Appx 94, 104 (3d Cir. 2015) (citing *Wood*). In addition, this Court recognized *Wood's* application to situations beyond timeliness. *See United States v. Tyler*, 956 F.3d 116, 124 n.9 (3d Cir. 2020) (observing that where defendant did not challenge the sufficiency of the evidence as to a particular fact, he had "waived any such argument," citing *Wood*).

Other federal courts of appeals have held that the waiver rule established in *Wood* applies to waivers in many contexts in addition to the application of a statute-of-limitations defense. For example, in *Douglas v. United States*, 858 F.3d 1069 (7th Cir. 2017), the petitioner filed an untimely habeas petition after having waived his right to seek collateral review as part of his plea agreement. In the habeas proceedings, the federal government waived its right to hold Douglas to the terms of the plea agreement and agreed that Douglas's claims could be heard on their merits despite their untimeliness. The Seventh Circuit

held that it must reach the merits of the claims because "[t]he Supreme Court has held that federal courts may dismiss procedurally defective collateral attacks when the government fails to notice the problems, but must respect formal waivers by prosecutors and wardens." *Id.* at 1070 (citations omitted).

The Eighth Circuit has held that *Wood* applies to waivers of exhaustion defenses. In *Jimerson v. Payne*, the court held that "the State … affirmatively waived exhaustion before the district court when, in its response to [the] petition, it asserted: 'Respondent also admits that [petitioner] has no unexhausted, non-futile state remedies available to her," and that, under *Wood*, "[w]e are 'not at liberty' to revive a waived exhaustion defense." 957 F.3d 916, 928 (8th Cir. 2020).

Similarly, the Ninth Circuit found that a tribe had deliberately waived an exhaustion defense stemming from a petitioner's failure to file a direct appeal in tribal court prior to filing a habeas petition, and that the defense could not be restored. *Alvarez v. Lopez*, 835 F.3d 1024, 1027 (9th Cir. 2016). The court held that the tribe's lawyer's "dogged

insistence that we focus on commutation and tribal habeas 'deliberately steered' us away from any discussion of the direct appeal. That steering amounts to intentional waiver, which in turn precludes us from raising non-exhaustion sua sponte." *Id*. at 1028.

The Sixth Circuit has held that *Wood* applies to waivers of procedural-default defenses. In a case in which the state "explicitly and deliberately waived [an] argument" that claims were procedurally defaulted but then "had a change of heart" and sought to assert it, the court could not "override" the earlier waiver. *Maslonka v. Hoffner*, 900 F.3d 269, 276–77 & 277 n.1 (6th Cir. 2018). The Sixth Circuit explained, "Although the Supreme Court has not absolutely barred us from considering sua sponte a *forfeited* habeas defense, it has said that we may not 'depart from the principle of party representation basic to our adversary system' by considering a *waived* defense." *Id*. at 277 (citing *Wood*, 566 U.S. at 472.).

In fact, federal courts of appeals have held that the rule set forth in *Wood* applies to intentional waivers of all types, whether waivers of

affirmative defenses, waivers of the use of stricter standards of review, and waivers of legal arguments. For example, in *Ryan v. United States*, 688 F.3d 845 (7th Cir. 2012), a case remanded by the Supreme Court in light of *Wood*, the Seventh Circuit had requested briefing by the parties about whether the same standard of review should be used on direct appeal and collateral attack. The government "failed to contend that the standards differed," but the Court concluded that the standards were materially different and applied the stricter sufficiency-of-the-evidence standard in reviewing the petitioner's habeas claims. *Id*. at 847. On remand, the government stated that it had forfeited, rather than waived, the use of the stricter standard, and requested that the Court of Appeals apply the stricter standard. The Seventh Circuit refused, citing principles articulated in *Wood*. *Id*. at 848.

Other courts have similarly applied the *Wood* rule to waivers beyond those relating to procedural default. *See, e.g.*, *Hapag-Lloyd Aktiengesellshaft v. U.S. Oil Trading LLC*, 814 F.3d 146, 156 n.23 (2d Cir. 2016) (declining to consider defendant's argument that the district

court lacked personal jurisdiction because the defendant had not raised it below, a decision the court found "bespeaks more waiver than forfeiture, which eliminates our discretion to reach the issue," citing *Wood*).

The Commonwealth has been unable to find a single case in which a court limited *Wood's* application to cases involving waivers of statutes-of-limitations defenses.

