No. 23-2531

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

_____

KEVIN JOHNSON,

*Appellant*,

v.

SUPERINTENDENT MAHANOY, ET AL.,

*Appellees*.

_____

On Appeal from the July 24, 2023, Order of the United States
District Court for the Eastern District of Pennsylvania (Robreno, J.),
No. 13-cv-03197, Denying Petition for Writ of Habeas Corpus

_____

## REPLY BRIEF OF APPELLANT KEVIN JOHNSON

_____

CLAUDIA B. FLORES
Supervising Attorney,
Non-Capital Habeas Unit
LISA EVANS LEWIS
Chief Federal Defender

Federal Community Defender Office for the
Eastern District of Pennsylvania
601 Walnut Street, Ste. 540 West
Philadelphia, PA 19106
215-928-1100

NILAM A. SANGHVI
Pennsylvania Innocence Project
1515 Market Street, Ste. 300
Philadelphia, PA 19102
215-204-4255

DAVID RUDOVSKY
Kairys, Rudovsky, Messing,
    Feinberg, & Lin LLP
718 Arch Street, Ste. 501 South
Philadelphia, PA 19106
215-925-4400

# TABLE OF CONTENTS

**PAGE**

Table of Authorities ........................................................................................ iii

Introduction .................................................................................................... 1

Argument ........................................................................................................ 2

I.     The District Court Erred by Failing to Accept the Commonwealth's
Waiver of Procedural Default with Respect to Two of Johnson's Three
*Brady* Claims .......................................................................................... 2

     A.     The District Court's Erroneous Ruling on Procedural Default Is
Not Moot as it was Critical to its Analysis of the *Brady* Claims ........ 2

     B.     The Argument that the District Court Was Not Required to Accept
the Commonwealth's Waivers is Contrary to Supreme Court
Precedent ......................................................................................... 5

II.     Johnson Is Entitled to Habeas Relief ............................................................ 8

     A.     The Commonwealth Suppressed Exculpatory and Impeaching
Evidence in Violation of *Brady v. Maryland* ...................................... 8

          1.   Suppression of Johnson's Arrest Photographs ............................. 8

          2.   The Suppression of Angelo Smith's Failure to Identify
Johnson at a Judicial Proceeding ................................................. 11

          3.   The Suppression of Opal Nickson's Statements to
Investigators About the Perpetrator's Complexion .................... 15

          4.   The Cumulative Prejudicial Impact of the Commonwealth's
Suppression of Exculpatory Evidence ......................................... 18

     B.     Johnson's Trial Counsel Rendered Ineffective Assistance .............. 20

i

# TABLE OF CONTENTS (continued)

**PAGE**

III.   This Court Can Apply the Correct Legal Standard and Grant Habeas
Relief or, if it Finds Disputed Issues, it Can Remand for Further
Proceedings ................................................................................. 21

CONCLUSION ................................................................................. 23

CERTIFICATE OF BAR MEMBERSHIP

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## SUPREME COURT OPINIONS                                                PAGE(S)

*Banks v. Dretke*,
    540 U.S. 668 (2004) ................................................................. 2, 3, 9

*Gonzalez v. Thaler*,
    565 U.S. 134 (2012) ........................................................................ 7

*Granberry v. Greer*,
    481 U.S. 129 (1987) ........................................................................ 7

*Kyles v. Whitley*,
    514 U.S. 419 (1995) ................................................................... 4, 8-9

*Russello v. United States*,
    464 U.S. 16 (1983) ......................................................................... 7

*Wearry v. Cain*,
    577 U.S. 385 (2016) ...................................................................... 19

*Wood v. Milyard*,
    566 U.S. 463 (2012) ........................................................................ 5

## FEDERAL COURT OPINIONS

*Abdul-Salaam v. Sec'y, Pa. Dep't of Corrs.*,
    895 F.3d 254 (3d Cir. 2018) .......................................................... 21

*ADP, Inc. v. Levin*,
    No. 21-2187, 2022 WL 1184202 (3d Cir. Apr. 21, 2022) ......................... 21-22

*Bracey v. Sup't Rockview SCI*,
    986 F.3d 274 (3d Cir. 2021) ............................................................ 4

*Christy v. Horn*,
    115 F.3d 201 (3d Cir. 1997) ............................................................ 5

*Dennis v. Sec'y, Pa. Dep't of Corrs.*,
    834 F.3d 263 (3d Cir. 2016) (*en banc*) ........................................... 3, 9

*Howell v. Superintendent Albion SCI*,
    978 F.3d 54 (3d Cir. 2020) ............................................................ 19

# TABLE OF AUTHORITIES (continued)

**PAGE(s)**

*Hudson United Bank v. LiTenda Mortgage Corp.*,
  142 F.3d 151 (3d Cir. 1988) ............................................................ 21

