**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 23-2531

_____

KEVIN F. JOHNSON,
                    Appellant

v.

SUPERINTENDENT, MAHANOY SCI;
DISTRICT ATTORNEY OF PHILADELPHIA

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2:13-cv-03197)
District Judge: Hon. Eduardo C. Robreno (Ret.)

_____

Argued: December 11, 2024

Before: BIBAS, CHUNG, and ROTH, *Circuit Judges*

(Filed: July 14, 2025)

Claudia B. Flores
FEDERAL COMMUNITY DEFENDER OFFICE
EASTERN DISTRICT OF PENNSYLVANIA
601 Walnut Street, The Curtis Center, Suite 540 West

Philadelphia, PA 19106

David Rudovsky       **[ARGUED]**
KAIRYS, RUDOVSKY, MESSING, FEINBERG & LIN
718 Arch Street, Suite 501 South
Philadelphia, PA 19106

Nilam A. Sanghvi
PENNSYLVANIA INNOCENCE PROJECT
1515 Market Street, 3rd Floor
Philadelphia, PA 19102
    *Counsel for Appellant*

Sara M. Cohbra       **[ARGUED]**
Katherine E. Ernst
Samuel H. Ritterman
PHILADELPHIA COUNTY DISTRICT ATTORNEY'S OFFICE
3 S. Penn Square
Philadelphia, PA 19107
    *Counsel for Appellees*

Ronald Eisenberg      **[ARGUED]**
PENNSYLVANIA ATTORNEY GENERAL'S OFFICE
1600 Arch Street, Suite 300
Philadelphia, PA 19103

Susan E. Affronti
PENNSYLVANIA ATTORNEY GENERAL'S OFFICE
1000 Madison Avenue
Norristown, PA 19403
    *Counsel for Amicus Pennsylvania Attorney General's Office*

―――――――――

OPINION OF THE COURT

―――――――――

BIBAS, *Circuit Judge*.

Comity is the backbone of federal habeas review. When states prosecute and convict people, state courts play the primary role in enforcing federal law and correcting their own mistakes. So federal habeas petitioners must overcome legal hurdles that ensure that state courts take the first crack at resolving their claims.

Kevin Johnson tried to dodge some of these hurdles through a "Settlement Agreement" for habeas relief. And the Philadelphia District Attorney's Office tried to help Johnson do that by waiving its non-jurisdictional defenses to his claims. These maneuvers undercut Pennsylvania state courts' duty to review habeas relief independently, and the state Attorney General as amicus opposed the waivers. In these exceptional circumstances, the District Court rightly chose to reject one of the waivers. We likewise reject Johnson and the DA's effort to agree to a federal evidentiary hearing for facts that Johnson should have developed in state court. And on the merits, the District Court rightly rejected Johnson's remaining claims. So we will affirm its denial of his habeas petition.

## I. THE MURDER CASE

### A. A jury convicts Johnson of murdering Cowboy

This case stretches back almost four decades. In 1986, two men shot and killed Lyndon "Cowboy" Morris, a drug dealer,

while he was selling drugs out of a southwest Philadelphia rowhouse. Four people witnessed the crime. The first was James Smith, who opened the door for the gunmen and brought them upstairs to Cowboy's room when they demanded to see him. The others were Opal Nickson, Elisha Bennett, and Angelo Smith. They were getting high in the next room over. They saw one of the gunmen when he entered the doorway to that room, pointed his pistol at them, and ordered them to get down on the floor. Then they saw him run back out and shoot Cowboy.

Within twenty-four hours, all four witnesses had identified Kevin Johnson. They picked his photo out of an array, identifying him as the shooter with the pistol. James Smith, Nickson, and Bennett had all seen Johnson before; all three positively identified him. Only Angelo Smith, who said he did not think he had ever seen the shooter before, expressed doubts. When shown the photo array, he pointed to Johnson's photo and said it "looks like him[;] I am not positive." JA 196.

The state charged Johnson with first-degree murder. At trial, every eyewitness but Angelo Smith testified. Each positively identified Johnson in the courtroom as the shooter. James Smith testified that he saw Johnson's face twice: once when he opened the front door and led Johnson upstairs, and later when Johnson "came straight past" him on his way to shoot Cowboy. JA 738. Elisha Bennett confirmed that he saw Johnson's face when Johnson stepped into the doorway of the room he was in and pointed his gun at the group inside. Nickson testified that she also saw his face then. She emphasized that she "remembered his face real good" because she "knew him from [around] the neighborhood" where she grew up. JA

4

849. On the day of the shooting, she had even seen him driving on her street.

For his part, Johnson claimed mistaken identity. He said that night, he was selling clothing around Philadelphia with a friend. Johnson's lawyer tried but failed to find that friend. Still, Johnson put on three other alibi witnesses. They all testified that they had seen him at some point that night. But no one could place him far from the crime scene when the shooting occurred. And when Johnson took the stand, he contradicted his own alibi witnesses. The jury convicted him of first-degree murder, the judge sentenced him to life in prison, and the Superior Court affirmed his conviction and sentence.

## B. Johnson collaterally attacks his conviction

Next, Johnson sought relief under the Post Conviction Relief Act (PCRA), Pennsylvania's statutory substitute for habeas corpus. He claimed ineffective assistance of counsel. He also claimed to have new evidence from James Smith, who in 2001 had recanted his identification and said police had forced him to identify Johnson as the shooter. The PCRA court denied his petition, but the Superior Court reversed and remanded for an evidentiary hearing on ineffective assistance. After that hearing, the state courts dismissed his petition and then affirmed that dismissal. Then Johnson filed his first federal habeas petition, claiming ineffective assistance.

In 2014, more than a quarter century after the murder and while the federal petition was pending, a defense investigator interviewed all four eyewitnesses. In affidavits, three recanted. James Smith reiterated a claim that he had made in 2001 that police had coerced him to identify Johnson. Bennett and

Nickson accused police of doing the same to them. Nickson added that she had told police "that Kevin [Johnson] looked a little like the guy with the pistol but Kevin's skin was much lighter" and that she had told the prosecutor before testifying "that the guy with the pistol had darker skin than Kevin." JA 217. Angelo Smith, who did not testify at trial, did not claim police coercion. Instead, he said he had shown up to Johnson's trial but was sent home when he told "either the DA or the police" that he could not identify Johnson. JA 221.

Based on this new evidence, Johnson amended his federal petition to add *Brady* claims. He also filed a second PCRA petition. But the state PCRA court dismissed that petition as time barred, and the appellate court affirmed.

So Johnson returned to federal court, picking up his amended federal habeas petition where he had left off. In 2019, during discovery, the District Attorney found and turned over Johnson's arrest photos. The photos showed Johnson with a thin mustache. By contrast, James and Angelo Smith had described the shooter as "clean shave[n]," with "no mustache or facial hair." JA 192, 195. One photo also listed Johnson's height as 5'6", though James Smith had described the shooter as 6'1". Based on these photos, Johnson filed a third PCRA petition, as he could not pursue this claim on federal habeas until a state court had first considered it. 28 U.S.C. § 2254(b)(1)(A).

### C. Johnson and the DA try to "settle" for habeas relief

A month later, Johnson and the DA asked the federal District Court to approve a "Compromise and Settlement Agreement for Habeas Relief." JA 316. In that agreement, the DA

agreed not to oppose habeas relief and Johnson agreed to withdraw the third PCRA petition based on the arrest photo. But the parties knew that Johnson's path to federal habeas relief was blocked by his failure to exhaust state remedies and by his procedural defaults. If someone convicted in state court has not exhausted his state-law remedies, then ordinarily, federal courts cannot consider his habeas petition. 28 U.S.C. §2254(b)(1)(A); *Lines v. Larkins*, 208 F.3d 153, 159–60 (3d Cir. 2000). And if a state court decides that a petitioner's path through state court is blocked by a procedural bar (like a statute of limitations), his claim is deemed procedurally defaulted. *Lines*, 208 F.3d at 160. Federal courts cannot hear procedurally defaulted claims "unless the petitioner establishes cause and prejudice or a fundamental miscarriage of justice to excuse [his] default." *Id.* (internal quotation marks omitted).

These hurdles stood in Johnson's way. Two of his *Brady* claims (based on Angelo Smith's inability to identify Johnson in the courtroom and on Nickson's recantation) are barred by Pennsylvania's statute of limitations and so were procedurally defaulted in state court. (Johnson did not and does not press *Brady* claims based on the other two recantations.) And the third claim, based on the arrest photos, was never exhausted; Johnson withdrew his third PCRA petition before the state court could consider it. But failure to exhaust and procedural default are merely defenses that the state may raise, not jurisdictional bars. *Granberry v. Greer*, 481 U.S. 129, 131–32 (1987); *Trent v. Cain*, 522 U.S. 87, 89 (1997). So under the "Settlement Agreement," Johnson and the DA tried to bankshot Johnson's habeas petition from state court to federal by

waiving all non-jurisdictional defenses, including procedural default and exhaustion.

The District Court declined to automatically grant the habeas petition per the Settlement Agreement. It concluded that it "d[id] not possess unfettered discretion to order a state prisoner released without assuring itself that the petitioner's claims have merit." JA 10–11. So it asked the parties to brief the effect of the state's waivers and whether Johnson was entitled to habeas on the merits. And because "the proceeding was no longer adversarial," it invited the state Attorney General to express her views as amicus curiae. JA 9.

The Attorney General objected that the waivers "amount[ed] to forum-shopping"—an effort to force the federal court to address claims that should have been resolved in state court in a bid to lower a sentence that a new DA disliked. JA 390. She thus argued that the federal District Court had discretion to reject those waivers. And she contended that on the merits, Johnson did not deserve habeas relief.

Agreeing that it had discretion to decline the waivers, the District Court rejected the procedural-default waiver, though it accepted the exhaustion one. And it concluded that neither of the narrow exceptions to procedural default applied, so it did not reach the merits of the Angelo Smith and Nickson *Brady* claims. But, for the arrest-photos *Brady* claim, the court looked past the failure to exhaust. Still, it rejected that claim on the merits, holding that the photo would not have been material to the verdict. The court also rejected Johnson's ineffective-assistance claims. It thus denied his petition.

Today, we resolve two questions:

1) Did the District Court have discretion to reject the pro-cedural-default waivers? We answer yes.

2) Even if it did, did it properly deny habeas relief? Again, we answer yes.

## II. THE DISTRICT COURT PROPERLY REJECTED THE DA'S PROCEDURAL-DEFAULT WAIVER

Johnson argues that the District Court had no discretion to reject the DA's knowing and intentional waiver of the procedural-default bar. We see the force of that argument. The Supreme Court has instructed that a court is "not at liberty … to bypass, override, or excuse a State's deliberate waiver of a [statute of] limitations defense." *Wood v. Milyard*, 566 U.S. 463, 466 (2012). So as a rule, courts may not "override" intentional waivers. *Id.* at 473–74 (internal quotation marks omitted); *see also United States v. Dowdell*, 70 F.4th 134, 140 (3d Cir. 2023) ("[W]e cannot reach waived arguments … ."). Three of our sister circuits have held that, under *Wood*, courts must accept procedural-default waivers. *Maslonka v. Hoffner*, 900 F.3d 269, 276–77 (6th Cir. 2018); *Williams v. United States*, 879 F.3d 244, 248 (7th Cir. 2018); *McCormick v. Parker*, 821 F.3d 1240, 1245 (10th Cir. 2016). That makes sense. "[P]rocedural default … is not a jurisdictional matter" but an affirmative defense. *Trest*, 522 U.S. at 89; *see also Wood*, 566 U.S. at 472. And we typically expect parties to preserve these defenses if they want to rely on them.

But we need not decide whether *Wood* extends to all ordi-nary procedural-default waivers. Even if it does, the waivers here were anything but ordinary. Indeed, *Wood* did not consider, and had no occasion to consider, the type of waiver here.

Though *Wood*'s rule seems categorical, context tells us that it has limits. This case shows us those limits.

In *Wood*, the state chose to waive its statute-of-limitations defense because it thought it was "unclear" under existing law whether the petition was timely. JA at 70a, *Wood*, 566 U.S. 463 (No. 10-9995). So it reasonably decided to "steer[] the District Court away from" that tricky legal question and "towards the merits of Wood's petition," where the parties and court would better spend their efforts. *Wood*, 566 U.S. at 474. In other words, the state made a garden-variety, case-specific, tactical waiver of one argument to focus the litigation on its stronger claims.

The waiver here is far different. The DA waived procedural default as part of a strategic agreement with Johnson. The strategy was to: (1) circumvent state law, which would have blocked Johnson's bid for relief; and (2) gain access to what they hoped would be a more favorable forum with a more favorable standard of review.

In essence, Johnson and the DA wanted a fast track to habeas relief—one that would have granted Johnson habeas without any substantive review of the merits of his claims. They tried to do that through a private "Compromise and Settlement Agreement" for habeas relief that they wanted a court to sign. But the state court could not have gone along with such an agreement. Under Pennsylvania law, state PCRA courts cannot rubber-stamp settlement agreements for habeas relief. *Commonwealth v. Brown*, 196 A.3d 130, 146 (Pa. 2018) ("A confession of error by the Commonwealth … is insufficient for any grant of relief under the PCRA."). The PCRA mandates "judicial merits review favorable to the petitioner before any relief may be

granted." *Id.* So the state court would have rejected the agreement unless it was backed by a favorable claim on the merits. But Johnson's underlying state claim was thin and had no good chance at relief. The state court had already ruled that he was blocked from presenting two of his *Brady* claims because they were untimely. So he was left to bid for relief in state court with only the third *Brady* claim, based on his arrest photos. That would have been a risky gambit. If the state court considered and rejected it on the merits, any future federal habeas court would have been required to review that decision very deferentially under AEDPA.

Johnson tried to wriggle out of that bind. He removed the third *Brady* claim from state court and then tried to slip *all* his *Brady* claims in through a more favorable entrance—a backdoor to habeas relief. To do that, the DA and Johnson strategically packaged the procedural-default and exhaustion waivers together with the settlement agreement. Here is how they built that package: To ensure "that Johnson's claims [we]re properly before [the] Court," "[a]s part of th[e] Agreement, Johnson … withdr[ew] [his third PCRA] petition and … [the DA] waiv[ed] the exhaustion defense" and the procedural-default defenses. JA 317 n.1, 320 ¶ 23. They then asked the District Court to go along, granting the petition based on this private settlement without any briefing on the merits of the habeas claims. *See* App. 331 (terms of the proposed court order: "This Court shall conditionally grant Petitioner's Petition for Writ of Habeas Corpus based upon the Parties' agreement that the interests of justice so require."). Though the strategy did not work perfectly, it was still effective. Even though the District Court rejected the waiver, it arguably still reviewed Johnson's petition in a more

favorable posture than it would have absent the Settlement Agreement: It reviewed the claims for cause and prejudice and had no state findings to defer to.