**IV.  Alternatively, the district court abused its discretion by rejecting the Commonwealth's waivers without providing the parties a fair opportunity to present their positions, and because there were no extraordinary circumstances requiring the court to resurrect the procedural bars sua sponte.**

Even if this Court declines to extend the *Wood* rule beyond the timeliness context, this Court should conclude that the district court abused its discretion in Johnson's case by rejecting the Commonwealth's explicit waivers and sua sponte reviving the procedural bars without affording the parties "fair notice and an opportunity to present their positions." *Day*, 547 U.S. at 210. The Supreme Court has held

that even in a situation in which the state forfeited a procedural defense by failing to raise it, a court must, "before acting on its own initiative, … accord the parties fair notice and an opportunity to present their positions." *Id*. Furthermore, a court may only consider a forfeited habeas defense "when extraordinary circumstances so warrant." *Wood*, 566 U.S. at 471. Because waiver is intentional, whereas forfeiture is generally due to neglect, a court's responsibility to permit the parties to weigh in on its plan to apply a waived defense is at least as compelling as its obligation to permit them to address the application of a forfeited defense.[12]

---

[12] At least one circuit has determined that, under *Wood*, parties have no obligation to state their reasons for waiving procedural defenses. In *Ryan*, described above, the Seventh Circuit held:

> The Supreme Court found a waiver in *Wood* because the state knew about a potential defense and told the court that it was not asserting it. That's exactly what happened here. The United States Attorney learned at oral argument that there was a potential procedural argument, then informed the court that the argument was not being asserted.

Had the district court asked the parties to explain their positions before rejecting the waivers sua sponte, the Commonwealth would have provided the following reasons for waiving the procedural default defenses:

First, after careful consideration of the amended petition and the entire record in this case, the Commonwealth affirmatively waived exhaustion and other procedural defaults because of "the simple belief that it would be unfair to impose the limitations on [Johnson]" in light of the unfairness of the underlying proceedings. *See Day*, 547 U.S. at 218 (Scalia, J., dissenting).

The unfairness of the proceedings in state court that motivated

---

> *Why a litigant comes to such a decision is irrelevant, and a mistake in reaching a decision to withhold a known defense does not make that decision less a waiver. This court is neither authorized nor inclined to delve into the deliberational process that preceded a decision by the United States Attorney; we must respect the decision announced in court.*

688 F.3d at 848 (emphasis added).

the CIU to choose to waive exhaustion and other procedural defaults included the unfairness underlying the constitutional claims presented to the district court for relief, new scientific developments, and reassessment of police and prosecutorial practices. The primary factors motivating the CIU to waive barriers to merits review were the following:

(1) Suppression of exculpatory information by the Commonwealth, which caused Johnson to raise his *Brady* claims for a relief in a piecemeal manner in state courts, precluding those courts from considering their cumulative materiality and prejudice;

(2) Ineffective assistance of counsel at Johnson's trial, appeal, and first PCRA in state court, which similarly prevented the state court from considering the cumulative effect of constitutional violations and the fairness of his trial;

(3) Developments in the understanding of the unreliability of eyewitness identifications in general—the only evidence tying Johnson to the homicide of Lyndon Morris—along with the specific challenges

to the trustworthiness of the identifications of Johnson in this case, which should inform the evaluation of the strength of the case at trial against Johnson. JA529–41; 2022-09-22 Tr. of Hr'g at 16–18;

(4) Developments in the understanding of conditions that lead to false or unreliable witness statements, including specific interrogation techniques;

(5) The effect of egregious misconduct by the prosecutor during Johnson's trial, much of it reflected in the trial record and identified by the trial judge, which was never determined at an evidentiary hearing in state court;

(6) Repeated failures by Johnson's court-appointed appellate and post-conviction counsel to file briefs and petitions in a timely fashion—and in some cases, failure to file them at all, leading to extended, unnecessary, and prejudicial delays; and, perhaps most importantly,

(7) The Commonwealth's unwavering, and incorrect, position in state post-conviction proceedings that the courts should deny Johnson's claims without holding evidentiary hearings to determine the

factual basis of his claims, which led to the unavailability of trial counsel, who died before the state appellate courts ordered an evidentiary hearing on ineffective assistance of counsel;

(8) The Commonwealth's belief that justice and efficiency were served by not forcing Johnson to litigate—futilely—these issues through additional rounds of state court review, in order to finally have a court consider his individual *Brady* claims cumulatively.[13]

In sum, the CIU waived procedural defenses because it recognized that Johnson is in his current predicament because of a confluence of factors, including what the CIU conceded in the district court

_____

[13] When considering the "cumulative effect" of multiple items of favorable and suppressed information, Pennsylvania courts exclude any item that was not timely pled from the cumulative materiality analysis. *Commonwealth v. Natividad*, 200 A.3d 11, 39 (Pa. 2019); *see also id.* at 36 n.18 ("Parenthetically, we note 'this Court is bound by decisions of the U.S. Supreme Court, not the opinions of the inferior federal courts.' At the same time, it does not escape us that the Third Circuit's decision in *Dennis* was highly critical of this Court's treatment of certain aspects of federal precedent regarding *Brady* and its progeny…. Our analysis herein is mindful of those pointed criticisms.") (citations omitted). As a result, the only court in a position to assess the materiality of all the suppressed information in this case was the district court.

included numerous bad acts by the state during Johnson's trial and state post-conviction proceedings.