*Hull v. Freeman*,
  932 F.2d 159 (3d Cir. 1991) .............................................................. 5

*Johnson v. Folino*,
  705 F.3d 117 (3d Cir. 2013) ...................................................... 15, 22

*Munchinski v. Wilson*,
  807 F. Supp. 2d 242 (W.D. Pa. 2011) ................................................ 7

*United States v. Valentin*,
  --- F.4th ---, No. 21-2639, 2024 WL 4430731 (Oct. 7, 2024) .......................... 20

## UNITED STATES CODE

28 U.S.C. § 2254 ....................................................................... 7

## STATE CASES

*Commonwealth v. Johnson*,
  No. 1368 EDA 2017, 2018 WL 2295655 (Pa. Super. May 21, 2018) ........... 2-3

## RULES

Fed. R. Civ. P. 27 .................................................................... 17

Pa. R. Evid. 803.1 ............................................................ 10, 13, 16

## OTHER

*2019 Report of the United States Court of Appeals for the Third Circuit Task Force on Eyewitness Identifications*,
  92 Temple L. Rev. 1 & n.316 (2019) ....................................... 10-11

# INTRODUCTION

The Commonwealth violated Kevin Johnson's constitutional rights by suppressing: (1) his October 10, 1986, arrest photographs, which show that Johnson did not match the descriptions of the shooter provided by two key witnesses; (2) evidence that Angelo Smith failed to identify Johnson in courtroom proceedings and was instructed by the prosecutorial team that his testimony was not needed; and (3) evidence that Opal Nickson told investigators that the perpetrator had far darker skin than Johnson and that he was not involved in the crime.

The District Court recognized the underlying validity of these *Brady* claims on the issues of suppression and exculpatory value but declined to engage in the mandated cumulative prejudice analysis as to materiality, having erroneously refused the Commonwealth's waiver of procedural default with respect to the claims relating to Angelo Smith and Opal Nickson. Amicus largely avoids discussion of this issue by asserting that the question of procedural default is moot because the District Court decided all of Johnson's *Brady* claims on the merits. Amicus Br. at 44-45. That contention is belied by the record. As Johnson has shown, the District Court's refusal to accept the Commonwealth's waiver of affirmative defenses distorted its review of the materiality of the *Brady* claims. Having failed to recognize this flaw in the District Court's analysis, Amicus then engages in a "divide and

conquer" approach to the materiality issue and tellingly makes no attempt to rebut the compelling showing of cumulative prejudice.

## ARGUMENT

I.    **The District Court Erred by Failing to Accept the Commonwealth's Waiver of Procedural Default with Respect to Two of Johnson's Three *Brady* Claims**

### A.    The District Court's Erroneous Ruling on Procedural Default Is Not Moot as it Was Critical to its Analysis of the *Brady* Claims

Amicus argues that the District Court recognized the correct standard for procedurally defaulted issues by citing to *Banks v. Dretke*, 540 U.S. 668, 691 (2004), which held that a meritorious *Brady* claim would establish cause and prejudice and thereby excuse procedural default. Amicus Br. at 45. It further argues that this Court need not concern itself with this issue because it is moot. *Id.* Both arguments are incorrect.

First, Amicus ignores the court's misapplication of *Banks*. The District Court found that Johnson had satisfied the suppression and favorability prongs of *Brady* with respect to the Angelo Smith claim, but it declined to find that Johnson had shown cause and prejudice to overcome procedural default on the theory that Johnson failed to exercise due diligence in not seeking out the *Brady* material. JA26-28. There is no such duty under *Brady*. Johnson's claims relating to Angelo Smith and Opal Nickson were procedurally defaulted in state PCRA proceedings on timeliness grounds as Johnson "failed to prove the information could not have been

2

obtained with the exercise of due diligence." *Commonwealth v. Johnson*, No. 1368 EDA 2017, 2018 WL 2295655, at *5 (Pa. Super. May 21, 2018). The District Court also ruled that "there could be no *Brady* violation where defense counsel, with reasonable diligence, could have obtained the information." JA28. These rulings directly contradict decisions from this Court and the Supreme Court. *See Dennis v. Sec'y, Pa. Dep't of Corrs.*, 834 F.3d 263 (3d Cir. 2016) (*en banc*); *see also Banks*, 540 U.S. at 696; Opening Br. at 26-28. As a result, and notwithstanding its finding that Angelo Smith's failure to identify Johnson "may have undercut the credibility of the other three witnesses," the District Court failed to properly consider whether there was "a reasonable probability of a different result" at trial. *Dennis*, 834 F.3d at 285.