Our dissenting colleague says we must defer to the parties' wishes and approve their stratagem. But nothing in *Wood* compels us to go so far. The Settlement Agreement is a narrow and extraordinary circumstance that gives us two reasons to depart from the usual waiver rule.

The first reason is comity. This stratagem would have undermined state law by overturning a conviction without giving the state court the first crack simply because the current DA saw it as unjust. But it would have done more too. It would also have undermined the state court's insistence that the executive branch lacks the authority to unilaterally "reverse a jury's verdict without any judicial review." *Brown*, 196 A.3d at 146 (emphasis removed). Federal courts must scrutinize these moves; comity and the state's separation of powers demand it.

True, the DA is the litigating party here, not the Attorney General. Though the Attorney General is the "chief law enforcement officer of the Commonwealth," local DAs have the authority to enforce state law locally and typically do so as a matter of practice. Pa. Const. art. IV, §4.1; *see* 16 Pa. Cons. Stat. Ann. §14302; *Commonwealth v. Schab*, 383 A.2d 819, 824 (Pa. 1978). Respect for comity usually means not "intru[ding] into the state's internal allocation of governmental authority." *Barrera v. Young*, 794 F.2d 1264, 1269 (7th Cir. 1986) (Easterbrook, J.).

But comity also means respecting state courts. This respect is especially important on federal habeas review because state courts play the leading role in protecting federal rights when

prosecuting and convicting people. *See Coleman v. Thompson*, 501 U.S. 722, 731 (1991). That is why we have doctrines like procedural default and exhaustion in the first place. They ensure that federal habeas courts rarely "upset a state court conviction without an opportunity [for] the state courts to correct a constitutional violation." *Rose v. Lundy,* 455 U.S. 509, 518 (1982) (internal quotation marks omitted).

The Attorney General intervened as amicus and opposed the procedural-default waiver on precisely these grounds. She did so not because she disagreed with the DA's litigating tactics, but because he was using the waiver to get his settlement agreement in front of a favorable forum with a more favorable standard of review, making an "end run around the limits of [a federal] [c]ourt's jurisdiction." *Coleman*, 501 U.S. at 730. Plus, she reasonably worried that one voice in the plural state executive branch was trying to use a federal court to bypass the state judiciary's limits on prosecutorial authority.

The District Court did not abuse its discretion by weighing the views of the Attorney General, as amicus, against the DA's. When a DA asks a federal court to bless an extraordinary agreement that the state judiciary would reject and that the state's top law-enforcement officer opposes, comity cuts the other way. Comity does not require federal courts to accept the novel stratagem of a lone official, leaving federal courts powerless to respect state rules and the limits of their own jurisdiction.

The second reason not to bless the waiver is the adversarial process. Unlike the waiver in *Wood*, this one reflects a breakdown in the adversarial process, not an example of it. To be sure, prosecutors must ensure that "justice shall be done," which

sometimes means confessing error. *Berger v. United States*, 295 U.S. 78, 88 (1935); *see also* Model R. Pro. Conduct 3.8 (ABA 1983). So of course, prosecutors may properly confess error.

Still, courts cannot accept a prosecutor's confession of error at face value without "examin[ing] [it] independently." *Young v. United States*, 315 U.S. 257, 258–59 (1942). After all, our criminal justice system is built on the notion that "[t]ruth … is best discovered by powerful statements on both sides of the question." *United States v. Cronic*, 466 U.S. 648, 655 (1984) (internal quotation marks omitted). Courts must determine the truth and decide whether the facts and law demand relief.

This case does not involve a normal confession of error. The DA's office did not just confess error, making its office an adversary to Johnson in name only. It also sought to evade judicial review of its own confession by waiving its defenses. In other words, rather than set Johnson's petition up for meaningful review, it tried to clear his pathway to habeas relief through the Settlement Agreement. Johnson's case is one in a striking pattern of state-court murder convictions that have been overturned in recent years using similar alleged stratagems. Since 2018, more than 100 convictions have been overturned via post-conviction concessions from the Philadelphia DA, untested by the adversarial process. Attorney General's Amicus Brief in Support of Petitioners 14–30, *Commonwealth v. Brown*, No. 32 EM 2023 (Pa. August 15, 2024) (collecting cases).

When prosecutors couple a confession of error with waiver stratagems like this one, in the face of opposition from an amicus that also represents the state's interests (the Attorney

General), courts have discretion to consider whether accepting the DA's tactics would undermine their core reviewing function.

To be sure, the District Court had to give "the parties fair notice and an opportunity to present their positions" before rejecting the waiver. *Day v. McDonough*, 547 U.S. 198, 210 (2006). But that happened here. In its amicus brief, the Attorney General asked the District Court to reject the waivers. Both Johnson and the DA then filed reply briefs arguing that the District Court should accept them. So the parties had enough of a chance to advocate for their positions before the District Court made its decision.

*****

Federal courts weighing split comity interests in this non-adversarial context must prudently reason through these tricky issues. And a district court has plenty of discretion to reject the waiver when a DA uses it to skirt unfavorable state law, despite the state Attorney General's view that an adversarial posture is appropriate. To be sure, we expect that *Wood*'s default rule will almost always control. But *Wood* does not stretch far enough to cover extraordinary facts like these.

### III. ON THE EXISTING RECORD, JOHNSON CANNOT OTHERWISE OVERCOME THE DEFAULT OF HIS TWO *BRADY* CLAIMS

Without the procedural-default waivers, Johnson had only two narrow paths to get the District Court to hear his defaulted *Brady* claims. First, he could show "cause and prejudice" (that is, that he had good cause for the procedural default and had suffered prejudice from the alleged violation of federal law). *Coleman*, 501 U.S. at 750. Or second, he could show that barring

his petition would create a "fundamental miscarriage of justice." *Id*. As the District Court found, Johnson has shown neither.

### A. Johnson does not have enough to show cause and prejudice through *Brady*

First, Johnson seeks to prove cause and prejudice through his claims under *Brady v. Maryland*, 373 U.S. 83, 87 (1963). To succeed on a *Brady* claim, he must show that the prosecution (1) failed to disclose evidence that it had in its files that was (2) material and (3) favorable to him. *Johnson v. Folino*, 705 F.3d 117, 128 (3d Cir. 2013). When a petitioner proves those first two elements (suppression and materiality), he has shown cause and prejudice, and the procedural default will not bar review of his claims. *Banks v. Dretke*, 540 U.S. 668, 691 (2004). (If Johnson could not timely challenge his conviction because the state was suppressing evidence, that amounts to cause. *Id.* And if that evidence was material, the violation prejudiced him. *Id.*) When the District Court evaluated Johnson's two *Brady* claims, it found neither one material and so concluded that, on the existing record, Johnson could not prove prejudice to overcome the default.

Because the District Court did not hold an evidentiary hearing, we review de novo, viewing all facts in the light most favorable to Johnson. *Mathias v. Superintendent Frackville SCI*, 876 F.3d 462, 475 (3d Cir. 2017); *Roman v. DiGuglielmo*, 675 F.3d 204, 208 (3d Cir. 2012). If Johnson has stated "a cognizable claim for habeas relief," we must "then determine whether an evidentiary hearing is necessary to develop the facts before us." *Roman*, 675 F.3d at 208.

We agree with the District Court that Johnson does not have enough on the existing record to show cause and prejudice through *Brady*. But we rest on *Brady*'s suppression requirement. The District Court assumed that Johnson had proven suppression "if [Nickson and Smith's statements] are to be believed." App. 26, 29. Our dissenting colleague likewise assumes that Johnson has proven suppression without citation or explanation. Dissent at 34. But to succeed on a *Brady* claim, a defendant has the burden of showing that the evidence in question meets *Brady*'s three elements, including that the state had the evidence yet failed to turn it over. *Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 284 (3d Cir. 2016) (en banc); *see also United States v. Walter*, 870 F.3d 622, 629 (7th Cir. 2017) (placing the burden on defendants to prove all three elements); *Gillard v. Mitchell*, 445 F.3d 883, 894 (6th Cir. 2006) (same). We have yet to clarify how a defendant carries this burden where, like here, the parties dispute whether the prosecution even had the evidence and the record is unclear. *See Slutzker v. Johnson*, 393 F.3d 373, 386 n.13 (3d Cir. 2004).

Today, we hold that the habeas petitioner bears the burden of producing credible evidence that raises a reasonable inference that the prosecution possessed the alleged *Brady* material yet failed to turn it over. It is the petitioner's burden to prove that the prosecution violated his due-process rights, entitling him to a new trial. And he should not be able to make an end-run around that obligation by claiming, without enough proof, that the prosecution had relevant evidence and failed to disclose it. This is especially so here, where the state would have to prove a negative: that it satisfied its duty to turn over evidence that the Attorney General argues never existed in the first place.

With this principle in mind, we conclude that Johnson does not have enough on the existing record to carry his burden of producing credible evidence that the DA had both Angelo Smith's and Nickson's statements yet failed to turn them over. True, he presents affidavits in which Smith and Nickson claimed that they had told the prosecution key details about the shooter's appearance that the prosecution never turned over to Johnson. Yet a witness must do more than just accuse the prosecution of having this evidence. *Cf. Clay v. Bowersox*, 367 F.3d 993, 1002 (8th Cir. 2004) (finding no suppression when three witnesses claimed that they had told a police officer something, but there was no record that they had done so or other evidence supporting their claims).

The District Court rightly discounted these affidavits as riddled with credibility and reliability problems. "Courts have historically viewed recantation testimony with great suspicion." *Landano v. Rafferty*, 856 F.2d 569, 572 (3d Cir. 1988). And for good reason. That testimony "upsets society's interest in the finality of convictions, is very often unreliable and given for suspect motives, and most often serves merely to impeach cumulative evidence rather than to undermine confidence in the accuracy of the conviction." *Dobbert v. Wainwright*, 468 U.S. 1231, 1233–34 (1984) (Brennan, J., dissenting from denial of stay). Witnesses may be pressured by the defendant's friends and family into recanting; years after the crime, it is hard to know. Even so, we do not and should not reject recantation evidence as categorically unreliable. *See Howell v. Superintendent Albion SCI*, 978 F.3d 54, 60 (3d Cir. 2020). These concerns mean only that we must evaluate it with a careful eye. And here, the recantations are belated, inconsistent, and

confused. So they are not enough to carry Johnson's burden of proof on suppression.

*1. Angelo Smith's affidavits are not sufficiently credible evidence that he actually told police that he could not identify Johnson.* Start with Angelo Smith's two affidavits claiming that prosecutors told him not to testify at trial because he did not recognize Johnson. He later said, "I did not read [the first affidavit], I just signed it" because "I was tired and didn't want to read it, I just wanted the [defense investigator] out of there." JA 357. Worse still, he said that he did not even see the second affidavit. The investigator asked him to "sign a blank piece of paper and I did. I just wanted them to leave." *Id.*

To be sure, we must draw reasonable inferences in favor of Johnson. And it matters that in a 2016 interview with homicide detectives, Angelo Smith affirmed the affidavits' core story. Still, that statement was unsworn and not subjected to adversarial testing—"[t]he commonly accepted method to determine whether a witness is telling the truth." *Clark v. Warden*, 934 F.3d 483, 493 (6th Cir. 2019).

Johnson claims that other evidence corroborates Angelo Smith's statements, but it does not. The state paid Smith for two unspecified days to attend proceedings as a witness in Johnson's trial itself. But the record shows only that he showed up to one day of proceedings, the suppression hearing. Johnson reads this evidence as proof that Smith showed up to the first day of trial and left, suggesting that the government sent him home early because he could not identify Johnson. Yet the second day's payment may have been for the preliminary hearing; Smith may have attended it and confused it with the trial.

Nothing in the record tells us which version is right. What is more, other evidence casts doubt on Smith's testimony. When he did not show up to trial, the prosecution asked for a bench warrant to compel his testimony—a strange move if the prosecution had sent him home.

Thus, there is not enough credible evidence in the record to raise a reasonable inference that the prosecution had Angelo Smith's alleged statement (made right before testifying) that he could not identify Johnson. To supplement this record, Johnson would have to subject Smith's claim to adversarial testing at an evidentiary hearing. *See Howell*, 978 F.3d at 58, 60, 62 (granting an evidentiary hearing to confirm witnesses' affidavits recanting their trial testimony). But as we explain below, Johnson does not qualify for an evidentiary hearing.

*2. Nickson's affidavit is not sufficiently credible evidence that she told police that Johnson was not the shooter.* Nickson's affidavit, also from 2014, is even shakier. She said she told police in her first interview that Johnson's skin was too light to be the shooter and that she had "identified Kevin Johnson as the guy who pointed the pistol at us, though I knew it wasn't him." JA 217. But her 2014 recantation directly contradicts her later statement to homicide investigators: When asked in 2016 if she was "absolutely sure" that it was Johnson who had held her at gunpoint, she said, "Yes." JA 305. And at a 2019 deposition, she could not explain these inconsistencies. She said that she did not remember her 2016 statement to police. Plus, she said that she did not remember either signing the 2014 affidavit or claiming that she had falsely testified at Johnson's trial; she only remembered that the defense investigator who secured the affidavit was harassing her.

True, at that 2019 deposition, Nickson did repeat her 2014 claim that Johnson's skin color was lighter than the shooter's. Yet even viewing this evidence in the light most favorable to Johnson, it is hard to overlook the inconsistency of these statements. Nickson stressed that she "can't remember things clearly" (perhaps because of the stroke that she had previously suffered). JA 235. And her own statements bore that out. For instance, she said she had told prosecutors *before* Johnson's trial that his skin was too light. But a little later, she said she had realized that Johnson was not the shooter because of his skin color only *after* she saw him in person and testified, though she never told anyone about this realization. Given these inconsistencies and unreliability, Johnson has not put enough credible proof into the record that Nickson in fact told the police about Johnson's complexion.

Because Johnson does not currently have credible evidence supporting a reasonable inference that the prosecution possessed either Angelo Smith's or Nickson's statement yet failed to turn it over, he cannot show cause to overcome his procedural default of these two claims. To be clear, we do not suggest that these claims would not warrant relief if they were proven credible through adversarial testing. We pass no judgment on their underlying merit. Rather, we hold that on the existing record, Johnson does not have enough credible evidence to raise the reasonable inference that the state violated *Brady* by suppressing these statements.