The Pennsylvania Attorney General, presenting its case as invited amicus in the district court, argued that the Commonwealth's waivers were not binding upon the federal court and instead constituted improper "forum-shopping." Br. for the Office of the Atty. Gen., ECF No. 91 at 23. Indeed, amicus took the position that the Commonwealth's waiver was a deliberate ruse to divest the state courts of their jurisdiction to resolve the one unexhausted claim (the arrest photograph *Brady* violation) and nullify the state courts' prior rejections of out-of-time claims. ECF No. 91 at 23–26. The district court did not accept or endorse (indeed, it did not mention) amicus's contention that the Commonwealth was "forum-shopping." Instead, it acknowledged amicus's argument (erroneously relying on *Hull I* and *Christy*, as explained above), that the district court could "reject a waiver," JA17, but decided to disallow only some of the Commonwealth's waivers, JA19.

The Commonwealth strove to rectify wrongs that had occurred

in this case by declining to assert defenses that would deprive Johnson of his opportunity to prove claims he unfairly was prevented from proving for the past three decades. As the Commonwealth argued below, "Our Supreme Court also has recognized that 'principles of comity and finality … must yield to the imperative of correcting a fundamentally unjust incarceration.'" ECF No. 94–1 at 10 (citing *Murray v. Carrier*, 477 U.S. 478, 495–96 (1986)). The CIU waived exhaustion and procedural-default defenses to remedy past injustices in this case, many for which the Commonwealth was at least partially responsible, and to allow Johnson to present the merits of his claims in a court with jurisdiction to address all of them. That is, the Commonwealth "'strategically' withheld the defense[s and] chose to relinquish [them]." *Day*, 547 U.S. at 210.

Moreover, there were no extraordinary circumstances here that merited the district court's revival of the waived procedural defenses. *See Wood*, 566 U.S. at 471 n.5; *Day*, 547 U.S. at 210. Such circumstances generally require an *inadvertent* failure to raise the defense, rather than

an intentional one. *Wood*, 566 U.S. at 471 (quoting *Granberry*, 481 U.S. at 132, 134). This Court has stated it will not reach a *forfeited* issue absent extraordinary, or exceptional, circumstances, and that such circumstances "may exist where the case involves 'uncertainty in the law; novel, important, and recurring questions of federal law; intervening change in the law; and extraordinary situations with the potential for miscarriages of justice.'" *Barna v. Bd. of Directors of Panther Valley Sch. Dist.*, 877 F.3d 136, 147 (3d Cir. 2017) (citation omitted). None of these circumstances applied here. Therefore, the district court abused its discretion by failing to honor the waivers in order to consider all of Johnson's claims on their merits, most importantly a robust cumulative-prejudice claim.

## V.    Remand for Further Proceedings is Appropriate.

### A. This Court should remand to apply correct materiality and *Brady* analyses.

As set forth above, the district court's rejection of Johnson's *Brady* claims relied on incorrect readings of *Dennis* and *Bracey* and other misinterpretations of the materiality requirement. Because the

district court improperly concluded that two of the *Brady* violations could not be considered due to procedural default, and that the third failed on its merits, it did not assess how the multiple *Brady* violations would have cast doubt on the identification evidence as a whole—i.e., cumulatively, as required by *Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007). For example, the district court found that there was no reasonable probability of a different result had defense counsel presented Angelo Smith's testimony that he could not identify Johnson in the courtroom, because "[t]hree other witnesses recognized Petitioner as the man with the pistol at trial"), JA62, wholly ignoring the possibility that the identifications by Opal Nickson, James Smith, and Elisha Bennett, as their affidavits attested, also were inaccurate. Remand to correctly apply the materiality standard to Johnson's *Brady* claims is appropriate.

**B. Remand would permit the district court to correct its improper rejection of the Commonwealth's waiver of affirmative procedural default defenses and accept the waivers to consider the merits of all of Johnson's claims.**

A remand would provide the district court the opportunity to

accept the Commonwealth's waivers of affirmative procedural default defenses as required by the Supreme Court in *Wood*, 566 U.S. at 474. The district court would then review all of Johnson's claims on their merits and conduct a complete cumulative error/prejudice analysis.

### C. This Court should instruct the district court to engage in any fact-finding process the district court deems necessary to resolve factual issues.