Second, Amicus's attempt to sidestep the District Court's failure to engage in the cumulative prejudice review by claiming that "the court actually afforded Johnson the exact review he would have received had his claims not been defaulted," Amicus Br. at 45, fails. That contention reflects the same misunderstanding of controlling precedent. The argument that Johnson's *Brady* claims were found untimely in state court because "the witnesses stated they would have been willing to speak at any earlier time, but Johnson never asked," Amicus Brief, at 44-45, ignores the law and the fact that Johnson did not know either that Angelo Smith had informed the prosecution at a court hearing that he could not identify Johnson as the

perpetrator or that Nickson told police and prosecutors that the perpetrator was darker skinned than Johnson. *See Bracey v. Sup't Rockview SCI*, 986 F.3d 274, 291 (3d Cir. 2021) ("*Dennis* [holds] that, absent evidence to the contrary, a petitioner would reasonably expect—and, indeed, is entitled to presume . . . that there is no *Brady* violation to be discovered." (internal citations and quotation marks omitted)).

The District Court's improper analysis *caused* it to forego the cumulative prejudice review required by *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). *See* JA43. Contrary to Amicus's argument, Amicus Br. at 45, the District Court would surely have engaged in a cumulative materiality analysis had it not imposed a due diligence burden on Johnson. In addressing the materiality of the arrest photo, the court stated that Johnson could not demonstrate a reasonable probability of a different result at trial "on the basis of the arrest photo *alone*." JA43 (emphasis added). It then stated, "Given that there is only one piece of newly discovered, suppressed evidence that *can be reviewed*, i.e., the arrest photograph, the cumulative *Brady* error analysis set forth in *Kyles v. Whitley* is unnecessary." *Id.* (emphasis added).

Had the District Court applied the correct cumulative prejudice standard, it is far more than likely that it would have determined that taken together, the violations were material. *See* Opening Br. at 41-44.

4

**B.      The Argument that the District Court Was Not Required to Accept the Commonwealth's Waivers is Contrary to Supreme Court Precedent**

To the extent Amicus addresses the core legal question of whether the District Court was required to accept the Commonwealth's waivers, it avoids the Supreme Court's rulings regarding prosecutorial waivers alluding, without citation, to "circuit precedent to the contrary." Amicus Br. at 46. The cases relied upon by the District Court are not controlling as they pre-date the Supreme Court's decision in *Wood v. Milyard*, 566 U.S. 463, 466 (2012) ("A court is not at liberty . . . to bypass, override, or excuse a State's deliberate waiver" of affirmative defenses."). *See* JA17-18. Further, those cases did not involve express waivers of affirmative defenses. In *Hull v. Freeman*, 932 F.2d 159 (3d Cir. 1991), neither party raised the exhaustion defense; the Court addressed the issue in "the interests of comity and federalism" and determined the claim had been exhausted. *Id.* at 164-65, *overruled on other grounds by Caswell v. Ryan*, 953 F.2d 853 (3d Cir. 1992). In *Christy v. Horn*, 115 F.3d 201 (3d Cir. 1997), where the Commonwealth did raise the exhaustion defense, this Court observed that a district court is not required "to accept a waiver and may require state court exhaustion," but it made no mention of other affirmative defenses. *Id.* at 207 n.3.

Amicus also asserts that no federal court has addressed "waivers like those here," suggesting that Johnson was engaged in inappropriate forum shopping, and

that the Commonwealth improperly agreed to waive procedural default in an effort to "overturn [a] conviction [ ] that they see as unjust, but that state courts did not." Amicus Br. at 46. There was no objectionable forum shopping, and the waiver of procedural default only allowed the District Court to evaluate his claims on the merits—a review the state courts refused on the misplaced application of a due diligence requirement.

Johnson chose to proceed on the merits in the habeas proceeding as all his post-conviction claims were properly before the District Court (aside from the claims raised in his 2020 PCRA petition which were record-based), the habeas proceeding had been pending for several years, and the Commonwealth agreed to waive exhaustion of his new claims. The District Court recognized these issues, finding "that further delay will not serve the interest of justice. . . ." JA19. The ominous warning by Amicus that "[t]hese forum-shopping waivers raise unique, unprecedented concerns," Amicus Br. at 4, is without merit. *See* Opening Br. at 24-25.[1]

---

[1] Amicus repeatedly expresses concern regarding how the parties have litigated this case. The District Court expressed no such concerns, and while Amicus accuses the parties of misstating the record, the Amicus brief contains several factual inaccuracies, as discussed later in this brief. Moreover, Amicus fails to acknowledge the record evidence of the trial prosecutor's misconduct or its own conflict of interest—specifically, one of the signatories to its brief, Senior Deputy Attorney General Cari Mahler, represented the Commonwealth in Johnson's PCRA proceedings and did not disclose the *Brady* material at issue here.