## B. Johnson cannot show cause and prejudice through ineffective assistance

Johnson says he can still prove cause and prejudice because his state PCRA lawyer was ineffective. But he cannot. Ineffective assistance of state habeas counsel can count as cause to excuse a procedural default of a claim that trial counsel was ineffective. *Martinez v. Ryan*, 566 U.S. 1, 9 (2012). Yet this equitable exception to procedural defaults is narrow, and the Supreme Court has never extended it beyond ineffectiveness of *trial* counsel. *Id.* at 10; *Davila v. Davis*, 582 U.S. 521, 525 (2017) (rejecting extension to ineffectiveness of appellate counsel). We join the Ninth Circuit in declining to extend *Martinez*'s exception to reach post-conviction counsel's failure to preserve *Brady* claims. *Hunton v. Sinclair*, 732 F.3d 1124, 1126 (9th Cir. 2013).

## C.  Johnson has not shown a miscarriage of justice

Finally, Johnson says he can still overcome the default because his *Brady* claims, taken together, show that he is actually innocent. Johnson points to his alibi evidence, Nickson's and Angelo Smith's recantations, the arrest photos showing him with a mustache and standing 5'6", and the lack of physical evidence connecting him to the crime.

Actual innocence brings a petitioner within the narrow set of cases that show a "miscarriage of justice." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). But the bar is high. An actual-innocence claim can be a key to the procedural-default gate only if a petitioner can (1) present "new reliable evidence" that (2) persuades a court that "more likely than not … no reasonable juror would have convicted" him. *Schlup*, 513 U.S. at 324; *McQuiggin v. Perkins*, 569 U.S. 383, 394–95 (2013) (quoting *Schlup*, 513 U.S. at 329). Multiple credible recantations may

be enough to show actual innocence—but only if they are "trustworthy." *Schlup*, 513 U.S. at 324; *Howell*, 978 F.3d at 60–61. But these eyewitness accounts do not clear that bar. They are inconsistent and, as discussed above, their credibility is dubious.

After subtracting Nickson's and Angelo Smith's affidavits, the District Court found that the arrest photos alone did not show that it was "more likely than not that no reasonable juror would have convicted" Johnson. *McQuiggin*, 569 U.S. at 395 (quoting *Schlup*, 513 U.S. at 329). We agree. As we explain below, the photos on their own do not undermine our confidence in the verdict. So there is no miscarriage of justice that would warrant unlocking and lifting the procedural-default gate.

## IV. JOHNSON DOES NOT GET AN EVIDENTIARY HEARING

As a fallback, Johnson and the DA argue that he should at least get an evidentiary hearing to develop his *Brady* claims based on Nickson's and Angelo Smith's recantations. That argument fails too.

### A. 28 U.S.C. § 2254(e)(2) bars an evidentiary hearing

A state prisoner is supposed to develop the facts in state court before seeking federal habeas. So a federal court usually cannot hold an evidentiary hearing if the petitioner did not first diligently "develop the factual basis of [his] claim in State court proceedings." 28 U.S.C. § 2254(e)(2) (opening clause); *Michael Williams v. Taylor*, 529 U.S. 420, 432 (2000). That means a federal habeas petitioner must first show that he "made a reasonable attempt, in light of the information available at the time, to investigate and pursue [the] claims in state court." *Michael Williams*, 529 U.S. at 435.

Whether a petitioner was diligent in this way turns on the facts and on the federal legal standard for diligence. *Boyle v. McKune*, 544 F.3d 1132, 1136 (10th Cir. 2008); *Wilson v. Beard*, 426 F.3d 653, 660 (3d Cir. 2005). The District Court made no factual finding on diligence. Ordinarily, we might remand to let it do so. But we have the same factual record that it did, and this case has already gone on for decades, so we will analyze whether Johnson was diligent ourselves. *See Shinn v. Ramirez*, 596 U.S. 366, 390 (2022) ("[A] federal habeas court may *never* needlessly prolong a habeas case." (internal quotation marks omitted)).

On this record, Johnson is at fault. He did not diligently develop the recantation *Brady* claims in state court. True, he asked for an evidentiary hearing on these claims in his 2016 counseled PCRA petition. Sometimes, that can be enough. *See Michael Williams*, 529 U.S. at 437. But "diligence is context specific." *Wilson*, 426 F.3d at 661. In this context, Johnson's requests came much too late.

The key facts were reasonably available to Johnson for more than a decade before he tried to develop them. The PCRA court found that Johnson had learned in 2001 that James Smith had recanted his statement and alleged that police had coerced him to identify Johnson. We presume that finding was correct. § 2254(e)(1). This knowledge should have alerted Johnson in 2001 that the other three eyewitnesses might have information relevant to a *Brady* claim. And in a different context, Johnson argued just that when he said his PCRA counsel had been ineffective. Yet he made no effort to investigate these potential claims until thirteen years later, when a defense investigator interviewed the other eyewitnesses.

Still, Johnson says habeas petitioners raising *Brady* claims need not show diligence. But that response conflates a prisoner's obligation to be diligent *at trial* with his obligation *on habeas*. At trial, *Brady* obligates prosecutors to disclose *Brady* material that they possess. *See United States v. Bagley*, 473 U.S. 667, 682 (1985). So defendants need not seek out *Brady* material diligently; they may assume that prosecutors fulfilled their duties. *Dennis*, 834 F.3d at 290.

Once a prisoner collaterally attacks his conviction, new requirements kick in. He must pursue his claims diligently, lest § 2254(e)(2) hold him at fault for failing to develop a sufficient habeas record in state court. Of course, he need not go hunting for *Brady* material if he "has no reasonable basis in fact to be aware of" it. *Bracey v. Superintendent Rockview SCI*, 986 F.3d 274, 294 (3d Cir. 2021) (internal quotation marks omitted). He may presume, "absent evidence to the contrary, … that there is no *Brady* violation to be discovered." *Id.* at 291 (explaining *Dennis*). Yet once he has a "reasonable basis … to believe" that *Brady* material may be out there, he "must investigate." *Id.* at 294. Otherwise, his lack of diligence will bar his federal habeas petition. *Id.* That bar applies here. Johnson was on notice yet waited thirteen years to investigate these *Brady* claims. Because he "failed to develop the factual basis of [this] claim" within the meaning of § 2254(e)(2), he cannot get a federal evidentiary hearing.

To be sure, § 2254(e)(2) has its exceptions. Even if a petitioner failed to diligently develop the record in state court, he can still get a hearing if he can show that his claim relies on a "factual predicate that could not have been previously discovered through the exercise of due diligence."

§ 2254(e)(2)(A)(ii). But Johnson has not shown that the predicate of his claim was inherently undiscoverable while he was litigating his claims in state habeas court. He makes no credible argument that he could not have interviewed Nickson and Angelo Smith once he learned of James Smith's recantation in 2001. So § 2254(e)(2)(a)(ii)'s exception does not apply here.

Our dissenting colleague, for her part, protests that we raise § 2254(e)(2)'s bar sua sponte. Dissent at 30. Not so. In briefing before us, the DA acknowledged that Johnson would need to clear § 2254(e)(2)'s bar to get an evidentiary hearing.

Because Johnson cannot meet that bar or its exceptions, we must therefore limit our review of Johnson's claims to the state court record. But as we concluded above, Johnson does not have enough evidence on the existing record to prove suppression, as he must to give him relief on these claims.

## B. Though § 2254(e)(2)'s requirements are waivable, we reject the DA's waiver

To get around this bar, Johnson argues that it is waivable. The DA forfeited the § 2254(e)(2) argument by never mentioning it below. Now he tries to affirmatively waive that bar on appeal. But we reject that waiver.

True enough, § 2254(e)(2)'s requirements are not jurisdictional. *See Stokes v. Stirling*, 64 F.4th 131, 139–40 (4th Cir. 2023); *see also Shinn*, 596 U.S. at 375 n.1 (exercising discretion to forgive the state's forfeiture of § 2254(e)(2) without suggesting that its bar is jurisdictional). Ordinarily, the state may forfeit or waive this non-jurisdictional defense like any other.

All the same, we reject the DA's attempt to waive §2254(e)(2) here for the exact same reasons that we rejected the procedural-default waiver. As with the procedural-default waiver, the same comity and adversarial-process concerns are at stake. Like the procedural-default doctrine, §2254(e)(2)'s bar on letting non-diligent petitioners use federal habeas to develop new evidence promotes comity and finality and protects federalism. *Shinn*, 596 U.S. at 382. It ensures that federal courts do not displace state courts as the primary fora for adjudicating state claims. Plus, it prevents petitioners from manipulating the federal habeas process by trying to build a factual record in federal court after failing to do so in the proper forum: state court. So as with the procedural-default waiver, we conclude that we may reject the waiver given the exceptional facts of this case, and we exercise that discretion here. For the same reasons, we choose to exercise our discretion to overlook the DA's initial forfeiture of §2254(e)(2)'s bar in the District Court. *See Shinn*, 596 U.S. at 375 n.1.

To be sure, federalism will often favor deferring to the state's choice not to enforce §2254(e)(2)'s requirements—but not here, where the DA has tried to thwart the state's procedural bars to give Johnson a preferred sentence outside the ordinary collateral-review process. We cannot sit as "an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings" just because he and the DA tried to settle their way into federal court. *Michael Williams*, 529 U.S. at 437.

What is more, applying §2254(e)(2)'s bar is just. Johnson makes no credible claim of innocence. His and his alibi witnesses' stories conflicted so badly that they were unbelievable.

As the District Court found, Angelo Smith's and Nickson's recantations are unreliable too. Nickson is now dead, so there is no way to probe her belated recantation at a hearing. And the DA does not even claim that Johnson is innocent. So for the same reasons that the District Court properly rejected the procedural-default waiver, we reject the parties' attempt to waive §2254(e)(2)'s bar. Johnson should have started pursuing those claims twenty-four years ago. It is too late now.

## V. JOHNSON'S OTHER *BRADY* CLAIM FAILS

Without the Angelo Smith and Nickson claims, Johnson has only one *Brady* claim left: the arrest photos. But rather than exhaust it, Johnson withdrew his third PCRA petition before the state court could consider it.

Ordinarily, Johnson's failure to exhaust this claim would bar it. §2254(b)(1)(A). But under §2254(b)(3), a state can waive exhaustion through counsel. *Orie v. Sec'y Pa. Dep't of Corr.*, 940 F.3d 845, 854 (3d Cir. 2019). These statutory roots give the exhaustion waiver a firmer footing than the procedural-default one. So the District Court properly accepted the exhaustion waiver, and we decide this claim on the merits.

Still, this claim fails. The arrest photos are immaterial because we see no "reasonable probability" that they would have led to an acquittal or lower sentence. *Bagley*, 473 U.S. at 682. In analyzing the potential prejudice caused by non-disclosure of the photos, we must consider the effect of all "wrongfully withheld evidence," "whether or not that evidence is before the Court in the form of an independent claim for relief." *Wearry v. Cain*, 577 U.S. 385, 394 (2016); *Glossip v. Oklahoma*, 145 S. Ct. 612, 629 (2025). This is because, for *Brady* materiality,

we must add up all the evidence that the government possessed yet failed to turn over. *Folino*, 705 F.3d at 129. But as we already concluded, Johnson failed to prove that the state did not disclose Nickson and Angelo Smith's alleged recantations. So we look only to the effect that non-disclosure of the photos had on Johnson's trial. We see no prejudice.

True, the photos show Johnson with a thin mustache two days after the shooting, even though James and Angelo Smith described the shooter as clean-shaven. They also show that Johnson was 5'6", while James Smith described the shooter as 6'1". Johnson could have used this evidence at trial to impeach James Smith's identification. Yet the supposedly impeaching arrest photos look just like the two photos of Johnson in the photo arrays—the one that all four eyewitnesses identified as the shooter. In both sets of photos, Johnson's mustache is visible head-on but hard to see from the side. See for yourself:



Photo-Array Photos                 Arrest Photos

That may explain how James and Angelo Smith missed it—particularly since Angelo saw only the side of Johnson's face as he stood halfway in the bedroom doorway, at an angle, and

just briefly before the lights went out. Indeed, the photos corroborate that right after the crime, Johnson looked just like the photos that the eyewitnesses picked out of the photo array. James and Angelo Smith's failure to mention a thin, easy-to-miss mustache carries little weight. What matters is that, even with the mustache, both identified him as the shooter.

The photo's mention of Johnson's height also carries little weight—which is perhaps why Johnson barely mentions it on appeal. Defense counsel pressed the height point at trial by asking Johnson about his height when he took the stand. So the arrest photos would have only been "cumulative of other evidence" proving Johnson's height at the time of the murder. *Folino*, 705 F.3d at 129.

Plus, "[t]he materiality of *Brady* material depends almost entirely on the value of the evidence relative to the other evidence mustered by the state." *Folino*, 705 F.3d at 129 (internal quotation marks omitted). Angelo Smith did not testify, so there was no need to impeach him by emphasizing the disparity between his description and the photos. And as the only witness who was unfamiliar with Johnson, his weaker recollection matters less. As for James Smith, Nickson "strongly corroborated" his identification. *Id.* She testified that she knew it was Johnson because she "remembered his face real good" from the neighborhood and had seen him earlier that day. JA 849. Bennett, who had also seen Johnson before, corroborated Nickson and James Smith's identifications too. In other words, the photos would have mildly impeached only one of the three eyewitnesses at trial, and all three positively identified Johnson both right after the crime and at trial. What is more, when testifying, Johnson contradicted his own alibi witnesses; they could not

agree on where he was shortly after the shooting. Thus, the arrest photos do not by themselves undermine our confidence in the verdict. The failure to disclose them did not violate *Brady*.

## VI. JOHNSON'S REMAINING CLAIMS ALSO FALL SHORT

### A. Johnson's ineffective-assistance claims fail

In addition, Johnson brings two ineffective-assistance-of-counsel claims. Neither succeeds.

*1. Johnson's meaningful-consultation argument fails*. First, he says his trial lawyer failed to consult him meaningfully before trial. Because the PCRA court already considered and rejected this claim on the merits, we review very deferentially. *Commonwealth v. Johnson*, 51 A.3d 237, 243–44 (Pa. Super. Ct. 2012) (en banc). Johnson does not contest any of the state court's factual findings. So we presume that they are right and can grant review only if that court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law." § 2254(d)(1), (e)(1).