The Commonwealth recognized that Johnson had proffered evidence of multiple constitutional violations that, if proven, would entitle him to habeas relief. The Commonwealth believed that Johnson was entitled to relief if the facts as Johnson presented them in his federal habeas corpus petition and supporting documents—plausible in the context of the facts on the face of the trial record and ongoing research about the fallibility of eyewitness identifications—were proved.[14]

---

[14] Johnson incorrectly asserts that the parties "agreed to the facts in the District Court." Opening Br. at 4 n.2. As the Commonwealth repeatedly informed the district court, impediments to the Commonwealth's ability to investigate the facts of the claims previously developed by Johnson, including obstacles imposed by the coronavirus pandemic,

The district court, however, did not hold a hearing before denying Johnson's claims. As a result, the court drew conclusions about the availability, favorability, and materiality of suppressed evidence, the diligence of defense counsel, and the prejudice stemming from trial counsel's deficient performance without determining the facts upon which these conclusions were based.[15]

---

prevented the Commonwealth from corroborating the factual bases of Johnson's claims. *See, e.g.*, JA321 n.5 (explaining that "[t]he Commonwealth has attempted to interview [Angelo] Smith, who is believed to currently reside in Williamsport, Pennsylvania, but those attempts have been unsuccessful"); JA326 n.12 (Bennett suffers from memory loss and has no memory of testifying at trial.").

The CIU offered to forego additional litigation in light of those obstacles, and in consideration of the troubling prior conduct of the DAO and prior defense counsel, because the outcome proposed in the Compromise and Settlement Agreement was reasonable and fair. JA352 (describing it as "an appropriate resolution"); JA541 (describing it as "reasonable and fair"). But it did not concede that Johnson's factual allegations were correct.

[15] The Commonwealth recently learned that Bennett is presumed to have died in October 2023, after the district court denied relief without taking evidence. Opal Nickson, although also deceased, testified at a deposition in June 2019 and was cross-examined extensively by the

This Court should instruct the district court to accept the Commonwealth's waivers of procedural default defenses and apply the correct *Brady* standards to the petition. Further, this Court should instruct the district court that it may not deny Johnson a hearing without first providing him an opportunity to establish his diligence under 28 U.S.C. § 2254(e)(2) in pursuing the factual development of his claims in state court.[16]

---

Commonwealth. J228–303. The deposition transcript, admissible under the prior-testimony exception to the hearsay rule for unavailable witnesses, may serve as the basis of fact-finding related to the Nickson *Brady* claim. Fed. R. Evid. 804(b)(1). To date, the district court has not made factual or credibility determinations from that deposition.

[16] It is the Commonwealth's position that 28 U.S.C. § 2254(e)(2) does not bar a federal evidentiary hearing in Johnson's case, contrary to the district court's comment in its opinion. JA32 n.12. Section 28 U.S.C. § 2254(e)(2) only bars an evidentiary hearing where a petitioner has not been reasonably diligent, under federal law, in presenting his claims to the state court. *See Williams v. Taylor*, 529 U.S. 420 (2000). The district court did not provide Johnson an opportunity to prove his diligence under Supreme Court precedent.

# CONCLUSION

This Court should vacate the district court judgment denying relief and remand to the district court for appropriate further proceedings.

Respectfully submitted,

/s/ *Sara Cohbra*
Sara Cohbra
Assistant District Attorney
Conviction Integrity Unit

/s/ *Michael Garmisa*
Michael Garmisa
Assistant District Attorney
Supervisor, Conviction Integrity Unit

Lawrence S. Krasner
District Attorney of Philadelphia

Office of the District Attorney
Three South Penn Square
Philadelphia, PA 19107
(215) 686-8000

## CERTIFICATE OF BAR MEMBERSHIP

I, Michael Garmisa, hereby certify that I am a member in good standing of the bar of this Court.

## CERTIFICATE OF COMPLIANCE

I am a member of the bar of the United States Court of Appeals for the Third Circuit. 3d Cir. L.A.R. 28.3(d).

This brief complies with the type-volume limitation of Fed. R. App. P. 32 (a)(7)(B) because this brief contains 11,015 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

I certify that today I served a copy of this brief and Supplemental Appendix on opposing counsel, Claudia B. Flores, Nilam A. Sanghvi, and David Rudovsky, electronically through this Court's docketing system.

The text of the electronic brief is identical to the text in the paper copies.

The Avast Antivirus virus detection program, version 2.7.2481, has been run on this file and no virus was detected. 3d

Cir. L.A.R. 31.1(c).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in fourteen-point Palantino Linotype font.

*/s/ Michael Garmisa*
Michael Garmisa

Dated: June 7, 2024

**CERTIFICATE OF SERVICE**

I, Michael Garmisa, hereby certify that on this date, I caused the foregoing to be served on all counsel through this Court's CM/ECF system.

/s/ *Michael Garmisa*
Michael Garmisa


Dated: June 7, 2024