6

Amicus further argues that procedural default waivers should be treated differently from exhaustion waivers, Amicus Br. at 46-47, but no authority supports that position. The District Court rejected the Commonwealth's waiver of procedural default, citing interests in finality and comity, JA19, but it made clear that "[r]espondents to habeas petitions can elect to waive procedural defaults.'" JA17 (citing *Munchinski v. Wilson*, 807 F. Supp. 2d 242, 269 (W.D. Pa. 2011)). The question is not whether the Commonwealth had the authority to waive procedural default, which it does, but whether the District Court had the discretion to reject the waiver, and if so, whether it abused that discretion.[2]

Johnson provided more than adequate evidence of cause and prejudice to overcome the procedural default of his claims, *see* Opening Br. at 25-33, and the argument that a procedural bar "can be overcome *only* through a showing of cause

---

[2] The argument that exhaustion waivers are distinguishable as expressly permitted by 28 U.S.C. § 2254(b)(3) is misplaced. *See* Amicus Br. at 46. That provision was intended to prevent the unintended *forfeiture* of the exhaustion defense and to ensure that state courts are afforded an opportunity to review any habeas claims in the first instance. Congress did not include similar language in other parts of the statute, suggesting that it did not intend to protect states from forfeiting other affirmative defenses. *See Gonzalez v. Thaler*, 565 U.S. 134, 143 (2012) (citing *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally . . .")); *see also Granberry v. Greer*, 481 U.S. 129, 134 (1987) ("When the State answers a habeas corpus petition, it has a duty to advise the district court whether the prisoner has, in fact, exhausted all available state remedies.").

and prejudice," Amicus Br. at 47 (emphasis added), is not accurate. Aside from the cause and prejudice ground for waiver, the Commonwealth had the discretion to waive a procedural default defense and, at a minimum, the District Court abused any its discretion it had to reject the Commonwealth's waiver. *See* Opening Br. at 22-25.

## II.    Johnson Is Entitled to Habeas Relief

### A.    The Commonwealth Suppressed Exculpatory and Impeaching Evidence in Violation of *Brady v. Maryland*

The District Court agreed that the Commonwealth withheld exculpatory and impeaching evidence subject to the *Brady* doctrine, but it denied relief for lack of materiality after declining to engage in a cumulative prejudice analysis. Amicus's arguments on these issues fail to come to grips with the scope and depth of the *Brady* prejudice.

#### 1.    Suppression of Johnson's Arrest Photographs

The photographs constitute significant exculpatory and impeachment evidence. Within hours of the shooting, both James Smith and Angelo Smith described the man with the pistol as being "clean shaven" and without a "mustache or facial hair." JA192, 194-95. Johnson's arrest photographs showed him with a "line" mustache. JA461-66. This evidence was exculpatory on the central identification issues of the case, and it could have been used further to impeach James Smith's trial testimony and to call into question the overall quality of the investigation. *See Kyles*, 514 U.S. at 446 (noting that attacking the credibility of a

8

police investigation is a common defense tactic and such use can be considered in assessing a *Brady* claim).

Amicus argues that the photographs were not suppressed on the theory that the defense had police statements from the identifying witnesses referencing the photographs and that Johnson knew that he had a mustache at the time of the incident. However, the *Brady* claim does not turn on what Johnson knew or might claim at trial; rather, *Brady* forbids suppression of the actual evidence, here the arrest photographs. *Dennis*, 834 F.3d at 290 ("The Supreme Court has noted that its precedent 'lends no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed.'" (quoting *Banks*, 540 U.S. at 695)). What Johnson or his counsel may or may not have known about his mustache is irrelevant to the government's obligation to disclose, and the photographs are qualitatively different from Johnson's knowledge of his mustache as they would provide proof from the government's files of his facial hair at the time of arrest.

Amicus also contends that the evidence would not have been useful as impeachment, as the mustache was not prominent and may have been undetectable in the darkened room. Johnson addressed that argument, Opening Br. at 36-37, pointing out that if full lighting is the basis for judging the reliability of the witness identifications, and if these witnesses were unable to observe the distinct Johnson

9

mustache because of the darkness in this chaotic scene, how could they have made a reliable identification? Indeed, the prosecutor at trial argued that the witnesses had a very good opportunity to observe and identify the assailant. JA672-73, 1498. Of course, due to the suppression of the photographs, he could do so without fear of documentary contradiction.

Amicus goes even further afield by asserting that use of this material at trial would have "sealed [Johnson's] fate," Amicus Br. at 27, on the theory that the introduction of this evidence would have opened the door to the pre-arrest photographs also showing Johnson with a mustache, which the eyewitnesses had been shown. But that door was already open because, once a witness makes an in-court identification, all pre-trial identifications are admissible as non-hearsay. *See* Pa. R. Evid. 803.1(2).