The state court applied the right federal law and did so reasonably. It found that Johnson's lawyer did not fail to consult him: The lawyer saw Johnson twice in person and spoke with him once by phone. *Johnson*, 51 A.3d at 245. And it concluded that these meetings were enough because the lawyer learned enough from them to put on a defense: He learned of five witnesses whom he was able to put on the stand at trial and of a sixth whom he tried to track down. *Id.* at 243–44. That holding applied *Strickland* accurately and reasonably. *See id.* at 243–44 (applying Pennsylvania's formulation of *Strickland v. Washington*, 466 U.S. 668, 687–91 (1984)); *see also Williams v.*

*Superintendent Greene SCI*, 112 F.4th 155, 167 n.7 (3d Cir. 2024) (recognizing that Pennsylvania's formulation is not contrary to *Strickland*). Under *Strickland*, courts' "scrutiny of counsel's performance must be highly deferential." 466 U.S. at 689. *Strickland* sets no constitutional floor on how long a lawyer must spend with his client. And the record shows that Johnson's lawyer met with him enough to put on a competent defense based on the information that Johnson gave him.

The state court also rejected Johnson's claim that he was effectively denied counsel altogether. *Johnson*, 51 A.3d at 245 (applying *Cronic*, 466 U.S. at 659–61). That holding was reasonable. As the court explained, Johnson's lawyer met with him enough to put on a defense, vigorously defended him at trial, and defeated the death penalty. His lawyer moved to suppress the eyewitnesses' initial identifications to the police, put on witnesses, cross-examined the prosecution's witnesses, and moved for a mistrial. Those actions amounted to meaningful adversarial testing, not a complete denial of counsel. *Id.* So this ineffective-assistance claim fails as well.

*2. Johnson's ineffective-pretrial-investigation argument also fails*. Next, he argues that his trial lawyer should have interviewed Angelo Smith and gotten Johnson's arrest photos. Johnson never presented this claim to the state court. But the DA waived its exhaustion defense. *Orie*, 940 F.3d at 854. So we consider it on the merits, reviewing it de novo. *Wilson v. Beard*, 589 F.3d 651, 658 (3d Cir. 2009).

Even so, this claim fails as well because there was no prejudice. *Strickland* borrowed its prejudice standard from *Brady*'s materiality standard. 466 U.S. at 694 ("[T]he appropriate test

for prejudice finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution …."). Under *Strickland*, we ask whether the lawyer's deficient performance is "sufficient to undermine confidence in the outcome," "consider[ing] the totality of the evidence before the … jury," including the exculpatory and impeaching evidence. *Id.* at 694–95; *see also United States v. Gray*, 878 F.2d 702, 713 (3d Cir. 1989). It is not. Even if Johnson's lawyer had gotten Angelo Smith's statement and the arrest photos, that would not have "put the whole case in such a different light as to undermine confidence in the verdict," given "the strength of the evidence against" Johnson. *Kyles*, 514 U.S. at 435; *Buehl v. Vaughn*, 166 F.3d 163, 172 (3d Cir. 1999).

Angelo Smith's failure to identify Johnson would not have mattered. Three eyewitnesses identified Johnson at trial as the shooter: Nickson, Bennett, and James Smith. Unlike those three, Angelo Smith had never seen Johnson before. Plus, Angelo Smith's testimony would not have been that exculpatory. It is not as if he would have said that the shooter was someone else. And he never testified at trial, so there was nothing to impeach.

Nor would the arrest photos have moved the needle. As explained above, the three eyewitness identifications were strong: Nickson, Bennett, and James Smith strongly corroborated one another, and James Smith's initial identification from the photo array (containing the mustache) corroborated his identification at trial. The mustache was thin and not obvious from an angle. The photo's evidence of Johnson's height was merely cumulative. And Johnson's alibi contradicted those of his own alibi witnesses. We see no reasonable probability that

interviewing Angelo Smith and getting the arrest photos would have made a difference.

### B. Johnson's cumulative-prejudice claim fails too

Finally, Johnson brings a cumulative-error claim. He asks us to add up the two recantation claims, the arrest-photo claim, and the ineffective-assistance-of-counsel claims. That is a "standalone constitutional claim subject to exhaustion." *Collins v. Sec'y, Pa. Dep't of Corr.*, 742 F.3d 528, 541 (3d Cir. 2014). Though Johnson never exhausted this claim, we can consider it because we accept the state's waiver of exhaustion.

Sometimes, "errors that individually do not warrant habeas relief may do so when combined," but they do not here. *Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007). We add up errors, not claims. *See id.* As noted, Johnson failed to prove that the state possessed Nickson's and Angelo Smith's recantations or that his lawyer failed to consult him enough. Those were not shown to be errors. So at most, we would add up the arrest-photos *Brady* claim and the failure-to-investigate *Strickland* claim (assuming that the lawyer's performance was deficient). Yet as just explained, putting Angelo Smith on the witness stand and showing the jury Johnson's arrest photos would not have mattered. Even taken together, these two claims are not enough.

\*\*\*\*\*

Johnson and the Philadelphia DA tried to short-circuit state-court review by asking the federal District Court to bless a "Settlement Agreement" based on underdeveloped and unproven claims. The District Court wisely rejected that

stratagem and reasonably rejected the DA's procedural-default waiver. And it rightly held that Johnson's non-defaulted *Brady* and ineffective-assistance-of-counsel claims did not stand up to scrutiny. So we will affirm the denial of his habeas petition.

ROTH, <u>Circuit Judge</u>, dissenting.

This habeas appeal deals with the gatekeeping function of federal courts when a state official has waived nonjurisdictional threshold barriers to relief. After spending decades challenging his first-degree murder conviction, which rests solely on since-recanted eyewitness identifications, Kevin Johnson brought several constitutional claims before the District Court. The Philadelphia District Attorney deliberately waived all nonjurisdictional threshold bars to habeas relief so that Johnson could have a full and fair opportunity to be heard on his two most compelling claims—his cumulative-*Brady* claim and his cumulative-error claim. The District Court accepted some of the District Attorney's waivers but overrode the procedural-default waivers on federal-state comity grounds. However, comity requires that federal courts respect the state's processes and not interfere with its internal allocation of governmental power. In this regard, Pennsylvania authorizes local district attorneys to represent the Commonwealth in federal habeas actions.

The Supreme Court has held that federal courts have no discretion to reject a state's deliberate valid waiver of nonjurisdictional threshold barriers to habeas relief. For this reason, the District Court had no power to override the District Attorney's valid waivers. Thus, I believe that we should reverse the denial of Johnson's habeas petition. Moreover, since the Commonwealth has forfeited 28 U.S.C. § 2254(e)(2)'s bar, I would remand this case to the District Court to hold an evidentiary hearing on the surviving claims.

# I.

On October 8, 1996, at around 10:19 p.m., Lyndon "Cowboy" Morris, a known cocaine-dealer, was robbed and shot to death inside a Southwest Philadelphia rowhome owned by Opal Nickson. Morris used runners to take money from his customers at the front door, bring the money upstairs, pass it to him through a small hole in his bedroom door, and then bring cocaine downstairs to the customers. One of those runners, James Smith (James), was present at the time of the shooting. Nickson and two of her friends, Angelo Smith (Angelo) and Elisha Bennett, were also present,[1] smoking crack cocaine and marijuana with James in the rear bedroom on the second floor across from Morris's room.[2]

Shortly before the shooting occurred, there was a knock at the front door. The knocker said it was "Keith," Opal Nickson's brother, so James opened the door.[3] Instead, he was confronted by two men, one armed with a sawed-off double-barrel shotgun and the other with a pistol. They directed him, at gunpoint, to take them upstairs to Morris's room.

Once they got up there, the man with the pistol went to the rear bedroom where Angelo, Bennett, and Nickson were getting high and eating Chinese food. The lights in the upstairs

---

[1] The Smiths, James and Angelo, are not related. Bennett's first name is often misspelled as "Elijah" throughout the record.

[2] A police sketch shows that the two bedrooms were approximately twenty-four (24) feet apart.

[3] Joint Appendix (J.A.) 697, J. Smith Trial Test. (Jan. 27, 1988).

hallway were off, and the rear bedroom was lit with only one lamp. The man remained "half hidden in the doorway."[4]

Angelo and Bennett were sitting side by side on the bed, with Angelo closer to the doorway, when the man pointed the gun at them. He did not see Nickson initially, because she was standing behind a dresser that was taller than her and positioned between her and the doorway. Angelo and Bennett stared at the gun, thinking the man was playing around. When he told them he was not, Nickson peeked around the dresser and caught a glimpse of him before "looking at that gun."[5] Angelo, meanwhile, turned over and lay face down on the bed, and Bennett "immediately" got underneath it.[6] As they did that, the man pointed the gun "straight" at Nickson's face and told her to lie down.[7] Staring at the gun, she immediately got down on the floor, and in the process, accidentally unplugged the only lamp when her foot got caught in the extension cord— causing the room to go "pitch black" and turning off the lights on the entire second floor of the house.[8] "Seconds" later they heard someone kicking on Morris's door, followed by gunshots.[9]

While the man with the pistol was checking the backroom, the other man had kept his shotgun pointed at James's back and told him to get Morris to open the door. James knocked on it, and then the man kicked it. Morris

---

[4] J.A. 206, Bennett Police Interview Statement (Oct. 9, 1986).
[5] J.A. 209, Nickson Police Interview Statement (Oct. 9, 1986).
[6] J.A. 1140, Bennett Trial Test. (Jan. 29, 1988).
[7] J.A. 839, 841, 848, Nickson Trial Test. (Jan. 28, 1988).
[8] *Id.* at 908.
[9] *Id.* at 908–10.

unlatched it, and the shotgun-armed man kicked it open and immediately shot one round into Morris's pelvic area.[10]  Scared for his life, James jumped the stairwell railing, and as he ran downstairs, he heard pistol shots and someone say to get the loot.  James fled through the front door.

Angelo, Bennett, and Nickson heard the men leave the house, waited for some time, and then fled themselves.  Police entered the house at around 10:30 p.m.[11]  Less than a half hour later, Angelo and Bennett saw each other at a local bar and discussed what had happened.  Bennett asked if Angelo knew the man with the pistol, and Angelo said no.

Police later obtained statements from James, Angelo, Bennett, and Nickson.[12]  In his first statement, given at 11:30 p.m. on the night of the murder, James provided a detailed account of the crime but denied knowing Morris and did not mention any illegal drugs.  He described one robber as a "black male, 5'7, husky build, dark complexion," with a "double barreled shotgun," who "had a full beard with a mustache that came together, but it wasn't really heavy, he was wearing all black, and a black leather flat cap."[13]  He described the other as a "black male, 6'1, brown skin, thin build about 20-21, both

---

[10] J.A. 544, Med. Exam'r Test. (Feb. 1, 1988).

[11] Police initially arrived at around 10:20 p.m. but left after no one answered the front door, which was closed.  Police returned ten minutes later after James flagged down a patrol unit that had just been at the house.  When police returned, the front door was open.

[12] James had reported the incident to police.

[13] J.A. 192, J. Smith Police Interview Statement (Oct. 8, 1986) (cleaned up).

men were about the same age, he was clean shaven, he was wearing all black leather, too."[14]   James said he would "see both of these guys all the time on the streets around 54th & Warrington Ave," and that they were part of a neighborhood gang and Keith's "friends."[15] James also told police that, after he fled from the house, he saw Keith nearby "standing on the corner," and that "Keith was shocked to see me come out of the house."[16]

Police picked up Angelo and brought him to the police station for an interview the next day around 4:30 a.m. He told Detective Michael Bittenbender that he was sitting in the rear bedroom with Nickson and Bennett when a "black fellow stuck his head through the door and pointed a gun" at them.[17] Angelo said that when the man told them to get down on the floor, Nickson kicked a plug, causing all the lights to go out. He described the man as "a black male, dark complexion, close cut hair, no mustache or facial hair," with a "revolver . . . as big as a 38 caliber snub nose."[18] He also told police: "After I saw the gun, that is what I was looking at."[19] Police then asked him to review a mugshot book containing "several hundred photographs which he viewed for about half an hour."[20] He picked out Johnson's photo—but he cautioned police that he

---

[14] *Id.* (cleaned up).

[15] *Id.* at 191–92.

[16] *Id.* at 189, 191.

[17] J.A. 194, A. Smith Police Interview Statement (Oct. 9, 1986).

[18] *Id.* at 195.

[19] *Id.*

[20] J.A. 1373–74, K. Johnson Trial Test. (Feb. 2, 1988).

was "not positive."[21]   However, he also said that if he saw the man again, he "w[ould] identify him" because the man had "threatened [Angelo's] life."[22]   Based on Angelo's uncertain identification, Johnson became the main suspect.  Police put his photo in an eight-person photo array.

About a half hour after questioning Angelo, police questioned James again.  By this time, he had been at the police station all night and had failed a polygraph, so police knew he had been untruthful in his first statement.   In a second statement, James admitted knowing Morris.   He also told police that Keith had been carrying a bag, and that James could "hear pieces of metal hitting together" inside the bag and that "it sounded like it was a shotgun broken down."[23]   James also told police that when he saw Keith outside the house, Keith was no longer holding the bag.[24]   Police showed him "a mug book,"[25] and Johnson's photo was selected.   During his interview, James feared police would charge him with drug offenses (or even murder).

Early that same morning, after police came looking for him, Bennett gave a statement to Detective Bittenbender. Bennett did not describe the man with the pistol, but he was shown the photo array, and Johnson's photo was selected a third time.   Bennett told police that he did not know Johnson but had seen him before.

---

[21] J.A. 196, A. Smith Police Interview Statement (Oct. 9, 1986).

[22] *Id.* at 197.

[23] J.A. 199, J. Smith Police Interview Statement (Oct. 9, 1986).

[24] *Id.* at 201.

[25] J.A. 753, J. Smith Trial Test. (Jan. 27, 1988).

Police took a statement from Nickson at noon, after taking her into custody and bringing her to the station for an interview. Her legs were shackled during the entire interview. In her statement, she described the man with the pistol as a black male in his late 20s, between 5'6 and 5'7, with a small build (160 lbs.), who was wearing a black leather cap, a black waist-length jacket, and a dark colored shirt. Nickson was also then shown the photo array, and Johnson's photo was selected a fourth time.

On October 10, 1986, Johnson was arrested and charged with capital murder. The warrant was based on a probable-cause affidavit stating that Angelo and James had identified him as the man with the pistol. Johnson immediately denied involvement and told police that, at the time of the murder, he had been selling clothes in West and Southwest Philadelphia with his friend, Ronald Crawford. Police searched Johnson's family home and did not recover any weapons or drugs. Police never found any other evidence implicating Johnson in Morris's murder. The murder weapons were never recovered, and no second gunman was ever identified or charged. The only evidence was the four eyewitness identifications. Johnson was the only person arrested and charged; there is no evidence that police pursued any alternative suspects. Johnson has maintained his innocence throughout this case, nearly thirty-nine years.