Amicus also argues that the eyewitnesses knew Johnson from the neighborhood and therefore had a strong basis for correctly identifying him. It is undisputed that Angelo Smith did not know Johnson, and Amicus overstates the contact the other witnesses had with him. *See* Opening Br. at 6, 48. This Court's report on eyewitness identifications recognizes the phenomenon of "unconscious transference," which occurs when a witness "recognizes that the person identified is familiar but mistakenly attributes the person's familiarity to the crime" instead of a prior exposure. *See 2019 Report of the United States Court of Appeals for the Third*

*Circuit Task Force on Eyewitness Identifications*, 92 Temple L. Rev. 1, 61-62 &

n.316 (2019). But even if they did know him, once again, there is an inference to the

contrary of Amicus's argument: anyone who knew Johnson in the years before this

incident and who claimed to have recognized him on the night in question in

response to a detective's inquiry as to physical characteristics would not describe

him as clean shaven.

Amicus ignores another key exculpatory component of the arrest photographs:

that Johnson's height was 5'6", *not* the much taller 6'1" given by James Smith.

*Compare* JA192 (James Smith's description) *with* JA592-600 (arrest photographs).

There can be no confidence in the outcome of a trial where Johnson was deprived of

evidence that showed that he did not fit the eyewitness descriptions of the perpetrator

in a case that rested entirely on eyewitness identification, a point that was stressed

by the prosecutor in his opening and closing statements on the *quality* of the

identifications. JA672-73, 1498.

### 2.    The Suppression of Angelo Smith's Failure to Identify Johnson at a Judicial Proceeding

Police interviewed Angelo Smith shortly after the shooting, and he made a

highly qualified and tentative identification of Johnson from a set of photographs,

stating that the photo "looks like" the man with the pistol but "I am not positive."

JA196. He added, "[T]hat photo that I picked out looked like the guy and if it comes

down to where I might see him again, I will identify him, he threatened my life to[o]." JA197.

In 2014, Angelo Smith signed two affidavits stating that he was subpoenaed to trial and was asked by someone associated with the prosecution whether he saw the man with the pistol in the courtroom. JA215-16. He responded that he did not see the perpetrator in the courtroom (where Johnson was present for trial). At that point, the official told him that he need not stay or testify as he could not identify Johnson. *Id.*

The District Court ruled that if Angelo Smith's "2014 affidavits are to be believed then the prosecution certainly suppressed his availability and inability to identify Petitioner in court, as the prosecutor affirmatively represented that Angelo Smith was simply unavailable to testify." JA26. The court also found that Angelo Smith's statement that he could not identify Johnson in the courtroom was favorable, as it would have undermined the Commonwealth's case. JA27.

Amicus argues that the evidence does not support the claim that Angelo Smith appeared at trial and further that Johnson was "well aware" of Angelo Smith's inability to identify him at trial. Amicus Br. at 33 n.18. Amicus is wrong on both points. First, there is substantial evidence in support of the claim that Angelo Smith did appear at the trial and that he informed the prosecution that he could not identify Johnson in the courtroom, including his 2014 affidavits, his consistency on this point

in his 2016 statement given to detectives during adversarial post-conviction proceedings, and a witness fee payment. *See* JA215-16, 221, 356-58, 360. Second, and dispositive of the issue, in arguing that Angelo Smith "confused the trial with the preliminary hearing," Amicus *concedes* the essential point: "that is the proceeding for which he actually appeared but was not needed, *because he could not make an ID* and nothing more was required at that stage." Amicus Br. at 31 (emphasis added). The fact that Angelo Smith came to court and could not identify Johnson, regardless of the stage of proceedings, was the critical fact that was not disclosed to the defense.

Faced with this clear failure to disclose *Brady* material, Amicus again argues that if this evidence had been introduced through Angelo Smith, it would have opened the door to testimony by Angelo Smith that Elijah Bennett had made a pre-trial identification of Johnson. Amicus Br. at 33. This argument fails as Bennett could testify to any pre-trial identifications as non-hearsay, substantive evidence. *See* Pa. R. Evid. 803.1(2). And, to the extent that Amicus maintains that Angelo Smith's testimony would have corroborated other identifications, the prosecutor had already made that point in his opening statement. *See* JA673.

Of additional significance is the fact that it was Angelo Smith's initial statement to the police that even put Johnson on the radar screen as the perpetrator. Not only was his statement that Johnson was not the perpetrator highly exculpatory,

it also supports his recantation and that of the other eyewitnesses who were all questioned following the Angelo Smith interview that served as an essential predicate to the investigation.