Johnson's preliminary hearing was held on October 29, 1986, in Philadelphia Municipal Court. Attorney Stephen Gallagher had been appointed to represent him.[26] Only two

---

[26] Attorney Gallagher represented Johnson for his preliminary

witnesses showed up for the hearing.[27]  One was Nickson, who identified Johnson as the culprit and said that she had previously seen him around the neighborhood she had grown up in; however, she acknowledged that he was "a stranger" and that she did not really "know" him.[28]  The other witness (either Angelo or Bennett) did not testify.[29]  After Johnson's case was held for court and forwarded to the Court of Common Pleas, his counsel received from the prosecution copies of the eyewitness interview statements and other items in discovery. Counsel later moved unsuccessfully to suppress the identifications.[30]  He also spent limited time consulting with Johnson in preparation for trial.[31]

---

hearing, formal arraignment, trial, sentencing, and direct appeal**.**

[27] All four eyewitnesses were subpoenaed to testify, but only Bennett, James, and Nickson personally signed for their subpoenas; Angelo did not.

[28] J.A. 628–29, Nickson Prelim. Hr'g Test. (Oct. 29, 1986).

[29] The other witness was either Bennett or Angelo.  It was not James Smith; he failed to appear for the hearing, so the municipal court issued a bench warrant for his arrest.  There is no record that the court issued a bench warrant for Bennett or Angelo.

[30] The transcript of the suppression hearing is unavailable, so we do not know what was said there.  However, there is no dispute that Angelo testified at the hearing.

[31] *See Commonwealth v. Johnson*, 51 A.3d 237, 244 (Pa. Super. 2012) (en banc) (finding that trial counsel "conducted a face-to-face meeting at [Johnson's] preliminary hearing, conducted another face-to-face meeting at the prison with [Johnson] prior to trial, and performed at least one telephone consultation").  The prison visit "occurred the night before jury selection

At trial in January and February 1988, the prosecution relied solely on Nickson, James, and Bennett to connect Johnson to the murder and identify him as the man with the pistol.[32]  Although James's testimony was largely consistent

---

began." *Id.* at 250 (Wecht, J., concurring).

[32] Angelo did not testify at trial, but the record strongly suggests that Angelo appeared in the courtroom on Friday, January 29, 1988.  The trial prosecutor confirmed that Angelo was subpoenaed to appear on that date, and although the trial prosecutor claimed that Angelo never showed up, there is a witness fee certificate dated February 23, 1988, payable to Angelo, for his two appearances in the Philadelphia Court of Common Pleas in the same courtroom (No. 436) where Johnson's trial and suppression hearing were held. Pennsylvania law required that Angelo be paid for attending trial even though he did not testify.  *See* 42 Pa.C.S. § 5903(g).  Although the trial court issued a bench warrant for Angelo, that was for his failure to appear on February 1, 1988.  The trial court later found that the trial prosecutor had "intentionally deceived" the court and defense counsel at sidebar before asking an improper question on cross-examination of Johnson, J.A. 1418, Trial Tr. (Feb. 3, 1988), and the prosecutor's conduct "demonstrate[d] a chronic inability to abide by professional standards in the prosecution of criminal cases," J.A. 1629, Trial Ct. Op. (Nov. 15, 1988),  Indeed, this was not the first time this prosecutor was admonished for unethical conduct.  *See, e.g.*, *Commonwealth v. Perillo*, 376 A.2d 635 (Pa. Super. 1977) (holding that prosecutorial misconduct that required reversal of first-degree murder conviction, where this prosecutor asked improper questions implying that a witness had been bribed to perjure himself); *see also In re*

with his second police statement, key parts of his story changed. He had initially told police that he had "jumped the banister" and fled the house after the man with the shotgun shot Morris.[33] That version is also reflected in the probable-cause affidavit for Johnson's arrest and a January 20, 1988 internal memorandum in which the trial prosecutor stated that "[w]hen the shooting started, [James] Smith ran and vaulted over the banister."[34] James nevertheless told the jury that he did not immediately flee and that he had caught a glimpse of the man with the pistol's face as the man ran past him and shot Morris several times. James further testified that he had seen part of the man's face by glancing "sideways" as they walked up the stairs,[35] but he never told police that. Nickson and Bennett also

---

*Campolongo*, 435 A.2d 581, 583–84 (Pa. 1981) (reversing summary criminal contempt-of-court citation issued to this prosecutor because "much of [his] conduct deemed by the trial court to be sufficiently reprehensible to require the declaration of a mistrial occurred after the contempt citation," and therefore the citation "was not based on the pattern of intentional prosecutorial misconduct which cumulatively resulted in the mistrial"); *Commonwealth v. Bronzeill*, 3 Phila. Co. Rptr. 554, 557 (Pa. C.P. Ct. 1980) (barring retrial of defendant after granting mistrial on the grounds that this prosecutor had "intentionally and deliberately engaged in a course of conduct from his opening speech to the declaration of the mistrial, calculated to inflame the passion and prejudice of the jury").

[33] J.A. 200–01, J. Smith Police Interview Statement (Oct. 9, 1986).

[34] J.A. 543, Phila. Dist. Att'y Off. Internal Memo. (Jan. 20, 1988).

[35] J.A. 705, 790–91, J. Smith Trial Test. (Jan. 27, 1988).

identified Johnson as the man with the pistol, and the jury was informed of their prior photo identifications.    However, Nickson and Bennett admitted that they had seen only half the man's face.

In defense, Johnson claimed mistaken identity and offered an alibi.  Consistent with his initial police statement, his defense was that on the night of the murder, he was selling clothing around Philadelphia with Crawford.  In support, Johnson put on three alibi witnesses, but his counsel could not locate Crawford. Although no one could place him very far from the crime scene around the time when the shooting occurred, each alibi witness testified that they had seen Johnson at various times and locations that night selling clothes from a car.  He also took the stand and testified in his own defense.

Based solely on the three eyewitness identifications, the jury convicted Johnson of first-degree murder, conspiracy, and possession of an instrument of a crime.  He was later sentenced to life imprisonment.  In 1992, the Pennsylvania Superior Court affirmed his convictions, and the Pennsylvania Supreme Court later denied further review.

## II.

After his convictions were affirmed on direct appeal, Johnson pursued relief in state court under Pennsylvania's Post-Conviction Relief Act (PCRA).[36]  He filed his first petition in 1996 and raised several issues, including ineffective assistance of trial counsel.  The PCRA court denied the petition

---

[36] 42 Pa. C.S. §§ 9541 *et seq.*

in 2003, but the Superior Court reversed on appeal in 2005 and remanded for an evidentiary hearing on Johnson's ineffectiveness claim. The PCRA court denied the petition again in 2010, but on appeal in 2011, the Superior Court reversed that decision and granted Johnson a new trial based on his ineffectiveness claim. However, after a rehearing en banc in 2012, the Superior Court vacated its decision and affirmed the PCRA court's denial of relief. The Pennsylvania Supreme Court denied Johnson's request for further review.

In 2013, Johnson filed a timely pro se federal habeas petition and, after being appointed counsel, filed an amended petition. In 2014, his federal counsel's investigator discovered new evidence, including affidavits by Angelo, Bennett, and Nickson—with the three eyewitnesses recanting their identifications of Johnson as the man with the pistol. Johnson also submitted a second recanting affidavit by James, who had originally recanted in 2001.[37] Their recantations are summarized below:

**James Smith.** In his 2001 affidavit, James swore that he identified Johnson's photo only because police told him that, if he did not, he would go to jail for drug offenses and murder. He "really could not recognize [Johnson] as being the person who had the pistol," but he identified Johnson anyway, partly because by the time of trial Morris's "brother had threatened [James's] life."[38] James also stated that police pointed to Johnson's photo and falsely told him that Angelo,

---

[37] I agree with the District Court that "James Smith's statements are relatively consistent from 2001 to 2014." *Johnson v. Kerestes*, 683 F. Supp. 3d 452, 486 (E.D. Pa. 2023).
[38] Suppl. App. 63, J. Aff. (Aug. 7, 2001).

Bennett, and Nickson had already picked it. In his 2014 affidavit, James reaffirmed his prior affidavit and further stated that his October 9, 1986 statement contained details that he had not witnessed. He also made specific allegations of prosecutorial misconduct. He stated that, during their pretrial witness preparation, he told the prosecutor that he was not confident that Johnson was the man with the pistol. The prosecutor threatened James with criminal charges if he recanted his identification, and told him that "it would be helpful if [he] testified that [he] saw the guy with the pistol fire some shots."[39] Afraid to anger the prosecutor and risk criminal charges, James complied.

**Angelo Smith.** In a June 2014 affidavit, Angelo stated that when he showed up to testify at trial pursuant to a subpoena, police asked if he saw the man with the pistol in the courtroom. He replied that he did not recognize anyone in the courtroom and that he "really did not get a good look at the guy's face because I was high on crack and was just starring [*sic*] at the gun in the guy's hand."[40] Angelo had told police the same thing (minus the crack use) during his interview hours after the murder. He alleged that, because he could not make an identification, police told him that his testimony was not needed. In an August 2014 affidavit, Angelo reaffirmed his prior affidavit.[41]

---

[39] J.A. 220, J. Smith Aff. (Aug. 6, 2014).

[40] J.A. 215-16, A. Smith Aff. (June 10, 2014).

[41] The only notable difference between Angelo's affidavits is that, in the second one, he clarified he could not remember whether he spoken to police or the prosecutor in the courtroom at trial.

**Opal Nickson.**  In a 2014 affidavit, Nickson swore that when she selected Johnson's photo in 1986 and testified against him at his preliminary hearing and trial, she knew he was not the man with the pistol.  She stated that, although Johnson "looked a little like the guy with the pistol," the perpetrator had darker skin.[42]  She also said police threatened her with losing her children and home if she did not pick a photo, and that, when she tried to tell the prosecutor, before trial, that she "thought that the guy with the pistol had darker skin than Kevin," the prosecutor threatened her with criminal charges.[43]  She admitted that after the murder she stayed up all night smoking crack.

**Elisha Bennett.**  In a 2014 affidavit, Bennett swore that during his 1986 interview, police kept pointing to one picture and told him that his friends had all identified that same person.[44]  He said that police threatened him with murder and drug charges if he did not pick a photo.  Bennett also admitted

---

[42] J.A. 217, Nickson Aff. (July 14, 2014).

[43] *Id.*

[44] Detective Bittenbender, who took Bennett's statement, has previously been found to have engaged in misconduct during police interviews. *See, e.g.*, *Ferber v. City of Philadelphia*, 661 A.2d 470 (Pa. Cmwlth. 1995) (discussing a civil rights lawsuit after exoneration of man convicted for first-degree murder and sentenced to death, and finding that the evidence showed Bittenbender and other police officers "manipulat[ed] witnesses to produce a sketch that was almost identical to [the suspect's] mugshot"); *Commonwealth v. Purvis*, 326 A.2d 369 (Pa. 1974) (reversing first-degree murder conviction on the grounds that Bittenbender and others had coerced suspect's confession).

14

that he had been smoking crack all night and that he had been high when he witnessed the murder and during his police interview.[45]

In 2016, after Johnson's federal case was stayed and placed in abeyance while he litigated a second PCRA petition raising *Brady* claims concerning Angelo's failed identification and Nickson's undisclosed statements and an ineffectiveness claim concerning counsel's failure to interview Angelo, police reinterviewed Angelo and Nickson. During his interview, Angelo said that he had signed the August 2014 affidavit without reading it, but he reaffirmed that he did not testify at trial after he "told the cops [he] didn't recognize the guy in the courtroom."[46] As for Nickson, who by then had suffered at least one stroke, she said she was certain that Johnson was the man with the pistol. However, in a court-approved deposition in 2019, Nickson, though suffering from memory issues, was adamant that Johnson was not the man with the pistol because his skin complexion was lighter skin than the true culprit.[47]

---

[45] It was also revealed that, since age sixteen, Bennett had suffered from epilepsy because he had been hit in the head with a baseball bat. That incident happened before the murder, and he had suffered from memory problems as a result of his "medication, seizures and street drugs and alcohol that [he had] used." Bennett admitted that his memory loss is probably why he "ha[s] no memory of testifying in court." J.A. 222–23, Bennett Aff. (Sept. 10, 2014).

[46] J.A. 356–58, A. Smith Police Interview Statement (Oct. 5, 2016).

[47] She also provided additional details about her interview that cast further doubt on the reliability of her identification. Specifically, she testified that when she returned home the

After the federal habeas action resumed,[48] in May 2019, the Philadelphia District Attorney's Office disclosed two arrest photographs of Johnson that were found buried in the Philadelphia police file on Morris's murder.[49] Those photos, which were taken by police on October 10, 1986, around thirty-six hours after the murder, show Johnson had a mustache (contrary to James's and Angelo's descriptions). The photos also include a date stamp and confirm his height (5'6") around the time of the murder. Johnson then amended and supplemented his habeas petition to include the arrest photos, and the District Court granted his motion to stay the federal proceedings so that he could file a third PCRA petition based on the newly discovered arrest photos. Johnson withdrew his PCRA petition in September 2021 before the PCRA court could address the merits.

In October 2021, Johnson and the Commonwealth, through the Philadelphia District Attorney's Office, submitted a settlement agreement for the District Court's judicial review. The agreement described Johnson's constitutional and actual innocence claims as well as the Commonwealth's concession that, if the factual allegations underlying the *Brady* claims are true, then he will have made out a meritorious claim for habeas

---

morning after the murder, police considered her a suspect, handcuffed her, and took her to the police station, where her legs remained shackled the entire time.

[48] In 2017, Johnson's second PCRA petition was dismissed as untimely on state procedural grounds. The Superior Court later affirmed the dismissal.

[49] The District Court's opinion refers to "photo" (singular) and "photos" (plural). There are two photos—a profile view and a front view.

relief based on the cumulative materiality of the suppressed evidence.[50]    Pursuant to the agreement, the Commonwealth

---

[50] State prosecutors do not violate their professional or ethical obligations by confessing error, and a confession of error does not require certainty of actual innocence. *See, e.g.*, *Glossip v. Oklahoma*, 145 S. Ct. 612, 618, 623 (2025) (reversing and remanding for new trial on petition from state court postconviction proceedings where "the attorney general did not endorse [the prisoner's] actual innocence claim" but did confess error); *Young v. United States*, 315 U.S. 257, 258–59 (1942) ("The public trust reposed in the law enforcement officers of the Government requires that they be quick to confess error when, in their opinion, a miscarriage of justice may result from their remaining silent."); *see also Commonwealth v. Brown*, 196 A.3d 130, 194 (Pa. 2018) (Dougherty, J., concurring) ("As the Attorney General cogently explains, a 'prosecutor is of course privileged to take a position on that claim; indeed, duty requires that he or she do so, in accordance with her good faith understanding of the applicable law.'" (citation omitted))).