Finally, the assertion that Johnson was told "three times" that Angelo Smith could not make an identification, Amicus Br. at 32, is without record support. First. Amicus points to Angelo's failure to positively identify Johnson in his police statement, but Angelo's tentative identification has no bearing on whether he would be able to make a positive identification in court. Rather, he stated that he *would be able to do so*: "*If it comes down to where I see him again, I will identify him.*" JA197 (emphasis added). Second, Amicus asserts that in "Angelo's suppression hearing testimony . . . Johnson had the opportunity to cross-examine." Amicus Br. at 32. This is pure speculation, as the transcript of that hearing cannot be found.[3] Third, Amicus does no better in asserting that the prosecutor made an "offer of proof during the trial." *Id.* No such offer of proof was made as the prosecutor only repeated communications he had with Angelo about coming to court. JA1237-38.

---

[3] Amicus blames Johnson for the unavailability of the transcript of the suppression hearing due to his "delay" in bringing this *Brady* claim. Amicus Br. at 25 n.13. Any delay in litigating these issues was caused not by Johnson, who has been diligently pursuing relief for years despite lackluster representation, but by the Commonwealth's decades-long withholding of the photographs and other exculpatory evidence. Assigning blame does nothing to advance the analysis, which must be conducted on the existing record.

The District Court's refusal to accept the Commonwealth's waiver of procedural default and its improper imposition of a due diligence requirement resulted in a flawed materiality analysis that failed to consider the impact of the suppressed information related to Angelo Smith at trial. This violation standing alone or as part of a cumulative analysis was manifestly material, as Angelo Smith's failure to identify Johnson was not only powerful evidence of innocence, but also corroborated the other recantations, as the identifications from the other eyewitnesses came at the heels of Angelo Smith's mistaken identification of Johnson. *See Johnson v. Folino*, 705 F.3d 117, 129 (3d Cir. 2013) ("[U]ndisclosed evidence that would seriously undermine the testimony of a key witness may be considered material when it relates to an essential issue, or the testimony lacks strong corroboration").

### 3.    The Suppression of Opal Nickson's Statements to Investigators About the Perpetrator's Complexion

In 2014, Opal Nickson signed an affidavit stating that she had told both police and the prosecutor before trial that the man with the pistol had darker skin than Johnson, a fact not previously disclosed. JA217-218. Interviewed by detectives in 2016, she retracted that statement, JA326,[4] but when she was deposed in 2019, she was quite clear that she could not identify Johnson as the perpetrator and that she

---

[4] Nickson testified that she was high when detectives interviewed her in 2016 and did not remember their questions. JA266-67.

had informed investigators and the prosecutor that the perpetrator had far darker skin than Johnson, JA250-51, 263-64, 271, 277.

The District Court recognized that the evidence was suppressed but characterized it as only "weakly favorable" as the room was almost immediately dark and, therefore, it would have been difficult for her to accurately judge the color of the assailant's skin. As noted above, that rationale ignores the more compelling inference that would have been drawn by a reasonable jury: if it was so dark and chaotic that she could not discern skin color, how trustworthy was her testimony at all?[5]

Amicus's assertions regarding Nickson are unsupported by the record. First, Amicus argues that Nickson was a reliable eyewitness as she knew Johnson and had seen him earlier that day when he talked to her friend for several minutes. Amicus Br. at 5. This argument overstates Nickson's familiarity with Johnson and is different from her sworn testimony at the preliminary hearing, where Nickson made clear that she "did not really know" Johnson. JA629.

---

[5] Once again, the speculation that counsel would not have used it to impeach as it would have opened the door to admission of Nickson's out-of-court photographic identification is wrong as a legal matter, *see* Pa. R. Evid. 803.1(2), and the prosecutor discussed the out-of-court identification in detail in his opening statement, *see* Opening Br. at 41.

Second, Amicus claims that Nickson called the police after the shooting and returned a week later to provide further information. Amicus Br. at 5. The record shows that Nickson's *friend* called the police, Nickson had to be taken to her initial police interview in handcuffs, and Nickson did not come back the following week, but was interviewed at her mother's home. *See* JA245, 638, 673, 858; OAG-SA17.

Third, the assertion that the 2019 deposition was taken "after agreement between the defense and the county prosecutors," Amicus Br. at 35, suggests that the deposition was part of a nefarious agreement between the parties. However, it is undisputed that Nickson was in poor health at the time, and depositions to preserve testimony of such witnesses are routine. *See, e.g.*, Fed. R. Civ. P. 27. The deposition was adversarial in nature with significant cross-examination by the Commonwealth and occurred years before the Commonwealth recommended that the District Court resolve this matter.