That said, the District Attorney has never conceded, nor stipulated to, the truth of Johnson's factual allegations.  His office has consistently maintained "that the recantations are not without issue."  J.A. 320, Settlement Agreement for Habeas Relief (Oct. 14, 2021).  His office had attempted to resolve Johnson's allegations through its own investigation, but those efforts were "stymied by the fact that trial counsel was deceased, then by the fact that the novel coronavirus pandemic killed one of the eyewitnesses [Nickson], and later by the inability to interview the two other eyewitnesses [James and Angelo] and the death[s] of the fourth eyewitness [Bennett]

expressly "waiv[ed] all non-jurisdictional bars to relief, including exhaustion, in this habeas proceeding" and "concede[d] that Johnson's claims are properly before this Court."[51]   The waivers were made so that Johnson's case, "which ha[d] been in near continuous litigation for over three decades" could "reach a resolution or, if needed, be adjudicated on the merits in a forum where *all* of [his] claims could be fully and fairly considered, and without further delay."[52]   The

---

and the trial prosecutor." Appellees Reply to Amicus Br. 12.

[51] J.A. 320, Settlement Agreement for Habeas Relief (Oct. 14, 2021).

[52] J.A. 521, Resp't Reply to Amicus Curiae Br. (Mar. 9, 2023) (emphasis in original).  Before Johnson filed his third PCRA petition asserting the arrest-photos claim, the Pennsylvania Supreme Court held that, when reviewing *Brady* claims, courts must exclude from the cumulative-materiality analysis any evidence that was not presented in a timely pled *Brady* claim. *See Commonwealth v. Natividad*, 200 A.3d 11, 39 (Pa. 2019). A federal court later decided that this state procedural rule is at odds with U.S. Supreme Court precedent.  *See Natividad v. Beard*, Civ. A. No. 08-449, 2021 WL 3737201, at *12–13 (E.D. Pa. Aug. 24, 2021) (Rufe, J.); *see also Kyles v. Whitley*, 514 U.S. 419, 421 (1995) ("On habeas review, we follow the established rule that the state's obligation under *Brady v. Maryland* to disclose evidence favorable to the defense, turns on the cumulative effect of all such evidence suppressed by the government, . . . ." (citing 373 U.S. 83 (1963))).  Nevertheless, the PCRA court's materiality analysis in Johnson's case still would have excluded the evidence underlying the two *Brady* claims that were previously dismissed as untimely.  *See Natividad*, 200 A.3d at 36 n.18 (noting that the state court is not bound by Third Circuit precedent).  As a result, the parties

agreement, if approved, would vacate Johnson's conviction and permit him in state court to plead no contest to third-degree murder and other offenses, and be resentenced to a cumulative sentence of no more than ten to twenty years' imprisonment with credit for time served.[53]  In September 2022, the District Court held a status hearing, after which the court requested supplemental briefing from Johnson and Respondents and invited the Pennsylvania Attorney General to provide input as amicus curiae.    Johnson subsequently amended and supplemented his habeas petition to include an ineffectiveness claim concerning trial counsel's failure to obtain the arrest photos and use them at trial.

In July 2023, the District Court, without holding an evidentiary hearing, declined to adopt the settlement agreement.[54]    The court accepted the waivers of the

---

agreed there is only one forum where Johnson could be fairly heard on his *Brady* claims—federal court.

[53] J.A. 328, Settlement Agreement for Habeas Relief (Oct. 14, 2021).

[54] I express no opinion on the legality of so-called habeas settlements. *See* Anup Malani, *Habeas Settlements*, 92 Va. L. Rev. 1, 24 (2006) ("The legal status of habeas settlements is very much up in the air.").  *Compare Johnson*, 683 F. Supp. 3d at 461–62, *with Washington v. Sobina*, 471 F. Supp. 2d 511, 518 (E.D. Pa. 2007) (Brody, J.) (opining on "the possible value of promoting settlement negotiations in habeas corpus actions").  However, I emphasize that "our judicial obligations compel us to examine independently the errors confessed." *Young*, 315 U.S. at 258–59.  To be clear, a "habeas settlement" refers to settlement of the *merits* of the habeas claim, not the waiver of non-jurisdictional bars to habeas relief.

nonexhaustion and timeliness defenses as to Johnson's *Brady* arrest-photos claim and *Strickland* claims concerning trial counsel's failure to obtain those photos and to interview Angelo, but the court overrode the procedural-default waivers as to the *Brady* claims regarding Angelo and Nickson. The court concluded that Johnson failed to overcome the procedural defaults, and ultimately denied his habeas petition in its entirety. In doing so, the District Court appears to have conflated a waiver of a non-jurisdictional bar to habeas relief with consideration of the merits of the habeas claim.

## III.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs habeas review.[55] "Because the District Court did not hold an evidentiary hearing and relied on the state court record, we exercise plenary review."[56] Our plenary review extends to rulings on procedural default.[57] If the petitioner overcomes the default, the habeas court must exercise de novo review and consider the defaulted claim's merits.[58]

---

[55] *See* 28 U.S.C. § 2254.

[56] *Robinson v. Beard*, 762 F.3d 316, 323 (3d Cir. 2014).

[57] *Fahy v. Horn*, 516 F.3d 169, 179 (3d Cir. 2008).

[58] *See Bey v. Superintendent Greene SCI*, 856 F.3d 230, 236 (3d Cir. 2017). A rebuttable presumption of correctness attaches to the state court's factual findings: "They are 'presumed to be correct' unless the habeas petitioner rebuts the presumption 'by clear and convincing evidence.'" *Laird v. Sec'y, Pa. Dep't of Corr.*, 129 F.4th 227, 240–41 (3d Cir. 2025) (quoting 28 U.S.C. § 2254(e)(2)). "The standard is demanding but not insatiable[,]" *Miller-El v. Dretke*, 545 U.S. 231, 240

## IV.

Before I consider the merits of Johnson's constitutional claims, I first address two threshold habeas barriers—procedural default and § 2254(e)(2)—that affect the scope of review.  Johnson and the Commonwealth, through the Philadelphia District Attorney, agree that the District Court committed reversible error in overriding the Commonwealth's deliberate waivers of the procedural-default defenses to Johnson's two otherwise-defaulted *Brady* claims.  They also agree that § 2254(e)(2) does not bar a federal evidentiary hearing on Johnson's meritorious claims.  The Attorney General disagrees with both points.

This dispute is resolved by the relevant case law.  It is clear that a federal habeas court may not override a state's deliberate waiver of nonjurisdictional threshold bars. Thus, the District Court abused its discretion in rejecting the Commonwealth's procedural-default waivers.

### A.

The procedural-default rule is a nonjurisdictional "threshold bar" to federal habeas relief.[59]  It is waivable and

---

(2005), and "[t]he presumption of correctness that attaches to factual findings is stronger in some cases than in others," *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 500 (1984).

[59] *See Stokes v. Stirling*, 64 F.4th 131, 139–42 (4th Cir. 2023) (concluding that § 2254(e)(2) is "a non-jurisdictional provision"), *cert. denied*, *Stirling v. Stokes*, 144 S. Ct. 377 (2023); *Szuchon v. Lehman*, 273 F.3d 299, 321 n.13 (3d Cir.

forfeitable.[60]  For instance, "procedural default is normally a 'defense' that the State is 'obligated to raise' and 'preserv[e]' if it is not to 'lose the right to assert the defense thereafter.'"[61]

In "extraordinary circumstances," federal courts retain "the authority to resurrect only forfeited defenses."[62]  Even so,

---

2001) (recognizing that the procedural-default rule is nonjurisdictional).

[60] *See Wood v. Milyard*, 566 U.S. 463, 466, 470 n.4, 472–73 (2012); *Smith v. Horn*, 120 F.3d 400, 408–09 (3d Cir. 1997) (recognizing that procedural default is forfeitable).

"A waived claim or defense is one that a party has knowingly and intelligently relinquished; a forfeited plea is one that a party has merely failed to preserve." *Wood*, 566 U.S. at 470 n.4.

[61] *Trest v. Cain*, 522 U.S. 87, 89 (1997) (alteration in original) (quoting *Gray v. Netherland*, 518 U.S. 152, 166 (1996)).  This is consistent with the Rules Governing Section 2254 Cases in the United States District Courts (the Habeas Corpus Rules) and the Federal Rules of Civil Procedure, which "apply in the context of habeas suits to the extent that they are not inconsistent with the Habeas Corpus Rules" and AEDPA. *Woodford v. Garceau*, 538 U.S. 202, 208 (2003); Fed. R. Civ. P. 81(a)(4); Habeas Corpus Rule 12.  An answer to a habeas petition "must state whether any claim in the petition is barred by a failure to exhaust state remedies, a procedural bar, non-retroactivity, or a statute of limitations," Habeas Corpus Rule 5(b), and the relevant civil procedural rules generally require that affirmative defenses be "raised in a defendant's answer or amendment thereto," *Day v. McDonough*, 547 U.S. 198, 202 (2006) (citing Fed. R. Civ. P. 8(c), 12(b), and 15(a)).

[62] *Wood*, 566 U.S. at 471 & n.5 (citing *Day*, 547 U.S. at 198,

our precedent cautions that a court may not resurrect a forfeited procedural bar unless "the values of comity, federalism, judicial efficiency, and the 'ends of justice'" weigh in favor of doing so.[63] This is particularly true when we are the ones who spot the issue, because "[w]hile considerations of federalism and comity sometimes weigh in favor of raising such issues sua sponte, consideration of that other great pillar of our judicial system—restraint—cuts sharply in the other direction."[64]

In the context of waiver, we lack even that limited discretion. A federal habeas court has no power "to bypass, override, or excuse a State's deliberate waiver."[65] In *Wood v.*

---

201).

[63] *See Szuchon*, 273 F.3d at 321 n.13; *cf. In re Rosado*, 7 F.4th 152, 157 (3d Cir. 2021) (recognizing that an appellate court's excusing forfeiture of a habeas affirmative defense is the exception, not the norm).

[64] *Smith*, 120 F.3d at 409.

[65] *Wood*, 566 U.S. at 466 (quoting *Day*, 547 U.S. at 202); *see also, e.g.*, *Núñez-Pérez v. Escobar-Pabón*, 133 F.4th 33, 42 (1st Cir. 2025) (Barron, C.J.) (holding that "a district court has no 'discretion to take up [a] timeliness [defense]' sua sponte 'when [the government] is aware of [the] limitations defense and intelligently chooses not to rely on it,' or when the defense is 'strategically withh[e]ld" (alterations in original) (quoting *Wood*, 566 U.S. at 466, 472)); *Stokes*, 64 F.4th at 136 n.3 ("Unlike a forfeited issue, a court does not have discretion to reach an issue that a party has waived." (citing *Wood*, 566 U.S. at 471–74 & n.4)); *Alvarez v. Lopez*, 835 F.3d 1024, 1027 (9th Cir. 2016) (explaining that courts have "no discretion" under the *Wood* rule).

*Milyard*,[66] the Supreme Court held that failure to abide by this limitation, even when otherwise-extraordinary circumstances are present, is an abuse of discretion.[67] It follows that a federal court commits reversible error if it overrides a state's deliberate waiver of a nonjurisdictional threshold bar to habeas relief.[68] This rule should extend to procedural-default.[69]

A federal court's resurrection of a nonjurisdictional threshold bar, "despite the [s]tate's waiver, serve[s] no important federal interest" because in any given habeas case, "the state is in the best position to know whether, in the interest of justice, its rule needs—indeed, deserves—federal court vindication."[70] Unless the habeas court has reason to believe the state's waiver was invalid (*e.g.*, made by someone who lacked authority to make it), it is not the court's place to

---

[66] 566 U.S. 463 (2012).

[67] *Wood*, 566 U.S. at 472–73.

[68] *See Maslonka v. Hoffner*, 900 F.3d 269, 276–77 & n.1 (6th Cir. 2018) ("We will not override the state's waiver [of procedural default], because to do so would be an abuse of discretion." (citing *Wood*, 566 U.S. at 472–73)); *cf. Williams v. United States*, 879 F.3d 244, 248 (7th Cir. 2018) (stating, in a § 2255 case, that "procedural default is an affirmative defense and can itself be waived," and citing *Wood* for the proposition that "courts must respect the government's formal waivers of procedural defects in collateral cases").

[69] *See Maslonka*, 900 F.3d at 276–77 & n.1 (applying the *Wood* rule to state's procedural-default waiver); *McCormick v. Parker*, 821 F.3d 1240, 1245–45 (10th Cir. 2016) (same).

[70] *Esslinger v. Davis*, 44 F.3d 1515, 1525, 1527 (11th Cir. 1995).

question the reason for the state's deliberate waiver.[71]   Rather than undermine comity, such deference furthers comity by respecting the state's "primary authority for defining and enforcing the criminal law."[72]

### i.

I begin with the procedural-default waivers related to Johnson's two defaulted *Brady* claims.  The District Court accepted the Commonwealth's nonexhaustion waivers but overrode the procedural-default waivers on federal-state comity grounds.  However, AEDPA's exhaustion requirement furthers comity also.  Neither we nor the Supreme Court has ever distinguished procedural-default waivers from exhaustion waivers; they both reflect "the same concerns" and "must be treated the same."[73]

---

[71] *See United States v. James*, 955 F.3d 336, 344–45 (3d Cir. 2020) ("[L]itigants, not the courts, choose the facts and arguments to present.  Thus, when a party clearly chooses a particular path, it will be respected and generally not further reviewed.").

[72] *Kennedy v. Superintendent Dallas SCI*, 50 F.4th 377, 382 (3d Cir. 2022) (quoting *Engle v. Isaac*, 456 U.S. 107, 128 (1982)).

[73] *Day*, 547 U.S. at 209 (quoting *Long v. Wilson*, 393 F.3d 390, 404 (3d Cir. 2004)).  Indeed, Congress expressed *heightened* concern for comity in the exhaustion context by explicitly barring inadvertent forfeiture of exhaustion defenses.  *See* 28 U.S.C. § 2254(b)(3).    No similar provision exists for procedural default.  *See Bennett v. Superintendent Graterford SCI*, 886 F.3d 268, 281 n.11 (3d Cir. 2018).  "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is

Further, there is no dispute over the validity of the waivers.[74] Unlike most states, Pennsylvania vests local district attorneys with authority and discretion independent of the state attorney general.[75] This Pennsylvanian delegation of authority dates back to 1850, when the state legislature enacted a law imposing a duty on local district attorneys to "conduct in court all criminal prosecutions in the name of the Commonwealth, or when the State is a party, which arise in the county for which he is elected, and perform all the duties which now by law are to be performed by deputy attorney generals."[76] This

---

generally presumed that Congress acts intentionally." *Gonzalez v. Thaler*, 565 U.S. 134, 143 (2012) (quotation and alteration omitted).