The District Court specifically noted the consistency between Nickson's statements about the complexion of the man with the pistol between her 2014 affidavit and her 2019 deposition:

> Opal Nickson stated in a 2014 affidavit as well as 2019 deposition that she believed the shooter to have darker skin than Kevin Johnson. Although the state courts have not had occasion to review Ms. Nickson's 2019 deposition, *the central facts supporting Petitioner's claim of actual innocence are the same as those in the 2014 affidavit.* Thus, the Court considers them jointly.

JA20 n.8 (emphasis added). The assertion that Nickson's testimony about the perpetrator's complexion came "[u]nder leading questioning by the defense," Amicus Br. at 36, also ignores Nickson's reiteration that Johnson's complexion was different from that of the man with the pistol on cross-examination. JA276-77. Her statement was corroborated by Angelo Smith's initial police statement, in which he described that man as having a "dark complexion." JA194.

### 4. The Cumulative Prejudicial Impact of the Commonwealth's Suppression of Exculpatory Evidence

Each of the *Brady* acts of suppression were material, and the cumulative prejudice caused by the *Brady* violations was overwhelming. The District Court did not engage in the cumulative prejudice analysis required by *Kyles*, and the only *Brady* claim it reviewed on the merits, the suppression of the arrest photo, was held not material, but only when considered "standing alone." JA42.

In its assessment of prejudice, the District Court failed to consider evidence that impeached each of the witnesses, including the fact the witnesses were high on drugs and/or alcohol, that their ability to see the perpetrator was severely compromised by the chaos and darkness in the room, and that their recantations were reliable in light of the undisputed fact that the initial tentative identification by

Angelo Smith was erroneous, yet it was the predicate to all other statements of identification.[6]

The suppression of the arrest photographs, Angelo Smith's failure to identify Johnson in court, and Nickson's statements about Johnson's complexion deprived Johnson of essential exculpatory evidence of innocence as well as direct impeachment of the eyewitness identifications and the integrity of the police investigation. Further, with more effective challenges to the identifications, the jury would likely have viewed his alibi evidence in a more favorable light. *See Wearry v. Cain*, 577 U.S. 385, 392-393 (2016) (granting habeas relief where the state had suppressed evidence that would have impeached the witness's credibility).

To counteract the cumulative prejudice, Amicus repeatedly emphasizes the supposed independent nature of the identifications. *See, e.g.*, Amicus Br. at 11, n.5; 13, n.6, n.7; 37, 40. In so doing, Amicus ignores the consistent accounts of police coercion in the identification process from the four Commonwealth witnesses. *See Howell v. Superintendent Albion SCI*, 978 F.3d 54, 60-61 (3d Cir. 2020) (emphasizing that "multiple recantations may themselves be mutually corroborating evidence, with each one having the potential to bolster the reliability of the others").

---

[6] This Court's Task Force on Eyewitness Identification has documented factors, all present here, that call into question the reliability of identification testimony. *See* n.3, *supra*; Opening Br. at 42-43.

This Court has recently acknowledged the concerns posed by coercion in securing identifications, which may render them inadmissible. *See United States v. Valentin*, --- F.4th ---, No. 21-2639, 2024 WL 4430731, at *4 (Oct. 7, 2024) (noting coercion undermined the reliability of the witness's identifications but finding the error harmless where, unlike here, there was other overwhelming evidence of guilt, including video, DNA, and cell phone records and the identification testimony at trial "was lackluster"); *see also id.* at *14 (McKee, J., concurring) (emphasizing "the extreme prejudice that typically follows a false identification"). There is more than a reasonable probability the outcome of Johnson's trial would have been different if he had access to the favorable, suppressed evidence.

### B.    Johnson's Trial Counsel Rendered Ineffective Assistance

As Johnson has argued, no deference to the state courts is required on his claims that trial counsel was constitutionally ineffective for failing to secure his arrest photographs and to interview Angelo Smith as the state courts did not rule on the merits of those claims. Opening Br. at 45. The Commonwealth's failure to produce this material violated *Brady* but, should this Court conclude that the photographs were not suppressed, then trial counsel was ineffective for failing to obtain them, as the District Court stated. JA55-56.

These errors were prejudicial because trial counsel failed to conduct the groundwork necessary to make informed decisions about trial strategy. *See, e.g.,*

*Abdul-Salaam v. Sec'y, Pa. Dep't of Corrs.*, 895 F.3d 254, 268-69 (3d Cir. 2018) (a "strategic" decision can be credited only if counsel has investigated and considered the evidence). Here, had he done so, counsel would have discovered the exculpatory and impeaching evidence discussed above. There is no inconsistency in attacking identification testimony by challenging lack of perception and recall *and* raising specific inconsistencies in descriptions provided; indeed, the combined impact is almost always likely to be more effective.