[74] Otherwise, the District Court would have erred in accepting the exhaustion waivers.

[75] *See Carter v. City of Phila.*, 181 F.3d 339, 353 (3d Cir. 1999) ("[I]n Pennsylvania, unlike many other jurisdictions, the [attorney general] has no inherent authority to supersede a district attorney's decisions generally."); *Commonwealth v. Khorey*, 555 A.2d 100, 106–08 (Pa. 1989); *Commonwealth v. Carsia*, 491 A.2d 237, 242–50 (Pa. Super. 1985) (en banc) (discussing "the historical powers of the Attorney General" and noting that "Pennsylvania has been a unique jurisdiction in the nature and scope of authority granted to its Attorney General"), *aff'd*, 517 A.2d 956 (Pa. 1986); *id.* at 250–51 (explaining that the state legislature's decision to give the Attorney General limited criminal jurisdiction reflects its intent that the Attorney General not "imping[e] upon the jurisdiction and duties of the constitutionally created office of county-elected district attorney" (quotation omitted)).

[76] An Act Providing for the Election of District Attorneys, Pub.

longstanding tradition establishes that the district attorney is a "constitutional officer"[77] with authorization to represent the Commonwealth in certain matters,[78] which we have recognized include "habeas actions in federal court."[79] Comity thus prohibits us from overriding a valid waiver by a Pennsylvania district attorney.[80] Accordingly, I conclude that

---

L. No. 385, 1850 Pa. Laws 654, 654 (codified as amended at 16 P.S. § 9952). This law "was designed to clothe the district attorney with an authority independent of that of the attorney general." *Gilroy v. Commonwealth*, 105 Pa. 484, 487 (1884).

[77] *See Commonwealth v. Schab*, 383 A.2d 819, (Pa. 1978) ("In 1874, the district attorney was made a constitutional officer." (citing Pa. Const. of 1874, art. XIV, § 1)); *see also* Pa. Const. art. IX, § 4 (current version, enacted in 1968).

[78] *Schab*, 383 A.2d at 821–22 ("It would be incongruous to place a district attorney in the position of being responsible to the electorate for the performance of his duties while actual control over his performance was, in effect, in the Attorney General.").

[79] *Harris v. Pernsley*, 820 F.2d 592, 598 (3d Cir. 1987) (citing *Commonwealth ex rel. Specter v. Bauer*, 261 A.2d 573, 575–76 (Pa. 1970)); *Bauer*, 261 A.2d at 575 (recognizing that district attorneys "have the power—and the duty—to represent the Commonwealth's interests in the enforcement of its criminal laws"). The Pennsylvania Attorney General does not dispute that a local district attorney has this authority.

[80] "Comity means respect for the state's processes, and a state may choose to speak through any branch of its government," and "if the federal court refused to accept the waiver, explicit or implicit, by the state through its [authorized representative], this would be a meddlesome intrusion into the state's internal allocation of governmental authority." *See Barrera v. Young*,

the District Court abused its discretion in overriding the Commonwealth's valid procedural-default waivers and skipping a merits review of Johnson's two otherwise defaulted *Brady* claims.

## ii.

I next consider § 2254(e)(2), which governs the scope of our evidentiary review. It is also a nonjurisdictional threshold bar to federal habeas relief.[81] Plenary habeas review may include the entire state-court record if the petitioner raises credible disputes about the state court's factual findings,[82] but § 2254(e)(2) generally prohibits a federal court from holding an evidentiary hearing or "expand[ing] the state court record through far-reaching civil discovery."[83] Nevertheless, as discussed above, this nonjurisdictional threshold bar is as forfeitable (and waivable) as any other.[84]

---

794 F.2d 1264, 1269 (7th Cir. 1986) (Easterbrook, J.).

[81] *Shinn v. Ramirez*, 596 U.S. 366, 375 n.1 (2022) (analyzing § 2254(e)(2) under traditional forfeiture principles); *Stokes*, 64 F.4th at 140–42 (declining to excuse the state's forfeiture of the § 2254(e)(2) bar).

[82] "It is not significant whether the state court was specifically directed to the petitioner's evidence, so long as it was in the record." Brian R. Means, Federal Habeas Manual § 3:88 (2024 update) (first citing *Miller-El*, 545 U.S. at 241 n.2; then citing *id.* at 282–83 (Thomas, J., dissenting)).

[83] *Williams v. Superintendent Mahanoy SCI*, 45 F.4th 713, 724 (3d Cir. 2022) (citing *Holland v. Jackson*, 542 U.S. 649, 563 (2004) (per curiam); and *Shinn*, 596 U.S. at 389).

[84] *Fairchild v. Workman*, 579 F.3d 1134, 1146 (10th Cir. 2009) (finding that the state forfeited the issue of diligence under § 2254(e)(2) by failing to preserve it for appellate review); *see*

I would decline to resurrect § 2254(e)(2)'s bar. Respondents have the obligation to timely raise threshold habeas bars in district court,[85] and here they did not. The issue was not raised by either the parties or amicus before the District Court (where the District Attorney twice asked the District Court to hold an evidentiary hearing). It was not raised in the parties' (or amicus's) briefs. Indeed, even at oral argument the § 2254(e)(2) bar was not raised until *we* brought it up. Even then, the District Attorney expressly waived any argument that it applied.[86] This puts us back at square one—but this time, even if we had discretion to deny the waiver (which we do not), we still could not forgive the forfeiture without abandoning our proper judicial role.

I submit that we cannot excuse a state's failure to timely assert a habeas procedural bar unless comity, federalism, judicial economy, and the interests of justice outweigh our judicial obligation to act as impartial arbiters and exercise

---

*also Stokes*, 64 F.4th at 136 n.3, 139–42 (applying the *Wood* rule to § 2254(e)(2), but concluding that the bar was forfeited rather than waived).

[85] *See* Habeas Corpus Rule 5(b); *Day*, 547 U.S. at 202 (citing Fed. R. Civ. P. 8(c), 12(b), and 15(a)).

[86] After oral argument, we asked the parties and amicus to submit supplemental briefing on whether Johnson meets § 2254(e)(2)'s requirements, whether § 2254(e)(2) is waivable, and whether Johnson preserved his arguments concerning his eligibility for a hearing. The parties and amicus complied with our request, and the District Attorney expressly waived § 2254(e)(2)'s bar.

restraint.[87]  "[R]estraint is all the more appropriate when the appellate court itself spots an issue the parties did not air below, and therefore would not have anticipated in developing their arguments on appeal."[88]  Indeed, where the state "never raised the issue at all, in any court," we "should be even less inclined to raise it sua sponte than when the state . . . has raised the issue . . . belatedly."[89]  Otherwise, we would "come dangerously close to acting as advocates for the state rather than as impartial magistrates."[90]  To avoid an accidental violation of federal-state comity, and given the Attorney General's limited role as amicus curiae,[91] I defer to the District Attorney.  For these reasons, I do not support the sua sponte invoking of § 2254(e)(2)'s bar against Johnson.[92]  I conclude that any

---

[87] *See Szuchon*, 273 F.3d at 321 n.13.

[88] *Wood*, 566 U.S. at 473.

[89] *See Smith*, 120 F.3d at 409.

[90] *Id.*

[91] As an amicus curiae, the Attorney General "is not a party to the litigation."  *See Newark Branch, NAACP v. Town of Harrison*, 940 F.2d 792, 808 (3d Cir. 1991) (quotation omitted).  Amicus status is different than intervenor status, *see Strasser v. Doorley*, 432 F.2d 567, 569 (1st Cir. 1970), and an amicus does not necessarily have a right to intervene, *see Warren v. Comm'r*, 302 F.3d 1012, 1014–15 (9th Cir. 2002).  The Attorney General therefore cannot assume the functions of a party and "has no standing to request relief not requested by the parties."  *Newark NAACP*, 940 F.2d at 808; *see also Knetsch v. United States*, 364 U.S. 361, 370 (1960) (recognizing that courts need not address an amicus curiae's argument if it "has never been advanced by [the parties] in th[e] case").

[92] Further weighing against reviewing this issue for the first

argument that § 2254(e)(2) bars a federal evidentiary hearing on Johnson's constitutional claims, or our review of the expanded record, has been forfeited.

## V.

Thus, I have concluded that we should consider the expanded record. Before going forward, however, we have to resolve Johnson's two ineffective assistance of counsel claims, based on the existing state court record.[93] These claims concern his trial counsel's failures to consult with him before trial and to present more alibi witnesses at trial. They were reviewed under the *Strickland* standard, which is "doubly deferential" when § 2254(d) applies.[94] "[T]he question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel

---

time on appeal are the mixed questions of law and fact raised by the two distinct diligence requirements in § 2254(e)(2)'s opening clause and § 2254(e)(2)(A)(ii); the record is undeveloped and contains no factual findings on these questions. *See O'Hanlon v. Uber Techs., Inc.*, 990 F.3d 757, 763 n.3 (3d Cir. 2021) ("[A]s a 'court of review, not of first view,' we will analyze a legal issue without the district court's having done so first only in extraordinary circumstances." (citation omitted) (quoting *Frank v. Gaos*, 586 U.S. 485, 493 (2019) (per curiam))).

[93] We cannot consider the expanded record when § 2254(d)(1) deference applies. *See Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011); *see also Williams*, 45 F.4th at 724.

[94] *Laird*, 129 F.4th at 247 (quoting *Knowles v. Mirzayance*, 566 U.S. 111, 123 (2009)).

satisfied *Strickland*'s deferential standard."[95]

Johnson concedes that he is not entitled to relief on his failure-to-consult claim but argues that it should be remanded for inclusion in the cumulative-error claim. I disagree. The Superior Court's decision contains factual findings that compel me to conclude that no *Strickland* error occurred because "counsel's performance did not objectively fall short of professional standards."[96] Thus, I would affirm the dismissal of this claim and not remand it for cumulative-error review.

As for the failure-to-call-more-witnesses claim. Ineffectiveness claims concerning "uncalled witnesses are not favored in federal habeas corpus review because allegations of what a witness would have testified to are largely speculative."[97] In addition, decisions about which witnesses to call at trial are usually strategic decisions left to counsel.[98] Reviewing the state court's decision, and limited to the state-court record, I do not find its application of federal law to be unreasonable. Therefore, I would not grant habeas relief on this claim under § 2254(d)'s "highly deferential standard."[99]

---

[95] *Harrington v. Richter*, 562 U.S. 86, 105 (2011). Johnson concedes he cannot receive relief on his failure-to-consult claim under *United States v. Cronic*, 466 U.S. 648 (1984), due to AEDPA deference. I will therefore limit my review to the *Strickland* version of this claim.

[96] *Laird*, 129 F.4th at 247.

[97] *Id.* at 246.

[98] *See Diggs v. Owens*, 833 F.2d 439, 445–46 (3d Cir. 1987).

[99] *Pinholster*, 563 U.S. at 181 (omissions in original) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).

## VI.

Turning to the merits of Johnson's remaining constitutional claims,[100] when § 2254(d)(1) deference is inapplicable and the district court has denied the petition without holding an evidentiary hearing, "[w]e review de novo all questions of law, and consider all factual allegations in the light most favorable to the petitioner to determine whether he has stated a cognizable claim for habeas relief. We then determine whether an evidentiary hearing is necessary to develop the facts before us."[101] Unless Johnson's "factual allegations are 'contravened by the existing record,'"[102] we should remand for an evidentiary hearing if his "petition presents a prima facie showing which, if proven, would enable the petitioner to prevail on the merits of the asserted claim."[103]

## A.

I begin with Johnson's three *Brady* claims: (1) the suppression of Angelo Smith's failure to identify Johnson in the courtroom at trial;[104] (2) the suppression of Opal Nickson's

---

[100] The District Court correctly determined that Johnson's *Brady* claims and *Strickland* failure-to-investigate claim are subject to de novo review.

[101] *Roman v. DiGuglielmo*, 675 F.3d 204, 208 (3d Cir. 2012).

[102] *Palmer v. Hendricks*, 592 F.3d 386, 393 (3d Cir. 2010) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007)).

[103] *Id.* (citations omitted).

[104] Johnson does not claim that Angelo's 2016 statement is *Brady* material. The statement alone cannot be *Brady* material because a prosecutor has no obligation to disclose exculpatory evidence that the prosecution obtained for the first time during

statements that the real perpetrator had darker skin than Johnson; and (3) the suppression of October 10th photos of Johnson, which show he did not match the descriptions of the shooter provided by James and Angelo.

Under *Brady* and its progeny, a prosecutor has a duty to disclose all favorable evidence material to the accused's guilt, including exculpatory and impeachment evidence.[105]    The suppression of evidence favorable to the accused violates due process, "irrespective of the good faith or bad faith of the prosecution."[106]  To sustain a *Brady* claim, Johnson must show the prosecution suppressed favorable, material evidence.[107]  I agree with the District Court that the allegations, viewed in the light most favorable to Johnson under our standard of review, satisfy *Brady*'s suppression and favorability prongs. Therefore, I focus on the third requirement—materiality.

**i.**

Materiality requires "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."[108]    The test is not

---

postconviction proceedings. *See Dist. Att'y Off. for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 68–69 (2009) (recognizing that *Brady* is a "trial right" and not a "postconviction" right).

[105] *See Kyles*, 514 U.S. at 438.

[106] *Brady*, 373 U.S. at 87.

[107] *United States v. Reyeros*, 537 F.3d 270, 281 (3d Cir. 2008).

[108] *Rega v. Sec'y, Pa. Dep't of Corr.*, 115 F.4th 235, 241 (3d Cir. 2024) (omission in original) (quoting *Kyles*, 514 U.S. at 433–34).

whether the petitioner "'more likely than not' would have been acquitted had the new evidence been admitted."[109] Instead, viewing the "facts through the lens of a jury who was deprived of this information,"[110] is there "a reasonable probability that at least one juror' would have decided differently."[111] A "reasonable probability" exists if "the government's evidentiary suppression 'undermines confidence in the outcome of the trial."[112] Thus, materiality exists if there is a reasonable probability that at least one juror would have held out and voted not to convict.[113]

Moreover, after "evaluat[ing] the tendency and force of the undisclosed evidence item by item" we must "evaluate its cumulative effect for purposes of materiality separately."[114] In other words, we assess materiality "collectively, not item by item."[115] As part of our assessment, we also consider what "*competent* counsel would have" done had the prosecution not suppressed the evidence.[116]

---

[109] *Wearry v. Cain*, 577 U.S. 385, 392 (2016) (per curiam) (omissions in original) (quoting *Smith v. Cain*, 565 U.S. 73, 75 (2012)); *see also Kyles*, 514 U.S. at 434–35.