**III.    This Court Can Apply the Correct Legal Standard and Grant Habeas Relief or, if it Finds Disputed Issues, it Can Remand for Further Proceedings**

Many of Johnson's claims are record-based and require no further factual development. This is true as to the *Brady* claims regarding the arrest photographs and Opal Nickson's statements about the perpetrator's complexion. The photograph claim requires a record-based analysis of the impeachment value of the photographs. The record as to the Nickson claim has been fully developed through her deposition. This Court can resolve these claims, either of which is sufficient to warrant relief. *See Hudson United Bank v. LiTenda Mortgage Corp.*, 142 F.3d 151, 159 (3d Cir. 1988) (holding that resolution of an issue by the appellate court is "generally appropriate when the factual record is developed and the issues provide purely legal questions"); *ADP, Inc. v. Levin*, No. 21-2187, 2022 WL 1184202, at *3 (3d Cir. Apr. 21, 2022) (noting that an appellate court may resolve an issue where the district court

21

applied an incorrect legal standard if application of the correct standard supports only one conclusion).

Absent a grant of habeas relief on the current record, a remand would be necessary given the District Court's flawed materiality analysis. *See Johnson*, 705 F.3d at 133 (holding that question of whether confidence in the verdict would be undermined considering newly disclosed *Brady* evidence and the relative lack of evidence against the petitioner was "more properly addressed by the District Court in the first instance").

A remand could also address certain factual issues. For example, contrary to the contention that the District Court did not credit the recantations, Amicus Br. at 32 n.17, the District Court assumed the recantations were true in deciding Johnson's *Brady* claims, *see* JA22-24, and acknowledged their relevance and tendency to exculpate Johnson. JA71. Separately, in discussing Johnson's actual innocence claim, which carries with it a higher legal burden, the court stated that the recantations were not sufficiently reliable. JA74. How the recantations should be viewed with respect to Johnson's various claims and through the lens of the correct legal standards is the type of question that the District Court is well suited to consider.[7]

---

[7] Amicus's claim that "literally all of the witnesses are now unavailable," Amicus Br. at 3, is incorrect. While Elisha Bennett is deceased, there is no information in the

## CONCLUSION

Johnson's trial was rife with constitutional violations, about which both the District Court and the state courts expressed concern. None of those courts looked at all of the issues together, but this Court has the opportunity to do so. The cumulative effect of the violations caused Johnson significant prejudice. Under *Brady* and *Strickland*, there is far more than a "reasonable probability" of a different result at trial. This Court should reverse the District Court's denial of his petition, grant the writ, and order his immediate release. In the alternative, the Court should remand for an evidentiary hearing.

Respectfully submitted,

*/s/ Claudia Flores*
CLAUDIA B. FLORES
Supervising Attorney
Non-Capital Habeas Unit
LISA EVANS LEWIS
Chief Federal Defender
Federal Community Defender Office
  for the Eastern District of Pennsylvania
Suite 540 West – The Curtis Center
601 Walnut Street
Philadelphia, PA 19106
215-928-1100

---

record suggesting Angelo Smith and James Smith are unavailable, and Nickson is available through her deposition testimony, which was taken precisely to ensure against her unavailability should she pass away during these proceedings. *See* Appellees' Br. at 63-64.

23

/s/ *Nilam A. Sanghvi*
The Pennsylvania Innocence Project
1515 Market Street, Suite 300
Philadelphia, PA 19102
215-204-4255

/s/ *David Rudovksy*
Kairys, Rudovsky, Messing, Feinberg, &
  Lin LLP
718 Arch Street, Suite 501S
Philadelphia, PA 19106
215-925-4400

*Counsel for Appellant Kevin Johnson*

Dated: October 23, 2024

## CERTIFICATE OF BAR MEMBERSHIP

I, Claudia Flores, hereby certify that I am a member in good standing of the Bar of this Court.

## CERTIFICATE OF COMPLIANCE

I, Claudia Flores, hereby certify that this Initial Brief for Appellant complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 5,456 words, as calculated by the word count software in Microsoft Word 2016 for Windows 10, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 for Windows 10 in 14-point Times New Roman font.

I further certify that the text of the electronic copy of the brief is identical to the text of the paper copies of the brief filed with the Court and that the electronic copy of this brief was scanned using Symantec Endpoint Protection, version 14.0, and found to contain no known viruses.

*/s/ Claudia Flores*
CLAUDIA FLORES


Dated: October 23, 2024

# CERTIFICATE OF SERVICE

I, Claudia Flores, hereby certify that on this date, I caused the foregoing to be served on all counsel of record through this Court's CM/ECF system.

*/s/ Claudia Flores*
CLAUDIA FLORES

Dated: October 23, 2024