[110] *Holberg v. Guerrero*, 130 F.4th 493, 508 (5th Cir. 2025).

[111] *Id.* (quoting *Wiggins v. Smith*, 539 U.S. 510, 527 (2003)); *Wearry*, 577 U.S. at 392 n.6 (recognizing that petitioner "can prevail" on a *Brady* claim "even if . . . the undisclosed information may not have affected the jury's verdict"); *Kyles*, 514 U.S. at 434–35.

[112] *Kyles*, 514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 678).

[113] *See Holberg*, 130 F.4th at 508.

[114] *Kyles*, 514 U.S. at 437–38 n.10.

[115] *Id.* at 437.

[116] *See Wilson v. Beard*, 589 F.3d 651, 664–65 (3d Cir. 2013)

"Evidence can be material even if it 'goes only to the credibility of the witness.'"[117] Evidence directly impeaching eyewitness identifications is often material when those identifications "lack[] strong corroboration."[118]  Not "every unexplored avenue of impeachment is ipso facto material," but "there are some instances where specific impeachment evidence is so important (for issues such as identity of the culprit) that it is material for *Brady* purposes even when a witness has already been effectively impeached on other issues."[119]

### ii.

We should begin with the District Court's failure to follow Supreme Court precedent, established in *Kyles v. Whitley*[120] and since reaffirmed in *Glossip v. Oklahoma*,[121] that the materiality analysis "requires a 'cumulative evaluation' of all the evidence, whether or not that evidence is before the [c]ourt in the form of an independent claim for relief."[122]  The District Court did not assess cumulative materiality because it erroneously concluded that "there is only one piece of newly

---

(emphasis in original) (citations omitted) (quoting *Kyles*, 514 U.S. at 441).

[117] *Glossip*, 145 S. Ct. at 628 (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)).

[118] *See Johnson*, 705 F.3d at 129.

[119] *United States v. Walker*, 657 F.3d 160, 188 (3d Cir. 2011) (italics and citations omitted).

[120] 514 U.S. 419 (1995).

[121] 145 S. Ct. 612 (2025).

[122] *Glossip*, 145 S. Ct. at 629 (quoting *Kyles*, 514 U.S. at 441).

discovered, suppressed evidence that can be reviewed, i.e., the arrest photograph."[123]  This constitutes reversible error because although the arrest photo "standing alone . . . is not material,"[124] it is material when considered with the other *Brady* evidence.

### iii.

At oral argument, the Attorney General rightly pointed out that our materiality analysis must include not only the exculpatory evidence, but also the inculpatory evidence presented at trial.  So, before turning to Johnson's individual *Brady* claims, I offer some observations on that inculpatory evidence—namely, James's, Bennett's, and Nickson's eyewitness identifications.  Our precedent and Pennsylvania law agree that eyewitness identification evidence "is among the least reliable forms of evidence."[125]  Indeed, we have long appreciated that "the major cause of wrongful convictions is . . . the use of eye-witness identifications."[126]

---

[123] *Johnson*, 683 F. Supp. 3d at 474–75.

[124] *Id.* at 474.

[125] *United States v. Brownlee*, 454 F.3d 131, 141 (3d Cir. 2006) (emphasis and quotation omitted); *Commonwealth v. Walker*, 92 A.3d 766, 779 (Pa. 2014) (recognizing that eyewitness identifications are "widely considered to be one of the least reliable forms of evidence" (citing *United States v. Wade*, 388 U.S. 218, 228 (1967))).

[126] *United States ex rel. Mealey v. Delaware*, 489 F.2d 993, 996 (3d Cir. 1974) (quotation omitted); *Brownlee*, 454 F.3d at 141 ("the single most important factor leading to wrongful conviction in the United States . . . is eyewitness misidentification" (omission in original) (quoting C. Ronald Huff et al., *Guilty Until Proven Innocent: Wrongful Conviction*

In Johnson's case, the parties have identified several factors that undermine the reliability of the eyewitness identifications.  The testimony and police statements describe poor lighting conditions inside the house at nighttime,[127] the eyewitnesses' focus on the weapon,[128] their feelings of stress and fear,[129] and their minimal opportunity to observe the man with the pistol.[130]  Additionally, the recantations, coupled with Nickson's trial testimony about the other three eyewitnesses smoking crack cocaine (and Bennett's testimony that Nickson would sometimes smoke crack), establish that they all were high on crack and marijuana when they viewed the man with the pistol during the few moments before the lights went out.[131]

---

and Public Policy, 32 Crime & Delinq. 518, 524 (1986))).

[127] See Third Circuit Task Force, Report on Eyewitness Identifications, 92 Temp. L. Rev. 1, 21, 89 (2019).

[128] See Dennis, 834 F.3d at 299 n.25 ("[T]he presence of a weapon at a crime scene, 'has a consistently negative scientific impact on both feature recall accuracy and identification accuracy.'" (quoting id. at 331 (McKee, C.J., concurring))).  .

[129] See Third Circuit Task Force, supra note 127, at 79 ("There is a general agreement on the damaging effect of stress on memory.  Highly stressful situations have been demonstrated to interfere with eyewitness memory." (footnotes and citations omitted)).

[130] See id. at 86 ("There is substantial agreement among eyewitness researchers that exposure duration—the length of time that the witness has to view the event and perpetrator—can impact the accuracy of memory for that event as limited time of exposure can lead to poorer quality person descriptions." (citations and quotation omitted)).

[131] See, e.g., Commonwealth v. Drew, 459 A.2d 318, 321 (Pa.

Further, the record suggests that the police used identification procedures that studies have shown increase the risk of eyewitness misidentification.[132]  If remanded, in assessing

---

1983) ("We have consistently held that intoxication on the part of a witness at the time of an occurrence about which he has testified is a proper matter for the jury's consideration as affecting his credibility."); *see also* 1 McCormick on Evid. § 44 (7th ed. 2016) ("If the witness was under the influence at the time of the events which he testifies to or at the time he testifies, this condition is provable to impeach on cross or by extrinsic evidence.").

[132] For instance, police asked Angelo to search through a mugshot book to find a photo of the man with the pistol.  *See* Third Circuit Task Force, *supra* note 127, at 67–68 (citing studies showing that mugshot-book identifications "can negatively impact the reliability of any purported identification that results" and "may cause the witness to conflate the perpetrator with someone seen elsewhere, unduly commit to the mug-shot identification, and be less reliable at a subsequent identification procedure even if there is no mug-shot identification"). The record also suggests that the police used the same photo array for Bennett and Nickson, without shuffling the positions of the photos, *see* Third Circuit Task Force, *supra* note 127, at 64 ("If a lineup or photo array is being shown to multiple witnesses, officers should shuffle the order of the lineup members or photos to ensure that the suspect is presented in different positions for the witnesses."), that police did not use any blinding techniques when showing Nickson the photo array, *see id.* at 27–34 (discussing the importance of using blinding techniques "to prevent an officer from providing, even subconsciously, any cues to the eyewitnesses"), and that the police provided post-identification

39

materiality under *Brady*, the District Court would need to further consider the reliability of the eyewitness identifications.

**iv.**

With the relatively weak incriminating evidence in mind and viewing the factual allegations in the light most favorable to Johnson, I conclude that he has made a prima facie showing of entitlement to relief on his *Brady* claims. I address each claim in turn.

Angelo's failed identification is both exculpatory and impeaching. The prosecution's entire case rested on identifications by three eyewitnesses whose reliability is questionable due to their drug use, their focus on the gun, the poor lighting conditions, and their limited opportunity to view the man with the pistol. Angelo's failed identification of Johnson in the courtroom was particularly exculpatory because, when he tentatively identified Johnson's photo shortly after the murder, Angelo told police: "[T]hat photo I picked out looked like the guy and if it comes down to where I might see him again, I *will* identify him."[133] However, when

---

feedback to Nickson by telling her that the other three eyewitnesses had selected the same photo, *see id.* at 53 (citing studies showing that "positive post-identification feedback can inflate a witness's level of confidence and impact the witness's memory of the conditions surrounding his or her viewing of the perpetrator, including how much attention he or she paid to the perpetrator, and how good a view he or she had of the perpetrator").

[133] J.A. 197, Angelo Smith Police Interview Statement (Oct. 9, 1986) (emphasis added).

Angelo arrived to testify at trial, he was unable to identify Johnson in the courtroom. He was then told that his testimony was not needed. Had Angelo been called as a defense witness, competent counsel would have effectively used his failed identification to argue that Johnson must not be the true culprit, because if he were, Angelo would have identified him. That testimony would have directly undercut the reliability of the other eyewitnesses' identifications and raised fresh questions for the jury about their memory and perception. Regardless of whether Angelo's failed identification, standing alone, is material under *Brady*, the District Court should assess the credibility of this evidence and consider it cumulatively with the other withheld evidence.

Like Angelo's failed identification, Nickson's undisclosed statements that the true culprit's skin complexion was darker than Johnson's are exculpatory and impeaching, especially because they relate directly to "the identity of the culprit."[134]

These eyewitness weaknesses would provide fertile ground for cross-examination as would Johnson's *Brady* claim concerning the October 10, 1986 arrest photos.[135] Unlike Bennett and Nickson, who had seen only the man's facial profile, James told the jurors that he had been face-to-face with the man when James opened the front door. James had initially told police that the man with the pistol was 6'1" tall (the same

---

[134] *See Walker*, 657 F.3d at 188.

[135] Unlike Bennett and Nickson, who had seen only the man's facial profile, James told the jurors that he had been face-to-face with the man when James opened the door.

height as him) and "clean shaven."[136]   The photos show that Johnson was 5'6" tall and had a mustache—directly contradicting what James had initially told the police.  Further, had the photos been timely disclosed for use at trial to impeach James's identification—and had the prosecution responded by telling the jury that James may have been mistaken because his "encounter with the man with the pistol occurred in partial darkness"[137]—this might have only raised more questions in each juror's mind about the reliability of all three eyewitness identifications.

In terms of impeachment value, competent counsel also would have used the photos to challenge the thoroughness and adequacy of the police investigation.   "Discrediting the investigation is a crucial corollary to presenting an innocence/alibi defense:  If the defense could lead the jury to believe that the Commonwealth conducted a shoddy investigation, the jury would have been more likely to listen to and believe [the defendant's] alibi."[138]   In addition, counsel could have asked police why they never interviewed Nickson's brother, or considered any alternative suspects.[139]   Clearly, the

---

[136] J.A. 192, J. Smith Police Interview Statement (Oct. 8, 1986).  He also testified that his initial description was false and that the man was 5'7" or 5'8".

[137] *Johnson*, 683 F. Supp. 3d at 474.

[138] *See Dennis*, 834 F.3d at 313 (quotation omitted).

[139] *See* Third Circuit Task Force, *supra* note 127, at 11 ("Wrongful identification clearly can serve as the first step along a continuum of actions leading to wrongful arrest, prosecution, and conviction.  A wrongful identification often leads to the pursuance of a perceived offender, less consideration given to other possible offenders, and opens the

photos have exculpatory and impeachment value.

**a.**

For the above reasons, the District Court's item-by-item materiality assessments were flawed. Accordingly, I would reverse the District Court's decision on Johnson's *Brady* claims and remand for an evidentiary hearing.

**B.**

Johnson's remaining ineffectiveness claims challenging trial counsel's failure to investigate by not obtaining his arrest photos and not interviewing Angelo are enlightened by my materiality discussion. For the first *Strickland* prong, the District Court correctly determined that Johnson had shown deficient performance by counsel "acted unreasonably in failing to interview Angelo Smith"[140] and "fail[ing] to secure the arrest photo."[141] However, the court concluded that Johnson had failed to show prejudice under the second *Strickland* prong. The *Strickland* prejudice and *Brady* materiality standards are essentially the same.[142] Because I

---

door for a myriad of missteps to be made." (quotation omitted)).

[140] *Johnson*, 683 F. Supp. 3d at 482, 484. I agree with the District Court that "in a case where eyewitness testimony was the only form of evidence inculpating a defendant, counsel's failure to interview any of the eyewitnesses was unreasonable, even where counsel ultimately subjected the witnesses to extensive cross examination at trial." *Id.* at 476 (first citing *Bryant v. Scott*, 28 F.3d 1411, 1415 (5th Cir. 1994); then citing *Lawrence v. Armontrout*, 900 F.2d 127, 130 (8th Cir. 1990)).

[141] *Id.* at 484.

[142] *See Bagley*, 473 U.S. at 682–83.

conclude that the District Court erred in its materiality analysis under *Brady*, I also conclude that it erred in assessing Johnson's failure-to-investigate claim for prejudice under *Strickland*.

## C.

Finally, I submit that we must reach Johnson's cumulative-error claim.[143]  Our review is de novo.[144]  We must exclude from our review any errors that do not rise to the level of federal constitutional error.[145]  As a result, we may consider only the errors relating to *Brady* and trial counsel's failure to

---

[143] This is "a standalone claim asserting the cumulative effect of errors at trial that so undermined the verdict as to constitute a denial of [Johnson's] constitutional right to due process." *Collins v. Sec'y Pa. Dep't of Corr.*, 742 F.3d 528, 542 (3d Cir. 2014).  If each constitutional error is deemed harmless, Johnson may still obtain relief on the standalone cumulative-error claim upon a showing of "actual prejudice." *Id.* (quoting *Fahy*, 516 F.3d at 205).  To prevail, he must show that the combination of individual constitutional errors was not harmless.  *See Fahy*, 516 F.3d at 205.  A constitutional error is harmless only if the habeas court concludes "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Mitchell v. Esparza*, 540 U.S. 12, 17–18 (2003) (quoting *Neder v. United States.*, 527 U.S. 1, 15 (1999)).  The weaker the inculpatory evidence, the more likely the error was harmful, *see Marshall v. Hendricks*, 307 F.3d 36, 68–69 (3d Cir. 2002), and "in cases of grave doubt as to harmlessness the petitioner must win," *O'Neal v. McAninch*, 513 U.S. 432, 437 (1995).
[144] *See Littlejohn v. Royal*, 875 F.3d 548, 568 (10th Cir. 2017).
[145] *See Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007).

investigate under *Strickland*.  I conclude that, when viewing the evidence in the light most favorable to Johnson, the record does not contravene his prima facie showing of entitlement to habeas relief on his cumulative-error claim.

## VII.

For the above reasons, I respectfully dissent.